# EXHIBIT 1

Private and Confidential

DATED 20 DECEMBER 2016

(1)   **CFL MOMENTUM BEHEER B.V.**
      **C.V. CFL MOMENTUM**

      (as Borrowers)

(2)   **CANADA FEEDER LINES B.V.**
      **CFL OFFSHORE PARTICIPATIONS II B.V.**

      (as Guarantors)

(3)   **THE FINANCIAL INSTITUTIONS LISTED IN**
      **SCHEDULE 1 PART II**
      (as Lenders)

(4)   **ICON AGENT, LLC**
      (as Arranger)

(5)   **ICON AGENT, LLC**
      (as Agent)

(6)   **ICON AGENT, LLC**
      (as Security Agent)

# FACILITY AGREEMENT
## TERM LOAN FACILITY FOR UP TO US$7,400,000

EXECUTION VERSION

REFERENCE RAW/CEH/243795.00019

Reed Smith LLP
The Broadgate Tower
20 Primrose Street
London EC2A 2RS
Phone:  +44 (0) 20 3116 3000
Fax:  +44 (0) 20 3116 3999
DX1066 City / DX18 London

reedsmith.com

**ReedSmith**

EME_ACTIVE-564940718.11-CEHENDER 12/20/2016 4:04 AM

# EXHIBIT 1

**CONTENTS**

**CLAUSE**

BACKGROUND ................................................................................................................. 1

1.     DEFINITIONS AND INTERPRETATION ................................................................. 1

2.     THE FACILITY ..................................................................................................... 20

3.     PURPOSE ............................................................................................................ 20

4.     CONDITIONS OF UTILISATION .......................................................................... 20

5.     UTILISATION ...................................................................................................... 21

6.     REPAYMENT ....................................................................................................... 23

7.     PREPAYMENT AND CANCELLATION .................................................................. 24

8.     INTEREST ............................................................................................................ 27

9.     INTEREST PERIODS ............................................................................................ 27

10.    FEES .................................................................................................................... 28

11.    TAX GROSS UP AND INDEMNITIES ................................................................... 28

12.    INCREASED COSTS ............................................................................................. 36

13.    OTHER INDEMNITIES ......................................................................................... 37

14.    MITIGATION BY THE LENDERS .......................................................................... 40

15.    COSTS AND EXPENSES ....................................................................................... 40

16.    GUARANTEE AND INDEMNITY .......................................................................... 41

17.    JOINT AND SEVERAL LIABILITY OF THE BORROWERS .................................... 43

18.    REPRESENTATIONS AND WARRANTIES ............................................................ 45

19.    INFORMATION UNDERTAKINGS ........................................................................ 51

20.    FINANCIAL COVENANTS .................................................................................... 53

21.    GENERAL UNDERTAKINGS ................................................................................ 53

22.    VESSEL UNDERTAKINGS .................................................................................... 57

23.    INSURANCE ......................................................................................................... 61

24.    ACCOUNTS .......................................................................................................... 66

25.    SECURITY SHORTFALL ...................................................................................... 68

26.    EVENTS OF DEFAULT ......................................................................................... 69

27.    CHANGES TO THE LENDERS .............................................................................. 73

28.    CHANGES TO THE OBLIGORS ............................................................................ 77

29.    ROLE OF THE AGENT, THE SECURITY AGENT AND THE ARRANGER ............... 78

30.    APPLICATION OF PROCEEDS ............................................................................ 93

31.    CONDUCT OF BUSINESS BY THE FINANCE PARTIES ........................................ 94

32.    SHARING AMONG THE FINANCE PARTIES ........................................................ 95

33.    PAYMENT MECHANICS ...................................................................................... 96

34.    SET-OFF .............................................................................................................. 99

EME_ACTIVE-564940718.11-CEHENDER 12/20/2016 4:04 AM

35.     NOTICES ............................................................................................... 99
36.     CALCULATIONS AND CERTIFICATES ......................................... 101
37.     PARTIAL INVALIDITY ................................................................... 101
38.     REMEDIES AND WAIVERS ............................................................ 102
39.     AMENDMENTS AND WAIVERS ..................................................... 102
40.     CONFIDENTIALITY ......................................................................... 103
41.     COUNTERPARTS .............................................................................. 107
42.     GOVERNING LAW ........................................................................... 107
43.     ENFORCEMENT ............................................................................... 107
SCHEDULE 1 THE ORIGINAL PARTIES ..................................................... 109
PART I THE OBLIGORS .................................................................................. 109
PART II THE ORIGINAL LENDERS ............................................................... 110
PART III ARRANGER, AGENT AND SECURITY AGENT ............................ 111
SCHEDULE 2 CONDITIONS PRECEDENT .................................................... 112
PART I INITIAL CONDITIONS PRECEDENT ................................................ 112
PART II CONDITIONS PRECEDENT TO UTILISATION ............................... 114
PART III CONDITIONS SUBSEQUENT .......................................................... 116
SCHEDULE 3 UTILISATION REQUEST ......................................................... 117
SCHEDULE 4 FORM OF TRANSFER CERTIFICATE .................................... 119
SCHEDULE 5 FORM OF ASSIGNMENT AGREEMENT ................................ 122
SCHEDULE 6 FORM OF COMPLIANCE CERTIFICATE ............................... 125
SCHEDULE 7 LMA FORM OF CONFIDENTIALITY UNDERTAKING ......... 126
SCHEDULE 8 TIMETABLES ............................................................................ 132
SCHEDULE 9 DETAILS OF VESSEL ............................................................... 133
EXECUTION PAGE ........................................................................................... 134

EME_ACTIVE-554940718.11-CEHENDER 12/20/2016 4:04 AM

**THIS AGREEMENT** is dated *20* December 2016

**BETWEEN:**

(1)     **CFL MOMENTUM BEHEER B.V.** a private limited liability company (*besloten vennootschap met beperkte aansprakelijkheid*) incorporated under the laws of the Netherlands having its official seat (*statutaire zetel*) in Groningen, the Netherlands and its registered address at Hoge der A 3-b, 9712 AC Groningen, the Netherlands and registered with the Dutch register under number 01169092 (the "**Legal Owner**");

(2)     **C.V. CFL MOMENTUM** a limited partnership (*commanditaire vennootschap*) established under Dutch law, having its registered address at Hoge der A 3-b, 9712 AC Groningen, the Netherlands and registered with the trade register of the chamber of commerce under number 01169500 (the "**Beneficial Owner**") represented by its sole managing partner (*beherend vennoot*), the Legal Owner;

(3)     **CANADA FEEDER LINES B.V.** a private limited liability company (*besloten vennootschap met beperkte aansprakelijkheid*) having its official seat (*statutaire zetel*) in Groningen, the Netherlands and its registered office at Hoge der A 3-b, 9712 AC Groningen, the Netherlands and registered with the Dutch register under number 02091435 ("**Guarantor A**");

(4)     **CFL OFFSHORE PARTICIPATIONS II B.V.** a private limited liability company (*besloten vennootschap met beperkte aansprakelijkheid*) having its official seat (*statutaire zetel*) in Groningen, the Netherlands and its registered office at Hoge der A 3-b, 9712 AC Groningen, the Netherlands and registered with the Dutch register under number 63736306 ("**Guarantor B**");

(5)     **THE FINANCIAL INSTITUTIONS** listed in Part II of Schedule 1 (*The Original Parties*) as Lenders (the "**Original Lenders**");

(6)     **ICON AGENT, LLC** as arranger (the "**Arranger**");

(7)     **ICON AGENT, LLC** as agent of the Finance Parties ("**Agent**"); and

(8)     **ICON AGENT, LLC** as security agent for the Finance Parties ("**Security Agent**").

**BACKGROUND**

The Lenders have agreed to make available to the Borrowers a loan facility of up to US$7,400,000 for the purpose of refinancing the purchase of the Vessel.

**IT IS AGREED** as follows:

**1.     DEFINITIONS AND INTERPRETATION**

**1.1     Definitions**

In this Agreement:

"**Account**" means the Earnings Account, the Retention Account, the Dry Dock Reserve Account or any other account, opened made or established in accordance with Clause 24.

"**Account Bank**" means, in relation to any Account, ABN Amro Bank N.V., having its official seat (*statutaire zetel*) in Amsterdam, the Netherlands and registered with the trade register of the chambers

EME_ACTIVE-564940718.11-CEHENDER 12/20/2016 4:04 AM

of commerce under number 34334259, or any other bank or financial institution approved by the Majority Lenders.

"**Account Security**" means, in relation to an Account, a deed or other instrument by the Borrowers in favour of the Security Agent in the agreed form.

"**Affiliate**" means, in relation to any person, a Subsidiary of that person or a Holding Company of that person or any other Subsidiary of that Holding Company.

"**Approved Commercial Manager**" means Industrial Project Services, LLC or any other company as the Agent may, with the authorisation of the Majority Lenders, approve in writing (such authorisation not to be unreasonably withheld).

"**Approved Flag**" means Netherlands flag or any other flag as the Agent may, with the authorisation of the Majority Lenders, approve in writing (such authorisation not to be unreasonably withheld).

"**Approved Manager**" means the Approved Commercial Manager or the Approved Technical Manager.

"**Approved Technical Manager**" means CFL Shipmanagement B.V. or any other company as the Agent may, with the authorisation of the Majority Lenders, approve in writing (such authorisation not to be unreasonably withheld).

"**Approved Shipbroker**" means Gisholt Shipping, Inc., B.V. Intershitra S&P, Compass Maritime Services LLC or such other independent sale and purchase shipbroker which the Agent has approved or appointed for the purpose.

"**Assignment Agreement**" means an agreement substantially in the form set out in Schedule 5 (*Form of Assignment Agreement*) or any other form agreed between the relevant assignor and assignee.

"**Availability Period**" means the period from and including the date of this Agreement to and including 31 December 2016.

"**Available Commitment**" means a Lender's Commitment minus:

(a)     the amount of its participation in the outstanding Loan; and

(b)     in relation to any proposed Utilisation, the amount of its participation in any Utilisation that is due to be made on or before the proposed Utilisation Date.

"**Available Facility**" means the aggregate for the time being of each Lender's Available Commitment.

"**Borrowers**" means, together, the Legal Owner and the Beneficial Owner and each a "**Borrower**".

"**Business Day**" means a day (other than a Saturday or Sunday) on which banks are open for general business in London, Amsterdam and New York.

"**Change of Control**" means:

(a)     in respect of each Borrower and Guarantor B, if it ceases to be a legally and beneficially wholly owned   Subsidiary of CFL Offshore BV; and

(b)     in respect of Guarantor A, if it ceases to be directly or indirectly or indirectly controlled by K. Koolhof Beheer B.V.

"**Charged Property**" means all of the assets of the Obligors which from time to time are, or are expressly or intended to be, the subject of the Security Documents.

"**Charter**" means the time charter dated 9 May 2011 between the Beneficial Owner and the Charterer, as amended and supplemented from time to time, whereby the Beneficial Owner has agreed to charter, and the Charterer has agreed to take on hire, the Vessel.

"**Charterer**" means Sole Transportation A/S, a company incorporated under the laws of Denmark with its registered address at Vestre Kaj 6, DK-4700 Naestved, Denmark.

"**Charterer Assignment**" means the first priority assignment of the Sub-Charter in the agreed form.

"**CISADA**" means the United Stated Comprehensive Iran Sanctions, Accountability and Divestment Act of 2010.

"**Classification**" means, the classification with the Classification Society specified in Schedule 9 or such other classification as the Agent may, with the authorisation of the Majority Lenders, approve in writing (such authorisation not to be unreasonably withheld).

"**Classification Society**" means the classification society specified in Schedule 9 or such other classification society being a member of International Association of Classification Societies as the Agent may, with the authorisation of the Majority Lenders, approve in writing (such authorisation not to be unreasonably withheld).

"**Code**" means the US Internal Revenue Code of 1986.

"**Commitment**" means:

(a)     in relation to an Original Lender, the amount set opposite its name under the heading "Commitment" in Part I of Schedule 1 (*The Original Parties*) and the amount of any other Commitment transferred to it under this Agreement; and

(b)     in relation to any other Lender, the amount of any Commitment transferred to it under this Agreement,

to the extent not cancelled, reduced or transferred by it under this Agreement.

"**Compliance Certificate**" means a certificate in the form set out in Schedule 6 (*Form of Compliance Certificate*) or otherwise in form and substance satisfactory to the Agent.

"**Confidential Information**" means all information relating to any Obligor, the Guarantor A Group, the Guarantor B Group, the Finance Documents or the Facility of which a Finance Party becomes aware in its capacity as, or for the purpose of becoming, a Finance Party or which is received by a Finance Party in relation to, or for the purpose of becoming a Finance Party under, the Finance Documents or the Facility from either:

(a)     any member of the Guarantor A Group or Guarantor B Group or any of its advisers; or

(b)     another Finance Party, if the information was obtained by that Finance Party directly or indirectly from any member of the Guarantor A Group or Guarantor B Group or any of its advisers, in whatever form, and includes information given orally and any document, electronic file or any other way of representing or recording information which contains or is derived or copied from such information but excludes information that:

- 3 -

(i)     is or becomes public information other than as a direct or indirect result of any breach by that Finance Party of Clause 40(*Confidentiality*); or

(ii)    is identified in writing at the time of delivery as non-confidential by any member of the Guarantor A Group or Guarantor B Group or any of its advisers; or

(iii)   is known by that Finance Party before the date the information is disclosed to it in accordance with paragraphs (a) or (b) above or is lawfully obtained by that Finance Party after that date, from a source which is, as far as that Finance Party is aware, unconnected with the Guarantor A Group or Guarantor B Group and which, in either case, as far as that Finance Party is aware, has not been obtained in breach of, and is not otherwise subject to, any obligation of confidentiality.

"**Confidentiality Undertaking**" means a confidentiality undertaking substantially as set out in Schedule 7 (*LMA Form of Confidentiality Undertaking*) or in any other form agreed between the Borrowers and the Agent.

"**Corresponding Debt**" means any amount, other than a Parallel Debt, which an Obligor owes to a Finance Party under or in connection with the Finance Documents.

"**CTA**" *means the Corporation Tax Act 2010.*

"**Daily OPEX Cap**" means, in relation to the Vessel:

(a)     Year 1: US$3,125 per day;

(b)     Year 2: US$3,195 per day;

(c)     Year 3: US$3,260 per day; and

(d)     Year 4: US$3,330 per day.

"**Deed of Release**" means a deed releasing the Existing Security in a form acceptable to the Agent.

"**Default**" means an Event of Default or any event or circumstance specified in Clause 25.7 (*Events of Default*) which would (with the expiry of a grace period, the giving of notice, the making of any determination under the Finance Documents or any combination of any of the foregoing) be an Event of Default.

"**Default Rate**" means ten (10) per cent. per annum.

"**Delegate**" means any delegate, agent, attorney or co-trustee appointed by the Security Agent.

"**Direct Agreement**" means the deed entered into between the Borrowers, the Charterer, the Sub-Charterer, the Agent and the Security Agent in the agreed form.

"**Disruption Event**" means either or both of:

(a)     a material disruption to those payment or communications systems or to those financial markets which are, in each case, required to operate in order for payments to be made in connection with the Facility (or otherwise in order for the transactions contemplated by the Finance Documents to be carried out) which disruption is not caused by, and is beyond the control of, any of the Parties; or

(b)    the occurrence of any other event which results in a disruption (of a technical or systems-related nature) to the treasury or payments operations of a Party preventing that, or any other Party:

    (i)    from performing its payment obligations under the Finance Documents; or

    (ii)   from communicating with other Parties in accordance with the terms of the Finance Documents,

and which (in either such case) is not caused by, and is beyond the control of, the Party whose operations are disrupted.

"**Dry Dock Reserve Account**" means an account in the name of the Legal Owner with the Account Bank designated "*Momentum Scan – Dry Dock Reserve Account*" or any other account with that office of the Account Bank or another office of the Account Bank which is designated by the Agent as the "Dry Dock Reserve Account" for the purposes of this Agreement.

"**Earnings**" means, in relation to the Vessel, and a person, all money at any time payable to that person for or in relation to the use or operation of the Vessel including freight, hire and passage moneys, money payable to that person for the provision of services by or from the Vessel or under any charter commitment, requisition for hire compensation, remuneration for salvage and towage services, demurrage and detention moneys and damages for breach and payments for termination or variation of any charter commitment.

"**Earnings Account**" means an account in the name of the Beneficial Owner with the Account Bank designated "*Momentum Scan - Earnings Account*" or any other account with that office of the Account Bank or another office of the Account Bank which is designated by the Agent as the "Earnings Account" for the purposes of this Agreement.

"**Environment**" means humans, animals, plants and all other living organisms including the ecological systems of which they form part and the following media:

(a)    air (including, without limitation, air within natural or man-made structures, whether above or below ground);

(b)    water (including, without limitation, territorial, coastal and inland waters, water under or within land and water in drains and sewers); and

(c)    land (including, without limitation, land under water).

"**Environmental Claim**" means any claim, proceeding, formal notice or investigation by any person in respect of any Environmental Law.

"**Environmental Incident**" means:

(a)    any actual or threatened release, discharge or spillage of Environmentally Sensitive Material from the Vessel or any other vessel owned, operated or managed by any other Guarantor A Group member or Guarantor B Group member;

(b)    any actual or threatened incident in which Environmentally Sensitive Material is released, discharged or spilled from a vessel other than the Vessel and which involves a collision between the Vessel and such other vessel or some other incident of navigation or operating, in either case, in connection with which the Vessel is actually or potentially liable to be arrested, attached, detailed or injuncted and/or the Vessel and/or any operator or manager of the Vessel is at fault or allegedly at fault or otherwise liable to any legal or administrative action;

EME_ACTIVE-564940718.11 CEHENDER 12/20/2018 4:04 AM

(c)     any other incident in which Environmentally Sensitive Material is, or is threatened to be, released, discharged or spilled otherwise than from the Vessel and in connection with which the Vessel is actually or potentially liable to be arrested and/or which the Borrowers and/or any operator or manager of the Vessel is at fault or allegedly at fault or otherwise liable to legal or administrative action.

**"Environmental Law"** means any applicable law or regulation which relates to:

(a)     *the pollution or protection of the Environment;*

(b)     the conditions of the workplace; or

(c)     the generation, handling, storage, use, carriage, release or spillage of any substance which, alone or in combination with any other, is capable of causing harm to the Environment, including, without limitation, any waste.

**"Environmentally Sensitive Material"** means oil, oil products or any other substance or contaminates (including chemical, gas or other hazardous or noxious substance) which is considered to be (or is capable of being or becoming) polluting, toxic or hazardous.

**"Event of Default"** means any event or circumstance specified as such in Clause 26 (*Events of Default*).

**"Existing Facility Agreement"** means the facility agreement dated 22 October 2010 (as amended from time to time) and entered into between, *inter alios*, the Borrowers as borrowers and Commerzbank AG, Filiale Luxembourg as lender in respect of the Vessel.

**"Existing Indebtedness"** means, at any date, the outstanding Financial Indebtedness of the Borrowers on that date under the Existing Facility Agreement.

**"Existing Lender"** means Commerzbank AG, Filiale Luxembourg.

**"Existing Security"** means any Security created to secure the Existing Indebtedness.

**"Facility"** means the term loan facility made available under this Agreement as described in Clause 2 (*The Facility*).

**"Facility Office"** means:

(a)     in respect of a Lender, the office or offices notified by a Lender to the Agent in writing on or before the date it becomes a Lender (or, following that date, by not less than five (5) Business Days' written notice) as the office or offices through which it will perform its obligations under this Agreement; and

(b)     in respect of any other Finance Party, the office in the jurisdiction in which it is resident for tax purposes.

**"Facility Period"** means the period from and including the date of this Agreement to and including the date on which the Total Commitments have been reduced to zero and all indebtedness of the Obligors under the Finance Documents has been fully paid and discharged.

**"FATCA"** means:

(a)     sections 1471 to 1474 of the Code or any associated regulations or other official guidance;

(b)    any treaty, law, regulation or other official guidance enacted in any other jurisdiction, or relating to an intergovernmental agreement between the US and any other jurisdiction, which (in either case) facilitates the implementation of paragraph (a) above; or

(c)    any agreement pursuant to the implementation of paragraphs (a) or (b) above with the US Internal Revenue Service, the US government or any governmental or taxation authority in any other jurisdiction.

"**FATCA Application Date**" means:

(a)    in relation to a "withholdable payment" described in section 1473(1)(A)(i) of the Code (which relates to payments of interest and certain other payments from sources within the US), 1 July 2014;

(b)    in relation to a "withholdable payment" described in section 1473(1)(A)(ii) of the Code (which relates to "gross proceeds" from the disposition of property of a type that can produce interest from sources within the US), 1 January 2017; or

(c)    in relation to a "passthru payment" described in section 1471(d)(7) of the Code not falling within paragraphs (a) or (b) above, 1 January 2017;

or, in each case, such other date from which such payment may become subject to a deduction or withholding required by FATCA as a result of any change in FATCA after the date of this Agreement.

"**FATCA Deduction**" means a deduction or withholding from a payment under a Finance Document required by FATCA.

"**FATCA Exempt Party**" means a Party that is entitled to receive payments free from any FATCA Deduction.

"**FATCA Protected Lender**" means any Lender irrevocably designated as a FATCA Protected Lender by the Borrowers' notice to that Lender and the Agent at least six months prior to the earliest FATCA Application Date for a payment by a Party to that Lender (or to the Agent for the account of that Lender).

"**Fee Letter**" means any letter or letters dated on or about the date of this Agreement between any of the Arranger, the Agent or the Security Agent and the Borrowers setting out any of the fees referred to in Clause 10 (*Fees*).

"**Finance Document**" means:

(a)    this Agreement;

(b)    any Security Document;

(c)    any Fee Letter;

(d)    any Transfer Certificate;

(e)    any Assignment Agreement; or

(f)    any other document designated as a Finance Document by the Agent and the Borrowers.

"**Finance Party**" means the Agent, the Security Agent, the Arranger or a Lender (together the "**Finance Parties**")

"**Financial Indebtedness**" means any indebtedness for or in respect of:

(a)     moneys borrowed;

(b)     any amount raised by acceptance under any acceptance credit facility or dematerialised equivalent;

(c)     any amount raised pursuant to any note purchase facility or the issue of bonds, notes, debentures, loan stock or any similar instrument;

(d)     the amount of any liability in respect of any lease or hire purchase contract which would, in accordance with GAAP, be treated as a finance or capital lease;

(e)     receivables sold or discounted (other than any receivables to the extent they are sold on a non-recourse basis);

(f)     any amount raised under any other transaction (including any forward sale or purchase agreement) having the commercial effect of a borrowing;

(g)     any derivative transaction entered into in connection with protection against or benefit from fluctuation in any rate or price (and, when calculating the value of any derivative transaction, only the marked to market value shall be taken into account);

(h)     any counter-indemnity obligation in respect of a guarantee, indemnity, bond, standby or documentary letter of credit or any other instrument issued by a bank or financial institution; and

(i)     the amount of any liability in respect of any guarantee or indemnity for any of the items referred to in paragraphs (a) to (h) above.

"**Fixed Rate**" means eight (8) per cent. per annum.

"**GAAP**" means generally accepted accounting principles in the Netherlands including IFRS.

"**General Assignment**" means the first priority assignment of the Vessel's Earnings and Insurances and any Requisition Compensation relating to the Vessel in the agreed form.

"**Guarantor A Group**" means Guarantor A and its Subsidiaries for the time being.

"**Guarantor B Group**" means CFL Offshore B.V. and its Subsidiaries for the time being.

"**Guarantors**" means, together, Guarantor A and Guarantor B (each a "**Guarantor**").

"**Holding Company**" means, in relation to a person, any other person in respect of which it is a Subsidiary.

"**IFRS**" means international accounting standards within the meaning of the IAS Regulation 1606/2002 to the extent applicable to the relevant financial statements.

"**Initial Valuation**" means the Valuation of the Vessel supplied to the Agent as a condition precedent under this Agreement on or before the Utilisation Date.

"**Insurances**" means:

(a)     any contract of insurance including entries of the Vessel in any protection and indemnity or war risk association, effected in relation to the Vessel and the Vessel's Earnings whether before or after the date of this Agreement; and

(b)     all rights and other assets relating to, or derived from, any such contracts of insurance.

"**Interest Payment Date**" means the date falling 3 months after the Utilisation Date, and each date falling quarterly thereafter, and the Termination Date.

"**Interest Period**" means, in relation to the Loan, each period determined in accordance with Clause 9 (*Interest Periods*) and, in relation to an Unpaid Sum, each period determined in accordance with Clause 8.3 (*Default interest*).

"**ISM Code**" means the International Safety Management Code for the Safe Operation of Ships and for Pollution Prevention (including the guidelines on its implementation), adopted by the International Maritime Organisation, as the same may be amended or supplemented from time to time (and the terms "**safety management system**", "**Safety Management Certificate**" and "**Document of Compliance**" have the same meanings as are given to them in the ISM Code).

"**ISPS Code**" means the International Ship and Port Facility Security Code adopted by the International Maritime Organisation (as the same may, be amended, supplemented or superseded from time to time).

"**ISSC**" means an International Ship Security Certificate issued under the ISPS Code.

"**ITA**" means the Income Tax Act 2007.

"**Legal Reservations**" means:

(a)     the principle that equitable remedies may be granted or refused at the discretion of a court and the limitation of enforcement by laws relating to insolvency, reorganisation and other laws generally affecting the rights of creditors;

(b)     the time barring of claims under the Limitation Acts, the possibility that an undertaking to assume liability for or to indemnify a person against non-payment of UK stamp duty may be void and defences of set-off or counterclaim;

(c)     the limitation of the enforcement of the terms of leases of real property by laws of general application to those leases;

(d)     similar principles, rights and remedies under the laws of any Relevant Jurisdiction; and

(e)     any other matters which are set out as qualifications or reservations as to matters of law of general application in any legal opinions supplied to the Agent as a condition precedent under this Agreement on or before the Utilisation Date.

"**Lender**" means:

(a)     any Original Lender; and

(b)     any other person which has become a Party in accordance with Clause 27(*Changes to the Lenders*),

which in each case has not ceased to be a Party in accordance with the terms of this Agreement.

"**Limitation Acts**" means the Limitation Act 1980, and the Foreign Limitation Periods Act 1984.

"**Loan**" means the loan made or to be made under the Facility or, as the context requires, the principal amount outstanding for the time being of that loan.

"**Major Casualty**" means, in relation to the Vessel, any casualty to the Vessel in respect of which the claim, inclusive of any deductible, exceeds or may exceed the Major Casualty Amount.

"**Major Casualty Amount**" means, in relation to the Vessel, US$500,000 or the equivalent in any other currency.

"**Majority Lenders**" means a Lender or Lenders whose Commitments aggregate more than $66^2/_3\%$ of the Total Commitments or, if the Total Commitments have been reduced to zero, aggregated more than $66^2/_3\%$ of the Total Commitments immediately prior to the reduction.

"**Make Whole Amount**" means an amount equal to the sum of:

(a)     2 per cent. of the principal amount to be prepaid; and

(b)     the amount of all interest which would otherwise have accrued for the period from the date of such prepayment to the date which is immediately after the second anniversary of the Utilisation Date.

"**Manager's Undertaking**" means the letter(s) of undertaking from each Approved Manager subordinating its rights and claims against the Vessel and the Borrowers to the rights of the Finance Parties, in the agreed form.

"**Market Value**" means the value of the Vessel determined in accordance with Clause 25.2 (*Valuation of Vessel*).

"**Material Adverse Effect**" means a material adverse effect on:

(a)     the business, operations, property, condition (financial or otherwise) or prospects of an Obligor; or

(b)     the ability of an Obligor to perform its obligations under the Finance Documents; or

(c)     the validity or enforceability of, or the effectiveness or ranking of any Security granted or purported to be granted pursuant to any of, the Finance Documents; or

(d)     the rights or remedies of any Finance Party under any of the Finance Documents.

"**Minimum Liquidity Amount**" means:

(a)     from the Utilisation Date to the date falling six (6) months after the Utilisation Date, US$50,000; and

(c)     at all times after the date falling six (6) months after the Utilisation Date, US$250,000.

"**Mortgage**" means the first preferred Netherlands ship mortgage granted or to be granted (as the context so requires) over the Vessel in the agreed form.

"**New Lender**" has the meaning given to that term in Clause 27 (*Changes to the Lenders*).

"**Obligors**" means the parties to the Finance Documents (other than the Finance Parties) and "**Obligor**" means any one of them.

"**OFAC**" means the Office of Foreign Assets Control of the US Department of the Treasury.

- 10 -

"**Operating Expenses**" means expenses properly and reasonably incurred by the Borrowers in connection with the ownership, operation, employment, maintenance, repair and insurance of the Vessel.

"**Original Financial Statements**" means:

(a)     in relation to the Guarantor A Group, the unaudited consolidated financial statements of the Guarantor A Group for the financial year 2015; and

(b)     in relation to the Guarantor B Group, the unaudited consolidated financial statements of the Guarantor B Group for the financial year 2015.

"**Owner Assignment**" means the first priority assignment of the Charter in the agreed form.

"**Parallel Debt**" means an Obligor's undertaking pursuant to Clause 29.29 (*Parallel Debt*).

"**Participating Member State**" means any member state of the European Union that adopts or has adopted the Euro as its lawful currency in accordance with legislation of the European Union relating to Economic and Monetary Union.

"**Party**" means a party to this Agreement (together the "**Parties**").

"**Permitted Maritime Lien**" means, in relation to the Vessel:

(a)     unless a Default is continuing, any ship repairer's or outfitter's possessory lien in respect of the Vessel for an amount not exceeding the Major Casualty Amount or the equivalent in any other currency;

(b)     any lien on the Vessel for masters, officer's or crew's wages outstanding in the ordinary course of its trading;

(c)     liens for salvage.

"**Permitted Security**" means, in relation to the Vessel, any Security over it which is:

(a)     granted by the Finance Documents;

(b)     a Permitted Maritime Lien; or

(c)     approved in writing by the Agent (on behalf of the Majority Lenders).

"**Qualifying Lender**" has the meaning given to it in Clause 11 (*Tax gross up and indemnities*).

"**Receiver**" means a receiver or receiver and manager or administrative receiver of the whole or any part of the Security Property.

"**Related Fund**" in relation to a fund (the "first fund"), means a fund which is managed or advised by the same investment manager or investment adviser as the first fund or, if it is managed by a different investment manager or investment adviser, a fund whose investment manager or investment adviser is an Affiliate of the investment manager or investment adviser of the first fund.

"**Relevant Jurisdiction**" means, in relation to an Obligor:

(a)     its jurisdiction of incorporation;

(b)     any jurisdiction where any asset subject to or intended to be subject to the Transaction Security to be created by it is situated;

(c)     any jurisdiction where it conducts its business; and

(d)     the jurisdiction whose laws govern the perfection of any of the Security Documents entered into by it.

"**Repayment Instalment**" means each scheduled instalment for the repayment of the Loan under Clause 6.1 (*Repayment*).

"**Repeating Representations**" means (a) each of the representations set out in Clauses 18.1 to 18.11 (Representations and Warranties) and (ii) any representation in any other Finance Document which is expressed to be a "Repeating Representation" or is otherwise expressed to be repeated.

"**Representative**" means any delegate, agent, manager, administrator, nominee, attorney, trustee or custodian.

"**Requisition Compensation**" means:

(a)     any and all compensation or other monies payable by reason of any act or event such as is referred to in paragraph (b) or (c) of the definition of "Total Loss"; and

(b)     all claims, rights and remedies of the relevant Borrower against the government or official authority or person or persons claiming to be or to represent a government or official authority or other entity in relation to (a) above.

"**Restricted Party**" means a person:

(a)     that is listed on, owned or controlled by a person listed on, or acting on behalf of a person listed on, any Sanctions List; or

(b)     is located, organised or resident in a Sanctioned Country;

(c)     otherwise a target of Sanctions (being a person with whom a US person or other national of a Sanctions Authority would be prohibited or restricted by law from engaging in trade, business or other activities or against whom Sanctions are otherwise directed).

"**Retention Account**" means an account in the name of the Legal Owner with the Account Bank designated "*Momentum Scan - Retention Account*" or any other account with that office of the Account Bank or another office of the Account Bank which is designated by the Agent as the "Retention Account" for the purposes of this Agreement.

"**Sanctions**" means any economic or trade sanctions, laws, regulations, embargoes, freezing provisions, prohibitions or restrictive measures relating to trading, doing business, investment, exporting, financing or making assets available (or other activities similar to or connected with any of the foregoing):

(a)     administered, enacted, enforced or imposed by law or regulation by the United States Government (including CISADA), the United Nations Security Council, the European Union or its Member States (including, without limitation, the United Kingdom and/or the French Republic), Switzerland or the respective governmental institutions and agencies of any of the foregoing, including without limitation, OFAC, the United States Department of State, and Her Majesty's Treasury (HMT) and the State Secretariat for Economic Affairs of Switzerland (SECO) (together, the "**Sanctions Authorities**"); or

- 12 -

(b)   otherwise imposed by any law or regulation (and, as regards a regulation, compliance with which is reasonable in the ordinary course of business of any Obligor);

"**Sanctioned Country**" means a country or territory that is, or whose government is, the subject of Sanctions broadly prohibiting dealings with such government, country or territory (including, without limitation, as at the Effective Date, Cuba, Iran, Burma, North Korea, Sudan and Syria).

"**Sanctions List**" means the Specially Designated Nationals and Blocked Persons list maintained by OFAC, the Consolidated List of Financial Sanctions Targets maintained by Her Majesty's Treasury, or any similar list maintained or made public by the United Nations Security Council or any of the Sanctions Authorities.

"**Secured Liabilities**" means all present and future obligations and liabilities (whether actual or contingent and whether owed jointly or severally or in any other capacity whatsoever) of each Obligor to any Finance Party under any Finance Document.

"**Secured Party**" means a Finance Party, a Receiver or any Delegate (together the "**Secured Parties**").

"**Security**" means a mortgage, charge, pledge, lien or other security interest securing any obligation of any person or any other agreement or arrangement having a similar effect.

"**Security Documents**" means:

(a)   the Mortgage;

(b)   the General Assignment;

(c)   the Share Pledge;

(d)   the Account Security;

(e)   the Owner Assignment;

(f)   the Charterer Assignment;

(g)   the Direct Agreement;

(h)   any Manager's Undertaking; and

(i)   any other document as may be executed to guarantee and/or secure any amounts owing to the Finance Parties under any Finance Document.

"**Security Period**" means the period commencing on the date of this Agreement and ending on the date on which the Agent is satisfied that there is no outstanding Commitment in force and that the Secured Liabilities have been irrevocably and unconditionally paid and discharged in full.

"**Security Property**" means:

(a)   the Transaction Security expressed to be granted in favour of the Security Agent as trustee for the Secured Parties and all proceeds of that Transaction Security;

(b)   all obligations expressed to be undertaken by an Obligor to pay amounts in respect of the Secured Liabilities to the Security Agent as trustee for the Finance Parties and secured by the Transaction Security together with all representations and warranties expressed to be given by

- 13 -

an Obligor or any other person in favour of the Security Agent as trustee for the Finance Parties; and

(c)      any other amounts or property, whether rights, entitlements, choses in action or otherwise, actual or contingent, which the Security Agent is required by the terms of the Finance Documents to hold as trustee on trust for the Secured Parties.

**"Security Requirement"** means:

(a)      up to and including the second anniversary of the Utilisation Date, 135% of the outstanding balance of the Loan; and

(b)      from the second anniversary of the Utilisation Date, 150% of the outstanding balance of the Loan.

**"Security Value"** means the Market Value of the Vessel calculated in accordance with Clause 25.2 (*Valuation of Vessel*) plus the net realisable value of additional security previously provided under Clause 24 (*Security shortfall*).

**"Shareholder"** means CFL Parts Holding B.V. a private limited liability company (*besloten vennootschap met beperkte aansprakelijkheid*) having its official seat (*statutaire zetel*) in Groningen, the Netherlands and its registered office at Hoge der A 3-b, 9712 AC Groningen, the Netherlands and registered with the Dutch register under number 01169073.

**"Share Pledge"** means the share pledge granted or to be granted (as the context so requires) by the Shareholder in favour of the Security Agent over the entire issued share capital of the Legal Owner in the agreed form.

**"Specified Time"** means a time determined in accordance with Schedule 8 (*Timetables*).

**"Sub-Charter"** means the time charter dated 16 December 2016 between the Charterer and the Sub-Charterer, as amended and supplemented from time to time, whereby the Charterer has agreed to charter, and the Sub-Charterer has agreed to take on hire, the Vessel on the terms and conditions set out therein.

**"Sub-Charterer"** means Industrial Maritime Carriers (Bermuda), Ltd., a company incorporated under the laws of Bermuda with its registered address at Clarendon House, 2 Church Street, Hamilton, Bermuda.

**"Subsidiary"** means a subsidiary undertaking within the meaning of section 1162 of the Companies Act 2006 and, in relation to a person incorporated (or established) under Dutch law, a "*dochtermaatschappij*" within the meaning of Section 2:24a of the Dutch Civil Code (regardless whether the shares or voting rights on the shares in such company are held directly or indirectly through another "*dochtermaatschappij*").

**"Tax"** means any tax, levy, impost, duty or other charge or withholding of a similar nature (including any penalty or interest payable in connection with any failure to pay or any delay in paying any of the same).

**"Termination Date"** means the date falling 48 months from the Utilisation Date.

**"Total Commitments"** means the aggregate of the Commitments being US$7,400,000 at the date of this Agreement.

**"Total Loss"** means:

- 14 -

(a)   any actual, constructive, compromised, agreed or arranged total loss of the Vessel;

(b)   any expropriation, confiscation, requisition or acquisition of the Vessel, whether or not for consideration (full, partial or nominal), which is effected by any government or official authority or by any person or persons claiming to be or to represent a government or official authority (excluding a requisition for hire for a fixed period not exceeding one (1) year without any right to an extension) unless it is within thirty (30) days redelivered to the Borrowers' full control; and

(c)   any arrest, capture, seizure or detention of the Vessel (including any hijacking or theft) unless it is within thirty (30) days redelivered to the Borrowers' full control.

**"Total Loss Date"** means:

(a)   in the case of an actual loss of the Vessel, the date on which it occurred or, if that is unknown, the date when the Vessel was last heard of;

(b)   in the case of a constructive, compromised, agreed or arranged total loss of the Vessel, the earliest of:

   (i)   the date on which a notice of abandonment is given to the insurers; and

   (ii)   the date of any compromise, arrangement or agreement made by or on behalf of the Borrowers with the Vessel's insurers in which the insurers agree to treat the Vessel as a total loss; and

(c)   in the case of any other type of total loss, on the date (or the most likely date) on which it appears to the Agent that the event constituting the total loss occurred.

**"Transaction Document"** means:

(a)   any Finance Document;

(b)   the Charter;

(c)   the Sub-Charter; and

(c)   any other document designated as such by the Agent and any Obligor.

**"Transaction Security"** means the Security created or evidenced or expressed to be created or evidenced under the Security Documents.

**"Transfer Certificate"** means a certificate substantially in the form set out in Schedule 4 (*Form of Transfer Certificate*) or any other form agreed between the Agent and the Borrowers.

**"Transfer Date"** means, in relation to an assignment or a transfer, the later of:

(a)   the proposed Transfer Date specified in the relevant Assignment Agreement or Transfer Certificate; and

(b)   the date on which the Agent executes the relevant Assignment Agreement or Transfer Certificate.

**"Unpaid Sum"** means any sum due and payable but unpaid by an Obligor under any Finance Document.

"**US Tax Obligor**" means an Obligor some or all of whose payments under the Finance Documents are from sources within the United States of America for United States federal income tax purposes.

"**Utilisation**" means an utilisation of the Facility.

"**Utilisation Date**" means the date of Utilisation, being the date on which the Loan is to be made.

"**Utilisation Request**" means a notice substantially in the form set out in Schedule 3 (*Utilisation Request*).

"**Valuation**" means a vessel valuation prepared:

(a)     as at a date not more than 14 days previously;

(b)     by an Approved Shipbroker;

(c)     with or without physical inspection of the vessel (as the Agent may require);

(d)     on the basis of a sale for prompt delivery for cash on normal arm's length commercial terms as between a willing seller and a willing buyer, free of any existing charter or other contract of employment; and

(e)     after deducting the estimated amount of the usual and reasonable expenses which would be incurred in connection with the sale.

"**VAT**" means:

(a)     any tax imposed in compliance with the Council Directive of 28 November 2006 on the common system of value added tax (EC Directive 2006/112); and

(b)     any other tax of a similar nature, whether imposed in a member state of the European Union in substitution for, or levied in addition to, such tax referred to in paragraph (a) above, or imposed elsewhere.

"**Vessel**" means m.v. MOMENTUM SCAN" IMO No. 9534432, details of which are set out in Schedule 9.

**1.2     Construction**

(a)     Unless a contrary indication appears, a reference in this Agreement to:

(i)     the "**Account Bank**", the "**Agent**", the "**Arranger**", any "**Finance Party**", any "**Lender**", any "**Obligor**", any "**Party**", any "**Secured Party**", the "**Security Agent**" or any other person shall be construed so as to include its successors in title, permitted assigns and permitted transferees to, or of, its rights and/or obligations under the Finance Documents and, in the case of the Security Agent, any person for the time being appointed as Security Agent or Security Agents in accordance with the Finance Documents;

(ii)     an "**agency**" of a state includes any local or other authority, self-regulating or other recognised body or agency, central or federal bank, department, government, legislature, minster, ministry, self-regulating organisation, official or public or statutory person (whether autonomous or not) or, or of, the government of, that state or political sub-division in or of that state;

- 16 -

(iii) a document in "**agreed form**" is a document which is previously agreed in writing by or on behalf of the any Obligor party to it and the Agent or, if not so agreed, is in the form and substance specified by the Agent;

(iv) "**approved**" means approved in writing by the Agent;

(v) "**assets**" includes present and future properties, revenues and rights of every description;

(vi) "**authorisation**" means an authorisation, consent, approval, resolution, licence, exemption or by a person by whom the same is required by law;

(vii) "**disposal**" includes a sale, transfer, assignment, grant, lease, licence, declaration of trust or other disposal, whether voluntary or involuntary, and "**dispose**" will be construed accordingly;

(viii) the "**equivalent**" of an amount specified in a particular currency ("**specific currency amount**") shall be construed as a reference to the amount of the other relevant currency which can be purchased with the specific currency amount in the London foreign exchange market at 11 am on the date the calculation falls to be made for spot delivery, as conclusively determined by the Agent (with the relevant exchange rate of such purchase being the "**Agent's spot rate of exchange**");

(ix) "**excess risks**" means, in relation to the Vessel, the proportion (if any) of claims for general average, salvage and salvage charges not recoverable under the hull and machinery insurances in respect of the Vessel in consequence of the value at which the Vessel is assessed for the purpose of such claims exceeding its insured value;

(x) "**excess war risk P&I cover**" means, in relation to the Vessel, cover for claims only in excess of amounts recoverable under the usual war risk cover including (but not limited to) hull and machinery, crew and protection and indemnity risks;

(xi) a "**Finance Document**" or "**Transaction Document**" or any other agreement or instrument is a reference to that Finance Document or Transaction Document or other agreement or instrument as amended, novated, supplemented, extended or restated;

(xii) "**guarantee**" means any guarantee, letter of credit, bond, indemnity or similar assurance against loss, or any obligation, direct or indirect, actual or contingent, to purchase or assume any indebtedness of any person or to make an investment in or loan to any person or to purchase assets of any person where, in each case, such obligation is assumed in order to maintain or assist the ability of such person to meet its indebtedness;

(xiii) "**indebtedness**" includes any obligation (whether incurred as principal or as surety) for the payment or repayment of money, whether present or future, actual or contingent;

(xiv) "**month**" means a period starting on one day in a calendar month and ending on the numerically corresponding day in the next calendar month, except that:

- 17 -

        (A)    if the numerically corresponding day is not a Business Day, that period shall end on the next Business Day in that calendar month in which that period is to end if there is one, or if there is not, on the immediately preceding Business Day;

        (B)    if there is no numerically corresponding day in the calendar month in which that period is to end, that period shall end on the last Business Day in that calendar month; and

        (C)    the above rules will only apply to the last month of any period.

(xv)    "**obligatory insurances**" means all insurances effected, or which the Borrowers are required to effect, under Clause 23 (*Insurance*) or any other provision of any Finance Document;

(xvi)    a "**person**" includes any individual, firm, company, corporation, government, state or agency of a state or any association, trust, joint venture, consortium or partnership (whether or not having separate legal personality);

(xvii)    a "**policy**" in relation to any insurance, includes a slip, cover note, certificate of entry or other document evidencing the contract of insurance or its terms;

(xviii)    "**protection and indemnity risks**" means the usual risks covered by a protection and indemnity association that is a member of the International Group of P&I Clubs, including pollution risks and the proportion (if any) of any sums payable to any other person or persons in case of collision which are not recoverable under the hull and machinery policies by reason of the incorporation in them of clause 6 of the International Time Clauses (Hulls)(1/11/02 or 1/11/03) or clause 8 of the Institute Time Clauses (Hulls) (1/10/83) or the Institute Amended Running Down Clause (1/10/71) or any equivalent provision;

(xix)    a "**regulation**" includes any regulation, rule, official directive, request or guideline (whether or not having the force of law) of any governmental, intergovernmental or supranational body, agency, department or of any regulatory, self-regulatory or other authority or organisation;

(xx)    "**war risks**" includes the risk of mines and all risks excluded by clause 29 of the Institute Hull Clauses (1/11/02 or 1/11/03) or clause 24 of the Institute Time clauses (Hulls) (1/11/1995) or clause 23 of the Institute Time Clauses (Hulls) (1/10/83);

(xxi)    words importing the plural shall include the singular and vice versa and words importing a gender shall include every gender;

(xxii)    a provision of law is a reference to that provision as amended or re-enacted; and

(xxiii)    a time of day is a reference to London time.

(b)    Section, Clause and Schedule headings are for ease of reference only.

EME_ACTIVE-564940718.11-CEHENDER 12/20/2016 4:04 AM

(c)    Unless a contrary indication appears, a term used in any other Finance Document or in any notice given under or in connection with any Finance Document has the same meaning in that Finance Document or notice as in this Agreement.

(d)    A Default (other than an Event of Default) is "**continuing**" if it has not been remedied or waived and an Event of Default is "**continuing**" if it has not been waived.

### 1.3 Currency symbols and definitions

"**$**", "**US$**" and "**Dollars**" denote the lawful currency of the United States of America.

### 1.4 Third Party Rights

(a)    Unless expressly provided to the contrary in a Finance Document a person who is not a Party has no right under the Contracts (Rights of Third Parties) Act 1999 (the "**Third Parties Act**") to enforce or to enjoy the benefit of any term of this Agreement.

(b)    Notwithstanding any term of any Finance Document the consent of any person who is not a Party is not required to rescind or vary this Agreement at any time.

(c)    Any Receiver, Delegate or any person described in Clause 1.1 (*Definitions*) may, subject to this Clause 1.4(c) and the Third Parties Act, rely on any Clause of this Agreement which expressly confers rights on it.

### 1.5 Dutch Terms

In this Agreement, where it relates to a Dutch entity, or Dutch security, a reference to:

(a)    a necessary action to authorise where applicable, includes without limitation:

    (i)    any action required to comply with the Works Councils Act of the Netherlands (*Wet op de ondernemingsraden*); and

    (ii)    obtaining an unconditional positive advice (*advies*) from the competent works council(s) if a positive advice is required pursuant to the Dutch Works Councils Act (*Wet op de ondernemingsraden*);

(b)    gross negligence means *grove schuld*;

(c)    negligence means *schuld*;

(d)    a security interest includes any mortgage (*hypotheek*), pledge (*pandrecht*), retention of title arrangement (*eigendomsvoorbehoud*), privilege (*voorrecht*), right of retention (*recht van retentie*), right to reclaim goods (*recht van reclame*), and, in general, any right in rem (*beperkt recht*), created for the purpose of granting security (*goederenrechtelijk zekerheidsrecht*);

(e)    wilful misconduct means *opzet*;

(f)    a winding-up, administration or dissolution (and any of those terms) includes a Dutch entity being declared bankrupt (*failliet verklaard*) or dissolved (*ontbonden*);

(g)    a moratorium includes *surseance van betaling* and if a moratorium is declared or occurs includes *surseance verleend*;

(h) any step or procedure taken in connection with insolvency proceedings includes a Dutch entity having filed a notice under Section 36 of the Dutch Tax Collection Act (*Invorderingswet 1990*);

(i) an administrative receiver or receiver includes a *curator*;

(j) an administrator includes a *bewindvoerder*;

(k) an attachment includes a *beslag*;

(l) a merger includes a *juridische fusie;*

(m) a demerger includes a *juridische splitsing*; and

(n) financial assistance means any action or contemplated action prohibited by a *naamloze vennootschap*, section 2:98(c) of the Dutch Civil Code.

## 2.   THE FACILITY

### 2.1   The Facility

Subject to the terms of this Agreement, the Lenders make available to the Borrowers a Dollars term loan facility in an amount equal to the lower of (i) the Total Commitments and (ii) 60% of the Market Value of the Vessel.

### 2.2   Finance Parties' rights and obligations

(a) The obligations of each Finance Party under the Finance Documents are several. Failure by a Finance Party to perform its obligations under the Finance Documents does not affect the obligations of any other Party under the Finance Documents. No Finance Party is responsible for the obligations of any other Finance Party under the Finance Documents.

(b) The rights of each Finance Party under or in connection with the Finance Documents are separate and independent rights and any debt arising under the Finance Documents to a Finance Party from an Obligor shall be a separate and independent debt.

(c) A Finance Party may, except as otherwise stated in the Finance Documents, separately enforce its rights under the Finance Documents.

## 3.   PURPOSE

### 3.1   Purpose

The Borrowers shall apply all amounts borrowed by under the Facility for the purpose of refinancing the outstanding debt in relation to the Vessel and for general corporate purposes only.

### 3.2   Monitoring

No Finance Party is bound to monitor or verify the application of any amount borrowed pursuant to this Agreement.

## 4.   CONDITIONS OF UTILISATION

EME_ACTIVE-564940718.11-CEHENDER 12/20/2016 4:04 AM

**4.1**     **Initial conditions precedent**

The Borrowers may not deliver an Utilisation Request unless the Agent, or its duly authorised representative, has received all of the documents and other evidence listed in Schedule 2, Part I (*Conditions Precedent to Utilisation Request*) in form and substance satisfactory to the Agent.  The Agent shall notify the Obligors and the Lenders promptly upon being so satisfied.

**4.2**     **Utilisation conditions precedent**

The Lenders will only be obliged to comply with Clause 5.4(a) (*Lenders' participation*) in relation to the Utilisation if:

(a)     in the case of the Utilisation Date (and prior to the Utilisation), the Agent has received all of the documentation and other evidence listed in Schedule 2, Part II (*Conditions Precedent to Utilisation*) in form and substance satisfactory to the Agent;

(b)     on the date of the Utilisation Request and on the proposed Utilisation Date:

(i)     no Default is continuing or would result from the proposed Utilisation;

(ii)     all representations and warranties under any of the Finance Documents made or to be made by an Obligor are true and accurate as at that date with reference to the facts and circumstances then existing; and

(iii)     the Vessel has not been the subject of sale or Total Loss;

(c)     immediately following the making of the proposed Utilisation, the Security Value would be less than the Security Requirement; and

(d)     the Agent is satisfied that the Utilisation requested shall not exceed the Total Commitments.

**4.3**     **Waiver of Conditions Precedent**

If the Agent, acting upon the instructions of the Majority Lenders (which authorisation the relevant Lenders shall have full power to withhold), permits a Utilisation of the Facility before certain of the conditions referred to at Clause 4.1 and/or Clause 4.2 are satisfied, the Borrowers shall ensure that such conditions are satisfied with five (5) Business Days after the Utilisation Date (or such longer period as the Agent may, with the authorisation of the Majority Lenders, specify) and any failure of the Borrowers to do so within that period shall constitute an Event of Default.

**4.4**     **Conditions Subsequent**

The Borrowers undertake to deliver or to cause to be delivered to the Agent within ninety (90) days after the Utilisation Date the relevant additional documents and other evidence listed in Part III of Schedule 2 (*Conditions Subsequent*).

**5.**     **UTILISATION**

**5.1**     **Delivery of a Utilisation Request**

The Borrowers may utilise the Facility by delivery to the Agent of a duly completed Utilisation Request not later than the Specified Time.

**5.2**     **Completion of a Utilisation Request**

EME_ACTIVE-564940718.11-CEHENDER 12/20/2016 4:04 AM

(a)     An Utilisation Request is irrevocable and will not be regarded as having been duly completed unless:

      (i)     it specifies the purpose of the Loan;

      (ii)     the proposed Utilisation Date is a Business Day within the Availability Period;

      (iii)     the currency and amount of the Utilisation comply with Clause 5.3 (*Currency and amount*);

      (iv)     it specifies the account and bank to which the proceeds of the Loan are to be credited;

      (v)     the proposed Interest Period complies with Clause 9 (*Interest Periods*).

### 5.3    Currency and amount

(a)     The currency specified in the Utilisation Request must be Dollars.

(b)     The amount of the proposed Utilisation must be an amount which is not more than the Available Facility or, if lower, 60% of the Market Value of the Vessel.

### 5.4    Lenders' participation

(a)     If the conditions set out in this Agreement have been met, each Lender shall make its participation in the Loan available by the Utilisation Date through its Facility Office.

(b)     The amount of each Lender's participation in the Loan will be equal to the proportion borne by its Available Commitment to the Available Facility immediately prior to making the Loan. No Lender is obliged to participate in the Loan if, as a result, its share in the Loan then outstanding or in respect of which the Utilisation Request has been issued would exceed its Commitment.

(c)     The Agent shall notify each Lender of the amount of the Loan and the amount of its participation in that Loan by the Specified Time.

### 5.5    Disbursement

The Agent shall, on the Utilisation Date, pay to, and for the account of, the Borrowers the amount which the Agent receives from the Lenders in respect of the Utilisation, such payment to be made in like funds as the Agent so receives from the Lenders to the account of the Borrowers or to such other account as the Borrowers may specify in the Utilisation Request.

### 5.6    Disbursement of Advance to third party

A payment by the Agent under Clause 5.5 (*Disbursement*) to a person other than the Borrowers shall constitute the making of the Loan and the Borrowers shall at that time become indebted, as principal and direct obligor, to each Lender in an amount equal to that Lender's participation in the Loan.

### 5.7    Prepositioning of funds

If, in respect of the Utilisation of the Loan, the Agent, at the request of the Borrowers and on terms acceptable to the Agent (acting on the instructions all Lenders, which approval they shall have full power to withhold), prepositions funds on suspense with a Dutch notary

nominated by the Existing Lender and approved by the Agent (in its sole discretion) ("**Escrow Agent**") as directed by the Borrowers in the Utilisation Request (the date of such preposition, the "**Preposition Date**"):

(a)    each Lender agrees to fund its participation in the Loan on a day not more than one (1) Business Day after the Agent confirms receipt of:

    (i)    a validly served Utilisation Request; and

    (ii)    all of the documentation and other evidence listed in Schedule 2, Part II (*Conditions Precedent to Utilisation*) in form and substance satisfactory to the Agent, other than as specified at paragraph 4(a) of Schedule 2, Part II (the "**Mortgage Registration CP**");

(b)    each Lender and each Borrower acknowledges and agrees that the Agent shall be entitled to issue a notarial letter or other similar communication in form and substance acceptable to the Agent (acting on instructions of all Lenders) to stipulate that such funds shall be held by the Escrow Agent in accordance with the terms of such notarial letter and shall not be released until the Agent has received evidence that the Existing Security has been released and discharged and Mortgage Registration CP is satisfied;

(c)    each Borrower shall, without duplication, indemnify each Finance Party against any costs, loss or liability it may incur in connection with such arrangement;

(d)    the date on which the Lenders fund the Loan for the purposes of transfer to the Escrow Agent constitutes the Utilisation Date and each Borrower agrees to pay interest on the amount of the funds so prepositioned at the rate described in Clause 8.1 (*Calculation of interest*) on the basis of successive interest periods of one day and so that interest shall be paid together with the first payment of interest on the Loan after the Utilisation Date in respect of it or, if such Utilisation Date does not occur, within three (3) Business Days of demand by the Agent; and

(e)    if the Existing Security is not released and discharged and the Mortgage Registration CP satisfied by 3.00 p.m. (CET) on the Utilisation Date requested in the Utilisation Request and the proceeds of the Loan are returned to the Agent who shall return them to the Lenders:

    (i)    the Borrowers shall pay all accrued interest and fees in respect of such returned proceeds on the date such proceeds are returned to the Agent; and

    (ii)    the Borrowers may submit a further Utilisation Request for re-advance of the Loan during the Availability Period if:

        (A)    all Lenders consent in writing thereto;

        (B)    the Borrowers have not previously submitted a reissued Utilisation Request for re-advance of the Loan pursuant to this Clause 5.7 (*Prepositioning of funds*); and

        (C)    the Borrowers procure that the Agent is provided with such confirmations of the continuing effectiveness of the terms of the Finance Documents as the Agent may require.

6.    **REPAYMENT**

6.1 **Repayment**

The Borrowers shall repay the Loan in sixteen (16) equal consecutive 3-monthly instalments each in the following amounts:

    (i)      Instalments 1-4: US$145,000;

    (ii)     Instalments 5-8: US$165,000;

    (iii)    Instalments 9-12: US$185,000;

    (iv)    Instalments 13-16: US$200,000.

Such instalments shall be paid on each Interest Payment Date; provided that the first instalment shall be paid no later than the end of the month in which the first Interest Payment Date falls. The balance of the Loan shall be repaid on the Termination Date as a balloon payment.

6.2 **Reborrowing**

The Borrowers may not reborrow any part of the Facility which is repaid.

6.3 **Adjustment of Repayment Instalments**

If the Commitment is not utilised in full, the amount of each Repayment Instalment shall be reduced accordingly.

7. **PREPAYMENT AND CANCELLATION**

7.1 **Illegality**

If, in any applicable jurisdiction, it becomes unlawful for any Lender to perform any of its obligations as contemplated by this Agreement or to fund or maintain its participation in the Loan or any part of the Loan or it becomes unlawful for any Affiliate of a Lender for that Lender to do so:

    (a)    that Lender shall promptly notify the Agent upon becoming aware of that event;

    (b)    upon the Agent notifying the Borrowers, the Commitment of that Lender will be immediately cancelled; and

    (c)    the Borrowers shall repay that Lender's participation in the Loan on the last day of the Interest Period for the Loan occurring after the Agent has notified the Borrowers or, if earlier, the date specified by the Lender in the notice delivered to the Agent (being no earlier than the last day of any applicable grace period permitted by law).

7.2 **Change of Control**

If a Change of Control occurs, then:

    (a)    the Borrowers shall promptly notify the Agent upon becoming aware of that event;

    (b)    a Lender shall not be obliged to fund a Utilisation; and

    (c)    if the Majority Lenders so require the Agent shall, by not less than fourteen (14) days' notice to the Borrowers, declare the Loan, together with accrued interest, and all other

amounts accrued under the Finance Documents immediately due and payable, whereupon the Total Commitments will be cancelled and all such outstanding amounts will become immediately due and payable.

**7.3     Mandatory prepayment**

(a)     If the Vessel is sold or becomes a Total Loss, the Borrowers shall be obliged to prepay the Loan:

(i)     if the Vessel is sold, on or before the date on which the sale is completed by delivery of the Vessel to the buyer;

(ii)     if the Vessel becomes a Total Loss, on the earlier of the date falling ninety (90) days after the Total Loss Date and the date of receipt by the Agent of the proceeds of insurance relating to such Total Loss.

(b)     Provided always that no Default shall have occurred, any proceeds of the sale or Total Loss of the Vessel after the mandatory prepayments in (i) and (ii) above have been made, and that there are no other amounts due and payable that remain outstanding under the Finance Documents, shall be released to the Borrowers.

**7.4     Automatic cancellation**

The unutilised Commitment (if any) of each Lender shall be automatically cancelled at the end of the Availability Period.

**7.5     Voluntary prepayment**

(a)     The Borrowers may, upon giving to the Agent not less than ten (10) Business Days' (or such shorter period as the Majority Lenders may agree) prior notice, prepay the whole or any part of the Loan (but, if in part, being an amount that reduces the amount of the Loan by a minimum amount of US$500,000 or multiple thereof).

(b)     The Loan may only be prepaid after the date falling two (2) years after the Utilisation Date.

(c)     Any partial prepayments under this Clause 7.5 shall be applied against the Repayment Instalments and the balloon payment payable on the Termination Date first by reduction of the balloon and then against Repayment Instalments in inverse chronological order.

**7.6     Right of prepayment and cancellation in relation to a single Lender**

(a)     If:

(i)     any sum payable to any Lender by an Obligor is required to be increased under paragraph 11.2(c) of Clause 11.2 (*Tax gross-up*);

(ii)     any Lender claims indemnification from the Borrowers under Clause 11.3(*Tax indemnity*) or Clause 12 (*Increased costs*); or

(i)     any FATCA Protected Lender notifies the Agent of a FATCA Event pursuant to Clause 7.7 (*Mandatory repayment and cancellation of FATCA Protected Lenders*),

the Borrowers may, whilst the circumstance giving rise to the requirement for that increase or indemnification or FATCA Deduction continues, give the Agent notice of cancellation of the Commitment of that Lender and its intention to procure the repayment of that Lender's participation in the Loan.

(b) On receipt of a notice of cancellation referred to in paragraph (a) above, the Commitment of that Lender shall immediately be reduced to zero.

(c) On the last day of each Interest Period which ends after the Borrowers have given notice of cancellation under paragraph (a) above (or, if earlier, the date specified by the Borrowers in that notice), the Borrowers shall repay that Lender's participation in the Loan.

**7.7    Mandatory repayment and cancellation of FATCA Protected Lenders**

If on the date falling 6 months before the earliest FATCA Application Date for any payment by a Party to a FATCA Protected Lender (or to the Agent for the account of that Lender), that Lender is not a FATCA Exempt Party and, in the opinion of that Lender (acting reasonably), that Party will, as a consequence, be required to make a FATCA Deduction from a payment to that Lender (or to the Facility Agent for the account of that Lender) on or after that FATCA Application Date (a "**FATCA Event**"):

(a) that Lender shall, reasonably promptly after that date, notify the Facility Agent of that FATCA Event and the relevant FATCA Application Date;

(b) if, on the date falling one month before such FATCA Application Date, that FATCA Event is continuing and that Lender has not been repaid or replaced pursuant to Clause 7.6 (*Right of repayment and cancellation in relation to a single Lender*):

(i) that Lender may, at any time between 1 month and 2 weeks before such FATCA Application Date, notify the Agent;

(ii) upon the Facility Agent notifying the Borrowers, the Commitment(s) of that Lender will be immediately cancelled; and

(iii) the Borrowers shall repay that Lender's participation in the Loan made to the Borrowers on the last day of the Interest Period for the Loan occurring after the Agent has notified the Borrowers or, if earlier, the last Business Day before the relevant FATCA Application Date.

**7.8    Restrictions**

(a) Any notice of cancellation or prepayment given by any Party under this Clause 7 shall be irrevocable and, unless a contrary indication appears in this Agreement, shall specify the date or dates upon which the relevant cancellation or prepayment is to be made and the amount of that cancellation or prepayment. The Agent must notify the Lenders promptly upon receipt of any such notice.

(b) Any prepayment under this Agreement shall be made together with accrued interest on the amount prepaid and shall be subject to any prepayment fees payable under this Agreement but without premium or penalty.

(c) The Borrowers may not reborrow any part of the Facility which is prepaid.

EME_ACTIVE-564940718.11-CEHENDER 12/20/2018 4:04 AM

(d)     The Borrowers shall not repay or prepay all or any part of the Loan or cancel all or any part of the Commitments except at the times and in the manner expressly provided for in this Agreement.

(e)     No amount of the Total Commitments cancelled under this Agreement may be subsequently reinstated.

(f)     If the Agent receives a notice under this Clause 7 it shall promptly forward a copy of that notice to either the Borrowers or the affected Lenders, as appropriate.

(g)     If all or part of a Loan is repaid or prepaid, an amount of the Commitments (equal to the amount of the Loan which is repaid or prepaid) will be deemed to be cancelled on the date of repayment or prepayment. Any cancellation under this paragraph shall reduce the Commitments of the Lenders rateably.

(h)     Save as provided for in Clause 7.6, any prepayment of the Loan shall be applied *pro rata* to each Lender's participation in the Loan.

## 8.     INTEREST

### 8.1     Calculation of interest

The rate of interest on the Loan for each Interest Period is the Fixed Rate.

### 8.2     Payment of interest

(a)     The Borrowers shall pay accrued interest on the Loan on the last day of each Interest Period.

(b)     If any Interest Period is longer than 3 months, the Borrowers shall also pay interest then accrued on the dates falling at 3 monthly intervals after the first day of the Interest Period.

### 8.3     Default interest

(a)     If an Obligor fails to pay any amount payable by it under a Finance Document on its due date, interest shall accrue on all amounts due and payable under the Finance Documents (including the Unpaid Sum) from the due date of the Unpaid Sum to the date of actual payment of the Unpaid Sum (both before and after judgment) at a rate equal to the Default Rate.

(b)     Any interest accruing under this Clause 8.3 shall be immediately payable by the Obligor on demand by the Agent.

### 8.4     Notification of rates of interest

The Agent shall promptly notify the Lenders and the Borrowers of the determination of a rate of interest under this Agreement.

## 9.     INTEREST PERIODS

### 9.1     Length of Interest Periods

(a)     Each Interest Period for the Loan shall start on the Utilisation Date or (if already made) on the last day of its preceding Interest Period and end on the next Interest Payment Date.

(b)   If an Interest Period would otherwise overrun the Termination Date, it will be shortened so that it ends on the Termination Date.

### 9.2   Non-Business Days

If an Interest Period would otherwise end on a day which is not a Business Day, that Interest Period will instead end on the next Business Day in that calendar month (if there is one) or the preceding Business Day (if there is not).

### 10.   FEES

### 10.1   Arrangement fee

The Borrowers shall pay to the Arranger an arrangement fee in the amount and at the times agreed in a Fee Letter.

### 10.2   Agency fee

The Borrowers shall pay to the Agent (for its own account) an agency fee in the amount and at the times agreed in a Fee Letter.

### 10.3   Prepayment fee

(a)   The Borrowers must pay to the Agent for each Lender a prepayment fee on the date of prepayment of all or any part of the Loan.

(b)   The amount of the prepayment fee is:

(i)   if the prepayment occurs on or before the second anniversary of the Utilisation Date, the Make Whole Amount;

(ii)   if the prepayment occurs after the second anniversary of the Utilisation Date but on or before the date falling 35 months after the Utilisation Date, 2 per cent. of the amount prepaid; and

(iii)   if the prepayment occurs after the date falling 35 months after the Utilisation Date, 1 per cent. of the amount prepaid.

### 10.4   Equity Participation Fee

(a)   Upon repayment or prepayment in full of the Loan, the Borrowers shall pay to the Lenders an equity participation fee in an amount equal to 30% of the Net Asset Value of the Vessel.

(b)   For the purposes of (a) above, "**Net Asset Value**" means the aggregate of (i) the Market Value of the Vessel determined by the average of three Valuations, such Valuations to be obtained at the Borrowers' cost less (ii) the amount of the Loan immediately prior to such repayment or prepayment.

### 11.   TAX GROSS UP AND INDEMNITIES

### 11.1   Definitions

(a)   In this Agreement:

"**Borrower DTTP Filing**" means an HM Revenue & Customs Form DTTP2 duly completed and filed by the Borrowers, which:

(i)     where it relates to a Treaty Lender that is an Original Lender, contains the scheme reference number and jurisdiction of tax residence stated opposite that Lender's name in Part II of Schedule 1 (*The Original Parties*), and is filed with HM Revenue and Customs within thirty (30) days of the date of this Agreement; or

(ii)    where it relates to a Treaty Lender that is a New Lender, contains the scheme reference number and jurisdiction of tax residence stated in respect of that Lender in the relevant Transfer Certificate or Assignment Agreement, and is filed with HM Revenue & Customs within thirty (30) days of that Transfer Date.

"**Protected Party**" means a Finance Party which is or will be subject to any liability, or required to make any payment, for or on account of Tax in relation to a sum received or receivable (or any sum deemed for the purposes of Tax to be received or receivable) under a Finance Document.

"**Qualifying Lender**" means:

(i)     a Lender which is beneficially entitled to interest payable to that Lender in respect of an advance under a Finance Document and is:

    (A)     a Lender:

        (1)     which is a bank (as defined for the purpose of section 879 of the ITA) making an advance under a Finance Document and is within the charge to United Kingdom corporation tax as respects any payments of interest made in respect of that advance or would be within such charge as respects such payments apart from section 18A of the CTA; or

        (2)     in respect of an advance made under a Finance Document by a person that was a bank (as defined for the purpose of section 879 of the ITA) at the time that that advance was made and within the charge to United Kingdom corporation tax as respects any payments of interest made in respect of that advance; or

    (B)     a Lender which is:

        (1)     a company resident in the United Kingdom for United Kingdom tax purposes;

        (2)     a partnership each member of which is:

            i.     a company so resident in the United Kingdom; or

            ii.    a company not so resident in the United Kingdom which carries on a trade in the United Kingdom through a permanent establishment and which brings into account in computing its chargeable profits (within the meaning of section 19 of the CTA) the

- 29 -

whole of any share of interest payable in respect of that advance that falls to it by reason of Part 17 of the CTA;

    (3)    a company not so resident in the United Kingdom which carries on a trade in the United Kingdom through a permanent establishment and which brings into account interest payable in respect of that advance in computing the chargeable profits (within the meaning of section 19 of the CTA) of that company; or

    (C)    a Treaty Lender; or

(ii)    a Lender which is a building society (as defined for the purpose of section 880 of the ITA) making an advance under a Finance Document.

"**Tax Confirmation**" means a confirmation by a Lender that the person beneficially entitled to interest payable to that Lender in respect of an advance under a Finance Document is either:

(i)    a company resident in the United Kingdom for United Kingdom tax purposes;

(ii)    a partnership each member of which is:

    (1)    a company so resident in the United Kingdom; or

    (2)    a company not so resident in the United Kingdom which carries on a trade in the United Kingdom through a permanent establishment and which brings into account in computing its chargeable profits (within the meaning of section 19 of the CTA) the whole of any share of interest payable in respect of that advance that falls to it by reason of Part 17 of the CTA; or

(iii)    a company not so resident in the United Kingdom which carries on a trade in the United Kingdom through a permanent establishment and which brings into account interest payable in respect of that advance in computing the chargeable profits (within the meaning of section 19 of the CTA) of that company.

"**Tax Credit**" means a credit against, relief or remission for, or repayment of any Tax.

"**Tax Deduction**" means a deduction or withholding for or on account of Tax from a payment under a Finance Document, other than a FATCA Deduction.

"**Tax Payment**" means either the increase in a payment made by an Obligor to a Finance Party under Clause 11.2 (*Tax gross-up*) or a payment under Clause 11.3 (*Tax indemnity*).

"**Treaty Lender**" means a Lender which:

(i)    is treated as a resident of a Treaty State for the purposes of the Treaty; and

- 30 -

(ii)     does not carry on a business in the United Kingdom through a permanent establishment with which that Lender's participation in the Loan is effectively connected.

"**Treaty State**" means a jurisdiction having a double taxation agreement (a "**Treaty**") with the United Kingdom which makes provision for full exemption from tax imposed by the United Kingdom on interest.

(b)     Unless a contrary indication appears, in this Clause 11 a reference to "determines" or "determined" means a determination made in the absolute discretion of the person making the determination.

## 11.2    Tax gross-up

(a)     Each Obligor shall make all payments to be made by it without any Tax Deduction, unless a Tax Deduction is required by law.

(b)     The Borrowers shall promptly upon becoming aware that an Obligor must make a Tax Deduction (or that there is any change in the rate or the basis of a Tax Deduction) notify the Agent accordingly. Similarly, a Lender shall notify the Agent on becoming so aware in respect of a payment payable to that Lender. If the Agent receives such notification from a Lender it shall notify the Borrowers and that Obligor.

(c)     If a Tax Deduction is required by law to be made by an Obligor, the amount of the payment due from that Obligor shall be increased to an amount which (after making any Tax Deduction) leaves an amount equal to the payment which would have been due if no Tax Deduction had been required.

(d)     A payment shall not be increased under paragraph (c) above by reason of a Tax Deduction on account of Tax imposed by the United Kingdom, if on the date on which the payment falls due:

(i)     the payment could have been made to the relevant Lender without a Tax Deduction if the Lender had been a Qualifying Lender, but on that date that Lender is not or has ceased to be a Qualifying Lender other than as a result of any change after the date it became a Lender under this Agreement in (or in the interpretation, administration, or application of) any law or Treaty or any published practice or published concession of any relevant taxing authority; or

(ii)     the relevant Lender is a Qualifying Lender solely by virtue of paragraph (i)(B) of the definition of Qualifying Lender; and:

(A)     an officer of H.M. Revenue & Customs has given (and not revoked) a direction (a "**Direction**") under section 931 of the ITA which relates to the payment and that Lender has received from the Obligor making the payment or from the Borrowers a certified copy of that Direction; and

(B)     the payment could have been made to the Lender without any Tax Deduction if that Direction had not been made; or

(iii)     the relevant Lender is a Qualifying Lender solely by virtue of paragraph (i)(B) of the definition of Qualifying Lender and:

- 31 -

(A)    the relevant Lender has not given a Tax Confirmation to the Borrowers; and

(B)    the payment could have been made to the Lender without any Tax Deduction if the Lender had given a Tax Confirmation to the Borrowers, on the basis that the Tax Confirmation would have enabled the Borrowers to have formed a reasonable belief that the payment was an "excepted payment" for the purpose of section 930 of the ITA; or

(iv)    the relevant Lender is a Treaty Lender and the Obligor making the payment is able to demonstrate that the payment could have been made to the Lender without the Tax Deduction had that Lender complied with its obligations under paragraph (g) below.

(e)    If an Obligor is required to make a Tax Deduction, that Obligor shall make that Tax Deduction and any payment required in connection with that Tax Deduction within the time allowed and in the minimum amount required by law.

(f)    Within thirty (30) days of making either a Tax Deduction or any payment required in connection with that Tax Deduction, the Obligor making that Tax Deduction shall deliver to the Agent for the Finance Party entitled to the payment a statement under section 975 of the ITA or other evidence reasonably satisfactory to that Finance Party that the Tax Deduction has been made or (as applicable) any appropriate payment paid to the relevant taxing authority.

(g)

(i)    Subject to paragraph (ii) below, a Treaty Lender and each Obligor which makes a payment to which that Treaty Lender is entitled shall co-operate in completing any procedural formalities necessary for that Obligor to obtain authorisation to make that payment without a Tax Deduction.

(ii)

(A)    A Treaty Lender which becomes a Party on the day on which this Agreement is entered into that holds a passport under the HMRC DT Treaty Passport scheme, and which wishes that scheme to apply to this Agreement, shall confirm its scheme reference number and its jurisdiction of tax residence opposite its name in Part II of Schedule 1 (*The Original Parties*); and

(B)    a New Lender that is a Treaty Lender that holds a passport under the HMRC DT Treaty Passport scheme, and which wishes that scheme to apply to this Agreement, shall confirm its scheme reference number and its jurisdiction of tax residence in the Transfer Certificate or Assignment Agreement which it executes,

and, having done so, that Lender shall be under no obligation pursuant to paragraph (i) above.

(h)    If a Lender has confirmed its scheme reference number and its jurisdiction of tax residence in accordance with paragraph (g)(ii) above and:

- 32 -

(i)    the Borrowers making a payment to that Lender have not made a Borrower DTTP Filing in respect of that Lender; or

(ii)    a Borrower making a payment to that Lender has made a Borrower DTTP Filing in respect of that Lender but:

(A)    that Borrower DTTP Filing has been rejected by HM Revenue & Customs; or

(B)    HM Revenue & Customs has not given the Borrowers authority to make payments to that Lender without a Tax Deduction within sixty (60) days of the date of the Borrower DTTP Filing,

and, in each case, the Borrower has notified that Lender in writing, that Lender and the Borrower shall co-operate in completing any additional procedural formalities necessary for that Borrower to obtain authorisation to make that payment without a Tax Deduction.

(i)    If a Lender has not confirmed its scheme reference number and jurisdiction of tax residence in accordance with paragraph (g)(ii) above, no Obligor shall make a Borrower DTTP Filing or file any other form relating to the HMRC DT Treaty Passport Scheme in respect of that Lender's Commitment or its participation in the Loan unless the Lender otherwise agrees.

(j)    A Borrower shall, promptly on making a Borrower DTTP Filing, deliver a copy of that Borrower DTTP Filing to the Agent for delivery to the relevant Lender.

## 11.3    Tax indemnity

(a)    The Borrowers shall (within five (5) Business Days of demand by the Agent) pay to a Protected Party an amount equal to the loss, liability or cost which that Protected Party determines will be or has been (directly or indirectly) suffered for or on account of Tax by that Protected Party in respect of a Finance Document.

(b)    Paragraph (a) above shall not apply:

(i)    with respect to any Tax assessed on a Finance Party:

(A)    under the law of the jurisdiction in which that Finance Party is incorporated or, if different, the jurisdiction (or jurisdictions) in which that Finance Party is treated as resident for tax purposes; or

(B)    under the law of the jurisdiction in which that Finance Party's Facility Office is located in respect of amounts received or receivable in that jurisdiction,

if that Tax is imposed on or calculated by reference to the net income received or receivable (but not any sum deemed to be received or receivable) by that Finance Party; or

(ii)    to the extent a loss, liability or cost:

(A)    is compensated for by an increased payment under Clause 11.2(*Tax gross-up*) or Clause 11.9 (*FATCA Deduction*); or

(B)     would have been compensated for by an increased payment under Clause 11.2(*Tax gross-up*) but was not so compensated solely because one of the exclusions in paragraph (d) of Clause 11.2(*Tax gross-up*) applied.

(c)     A Protected Party making, or intending to make, a claim under paragraph (a) above shall promptly notify the Agent of the event which will give, or has given, rise to the claim, following which the Agent shall notify the Borrowers.

(d)     A Protected Party shall, on receiving a payment from an Obligor under this Clause 11.3, notify the Agent.

## 11.4    Tax Credit

If an Obligor makes a Tax Payment and the relevant Finance Party determines that:

(a)     a Tax Credit is attributable to an increased payment of which that Tax Payment forms part, to that Tax Payment or to a Tax Deduction in consequence of which that Tax Payment was required; and

(b)     that Finance Party has obtained and utilised that Tax Credit, the Finance Party shall pay an amount to the Obligor which that Finance Party determines will leave it (after that payment) in the same after-Tax position as it would have been in had the Tax Payment not been required to be made by the Obligor.

## 11.5    Lender Status Confirmation

Each Lender which becomes a Party to this Agreement after the date of this Agreement shall indicate, in the Transfer Certificate or Assignment Agreement which it executes on becoming a Party, and for the benefit of the Agent and without liability to any Obligor, which of the following categories it falls in:

(a)     not a Qualifying Lender;

(b)     a Qualifying Lender (other than a Treaty Lender); or

(c)     a Treaty Lender.

If a New Lender fails to indicate its status in accordance with this Clause 11.5 then such New Lender shall be treated for the purposes of this Agreement (including by each Obligor) as if it is not a Qualifying Lender until such time as it notifies the Agent which category applies (and the Agent, upon receipt of such notification, shall inform the Borrowers). For the avoidance of doubt, a Transfer Certificate or Assignment Agreement shall not be invalidated by any failure of a Lender to comply with this Clause 11.5.

## 11.6    Stamp taxes

The Borrowers shall pay and, within five (5) Business Days of demand, indemnify each Secured Party against any cost, loss or liability that that Secured Party incurs in relation to all stamp duty, registration and other similar Taxes payable in respect of any Finance Document.

## 11.7    VAT

(a)     All amounts expressed to be payable under a Finance Document by any Party to a Finance Party which (in whole or in part) constitute the consideration for any supply

- 34 -

for VAT purposes, are deemed to be exclusive of any VAT which is chargeable on that supply, and accordingly, subject to paragraph (b) below, if VAT is or becomes chargeable on any supply made by any Finance Party to any Party under a Finance Document and such Finance Party is required to account to the relevant tax authority for the VAT, that Party must pay to such Finance Party (in addition to and at the same time as paying any other consideration for such supply) an amount equal to the amount of that VAT (and such Finance Party must promptly provide an appropriate VAT invoice to that Party).

(b)    If VAT is or becomes chargeable on any supply made by any Finance Party (the "**Supplier**") to any other Finance Party (the "**Recipient**") under a Finance Document, and any Party other than the Recipient (the "**Relevant Party**") is required by the terms of any Finance Document to pay an amount equal to the consideration for that supply to the Supplier (rather than being required to reimburse or indemnify the Recipient in respect of that consideration):

(i)    (where the Supplier is the person required to account to the relevant tax authority for the VAT) the Relevant Party must also pay to the Supplier (at the same time as paying that amount) an additional amount equal to the amount of the VAT. The Recipient must (where this paragraph applies) promptly pay to the Relevant Party an amount equal to any credit or repayment the Recipient receives from the relevant tax authority which the Recipient reasonably determines relates to the VAT payable on that supply; and

(ii)    (where the Recipient is the person required to account to the relevant tax authority for the VAT) the Relevant Party must promptly, following demand from the Recipient, pay to the Recipient an amount equal to the VAT chargeable on that supply but only to the extent that the Recipient reasonably determines that it is not entitled to credit or repayment from the relevant tax authority in respect of that VAT.

(c)    Where a Finance Document requires any Party to reimburse or indemnify a Finance Party for any cost or expense, that Party shall reimburse or indemnify (as the case may be) such Finance Party for the full amount of such cost or expense, including such part thereof as represents VAT, save to the extent that such Finance Party reasonably determines that it is entitled to credit or repayment in respect of such VAT from the relevant tax authority.

(d)    Any reference in this Clause to any Party shall, at any time when such Party is treated as a member of a group for VAT purposes, include (where appropriate and unless the context otherwise requires) a reference to the representative member of such group at such time (the term "representative member" to have the same meaning as in the Value Added Tax Act 1994).

(e)    In relation to any supply made by a Finance Party to any Party under a Finance Document, if reasonably requested by such Finance Party, that Party must promptly provide such Finance Party with details of that Party's VAT registration and such other information as is reasonably requested in connection with such Finance Party's VAT reporting requirements in relation to such supply.

**11.8    FATCA Information**

(a)    Subject to paragraph (c) below, each Party shall, within 10 Business Days of a reasonable request by another Party:

(i) confirm to that other Party whether it is:

    (A) a FATCA Exempt Party; or

    (B) not a FATCA Exempt Party; and

(ii) supply to that other Party such forms, documentation and other information relating to its status under FATCA as that other Party reasonably requests for the purposes of that other Party's compliance with FATCA;

(iii) supply to that other Party such forms, documentation and other information relating to its status as that other Party reasonably requests for the purposes of that other Party's compliance with any other law, regulation, or exchange of information regime.

(b) If a Party confirms to another Party pursuant to Clause 11.8(a)(i)(A) above that it is a FATCA Exempt Party and it subsequently becomes aware that it is not, or has ceased to be a FATCA Exempt Party, that Party shall notify that other Party reasonably promptly.

(c) Paragraph (a) above shall not oblige any Finance Party to do anything and paragraph (a)(iii) above shall not oblige any other Party to do anything, which would or might in its reasonable opinion constitute a breach of:

(i) any law or regulation;

(ii) any fiduciary duty; or

(iii) any duty of confidentiality.

(d) If a Party fails to confirm whether or not it is a FATCA Exempt Party or to supply forms, documentation or other information requested in accordance with paragraph (a)(i) above (including, for the avoidance of doubt, where paragraph (c) above applies), then such Party shall be treated for the purposes of the Finance Documents (and payments under them) as if it is not a FATCA Exempt Party until such time as the Party in question provides the requested confirmation, forms, documentation or other information.

**11.9**   **FATCA Deduction**

(a) Each Party may make any FATCA Deduction it is required to make by FATCA, and any payment required in connection with that FATCA Deduction, and no Party shall be required to increase any payment in respect of which it makes such a FATCA Deduction or otherwise compensate the recipient of the payment for that FATCA Deduction.

(b) Each Party shall promptly, upon becoming aware that it must make a FATCA Deduction (or that there is any change in the rate or the basis of such FATCA Deduction), notify the Party to whom it is making the payment and, in addition, shall notify the Borrowers and the Agent and the Agent shall notify the other Finance Parties.

**12.**   **INCREASED COSTS**

**12.1**   **Increased costs**

(a) Subject to Clause 12.3 (*Exceptions*) the Borrowers shall, within five (5) Business Days of a demand by the Agent, pay for the account of a Finance Party the amount of any Increased Costs incurred by that Finance Party or any of its Affiliates as a result of (i) the introduction of or any change in (or in the interpretation, administration or application of) any law or regulation or (ii) compliance with any law or regulation made after the date of this Agreement.

(b) In this Agreement **"Increased Costs"** means:

    (i) a reduction in the rate of return from the Facility or on a Finance Party's (or its Affiliate's) overall capital;

    (ii) an additional or increased cost; or

    (iii) a reduction of any amount due and payable under any Finance Document,

which is incurred or suffered by a Finance Party or any of its Affiliates to the extent that it is attributable to that Finance Party having entered into its Commitment or funding or performing its obligations under any Finance Document.

## 12.2 Increased cost claims

(a) A Finance Party intending to make a claim pursuant to Clause 12.1(*Increased costs*) shall notify the Agent of the event giving rise to the claim, following which the Agent shall promptly notify the Borrowers.

(b) Each Finance Party shall, as soon as practicable after a demand by the Agent, provide a certificate confirming the amount of its Increased Costs.

## 12.3 Exceptions

(a) Clause 12.1 (*Increased costs*) does not apply to the extent any Increased Cost is:

    (i) attributable to a Tax Deduction required by law to be made by an Obligor;

    (ii) compensated for by Clause 11.9 (*FATCA Deduction*);

    (iii) compensated for by Clause 11.3 (*Tax indemnity*) (or would have been compensated for under Clause 11.3 (*Tax indemnity*) but was not so compensated solely because any of the exclusions in paragraph (b) of Clause 11.3 (*Tax indemnity*) applied);

    (iv) attributable to the wilful breach by the relevant Finance Party or its Affiliates of any law or regulation.

(b) In this Clause 12.3, a reference to a **"Tax Deduction"** has the same meaning given to the term in Clause 11.1(*Definitions*).

## 13. OTHER INDEMNITIES

## 13.1 Currency indemnity

(a) If any sum due from an Obligor under the Finance Documents (a "**Sum**"), or any order, judgment or award given or made in relation to a Sum, has to be converted from the currency (the "**First Currency**") in which that Sum is payable into another currency (the "**Second Currency**") for the purpose of:

- 37 -

(i)      making or filing a claim or proof against that Obligor; or

(ii)     obtaining or enforcing an order, judgment or award in relation to any litigation or arbitration proceedings,

that Obligor shall as an independent obligation, within five (5) Business Days of demand, indemnify each Finance Party to whom that Sum is due against any cost, loss or liability arising out of or as a result of the conversion including any discrepancy between (A) the rate of exchange used to convert that Sum from the First Currency into the Second Currency and (B) the rate or rates of exchange available to that person at the time of its receipt of that Sum.

(b)     Each Obligor waives any right it may have in any jurisdiction to pay any amount under the Finance Documents in a currency or currency unit other than that in which it is expressed to be payable.

## 13.2   Other indemnities

(a)     Each Obligor shall, within five (5) Business Days of demand, indemnify each Finance Party, each Affiliate of a Finance Party and each officer or employee of a Finance Party or its Affiliate, against any cost, loss or liability incurred by that Finance Party as a result of:

(i)      the occurrence of any Event of Default;

(ii)     a failure by an Obligor to pay any amount due under a Finance Document on its due date, including without limitation, any cost, loss or liability arising as a result of Clause 32 (*Sharing among the Finance Parties*);

(iii)    funding, or making arrangements to fund, its participation in the Loan requested by the Borrowers in the Utilisation Request but not made by reason of the operation of any one or more of the provisions of this Agreement (other than by reason of default or negligence by that Finance Party alone); or

(iv)    the Loan (or part of the Loan) not being prepaid in accordance with a notice of prepayment given by the Borrowers.

(b)     Each Obligor shall, on demand, indemnify each Finance Party, each Affiliate of a Finance Party and each officer or employee of a Finance Party or its Affiliate (each such person for the purposes of this Clause (an "**Indemnified Person**"), against any cost, loss or liability incurred by that Indemnified Person pursuant to or in connection with any litigation, arbitration or administrative proceedings or regulatory enquiry, in connection with or arising out of the entry into and the transactions contemplated by the Finance Documents, having the benefit of any Security constituted by the Finance Documents or which relates to the condition or operation of, or any incident occurring in relation to, any Vessel unless such cost, loss or liability is caused by the *gross negligence* or *wilful misconduct* of that Indemnified Person.

(c)     Without limiting, but subject to any limitations set out in paragraph (b) above, the indemnity in paragraph (b) above shall cover any cost, loss or liability incurred by each Indemnified Person in any jurisdiction:

(i)      arising or asserted under or in connection with any law relating to safety at sea, the ISM Code, any Environmental Law or any Sanctions; or

- 38 -

        (ii)     in connection with any Environmental Claim.

(d)    Any Affiliate or any officer or employee of a Finance Party or of any of its Affiliates may rely on this Clause subject to Clause 1.4 (*Third party rights*) and the provisions of the Third Parties Act.

## 13.3    Indemnity to the Agent

Each Obligor jointly and severally shall promptly indemnify the Agent against:

(a)    any cost, loss or liability incurred by the Agent (acting reasonably) as a result of:

        (i)     investigating any event which it reasonably believes is a Default; or

        (ii)    acting or relying on any notice, request or instruction which it reasonably believes to be genuine, correct and appropriately authorised; or

        (iii)   instructing lawyers, accountants, tax advisers, surveyors or other professional advisers or experts as permitted under this Agreement; and

(b)    any cost, loss or liability (including, without limitation, for negligence or any other category of liability whatsoever) incurred by the Agent (otherwise than by reason of the Agent's gross negligence or wilful misconduct) in acting as Agent under the Finance Documents.

## 13.4    Indemnity to the Security Agent

(a)    Each Obligor jointly and severally shall promptly indemnify the Security Agent and every Receiver and Delegate against any cost, loss or liability incurred by any of them as a result of:

        (i)     any failure by any Obligor to comply with its obligations under Clause 15 (*Costs and expenses*);

        (ii)    acting or relying on any notice, request or instruction which it reasonably believes to be genuine, correct and appropriately authorised;

        (iii)   the taking, holding, protection or enforcement of the Transaction Security;

        (iv)   the exercise of any of the rights, powers, discretions, authorities and remedies vested in the Security Agent and each Receiver and Delegate by the Finance Documents or by law;

        (v)    any default by any Obligor in the performance of any of the obligations expressed to be assumed by it in the Finance Documents;

        (vi)   instructing lawyers, accountants, tax advisers, surveyors or other professional advisers or experts as permitted under this Agreement; or

        (vii)  acting as Security Agent, Receiver or Delegate under the Finance Documents or which otherwise relates to any of the Security Property (otherwise, in each case, than by reason of the relevant Security Agent's, Receiver's or Delegate's gross negligence or wilful misconduct).

(b)    The Security Agent and every Receiver and Delegate may, in priority to any payment to the Finance Parties, indemnify itself out of the Security Property in respect of, and

EME_ACTIVE-564940718.11-CEHENDER 12/20/2016 4:04 AM

pay and retain, all sums necessary to give effect to the indemnity in this Clause 13.4 and shall have a lien on the Transaction Security and the proceeds of the enforcement of the Transaction Security for all moneys payable to it.

### 13.5 Priority of Indemnity

The Security Agent and every Receiver and Delegate may, in priority to any payment to the Secured Parties, indemnify itself out of the Security Property in respect of, and pay and retain, all sums necessary to give effect to the indemnity in Clause 13.4(*Indemnity to the Security Agent*) and shall have a lien on the Transaction Security and the proceeds of enforcement of the Transaction Security for all moneys payable to it.

### 14. MITIGATION BY THE LENDERS

### 14.1 Mitigation

(a) Each Finance Party shall, in consultation with the Borrowers, take all reasonable steps to mitigate any circumstances which arise and which would result in any amount becoming payable under or pursuant to, or cancelled pursuant to, any of Clause 7.1 (*Illegality*), Clause 11 (*Tax gross up and indemnities*) or Clause 12 (*Increased costs*) including (but not limited to) transferring its rights and obligations under the Finance Documents to another Affiliate or Facility Office.

(b) Paragraph (a) above does not in any way limit the obligations of any Obligor under the Finance Documents.

### 14.2 Limitation of liability

(a) The Obligors shall, within three (3) Business Days of demand, promptly indemnify each Finance Party for all costs and expenses reasonably incurred by that Finance Party as a result of steps taken by it under Clause 14.1 (*Mitigation*).

(b) A Finance Party is not obliged to take any steps under Clause 14.1 (*Mitigation*) if, in the opinion of that Finance Party (acting reasonably), to do so might be prejudicial to it.

### 15. COSTS AND EXPENSES

### 15.1 Transaction expenses

The Borrowers shall, within three (3) Business Days of demand, pay each of the Agent, the Arranger and the Security Agent the amount of all costs and expenses (including legal fees) incurred by any of them (and, in the case of the Security Agent, any Receiver or Delegate) in connection with the negotiation, preparation, printing, execution, syndication and perfection of:

(a) this Agreement and any other documents referred to in this Agreement or in a Security Document; and

(b) any other Finance Documents executed after the date of this Agreement.

### 15.2 Amendment costs

If (a) an Obligor requests an amendment, waiver or consent or (b) an amendment is required pursuant to Clause 33.9 (*Change of currency*), the Borrowers shall, within three (3) Business

- 40 -

Days of demand, reimburse each of the Agent and the Security Agent for the amount of all costs and expenses (including legal fees) reasonably incurred by the Agent or the Security Agent (and, in the case of the Security Agent, any Receiver or Delegate) in responding to, evaluating, negotiating or complying with that request or requirement.

**15.3   Enforcement and preservation costs**

The Borrowers shall, within three (3) Business Days of demand, pay to each Finance Party the amount of all costs and expenses (including legal fees) incurred by that Finance Party in connection with the enforcement of, or the preservation of any rights under, any Finance Document or the Transaction Security and with any proceedings instituted by or against that Finance Party as a consequence of it entering into a Finance Document, taking or holding the Transaction Security, or enforcing those rights.

**16.   GUARANTEE AND INDEMNITY**

**16.1   Guarantee and indemnity**

Each Guarantor irrevocably and unconditionally jointly and severally:

(a)   guarantees to each Finance Party punctual performance by the Borrowers of all the Borrowers' obligations under the Finance Documents;

(b)   undertakes with each Finance Party that whenever the Borrowers do not pay any amount when due under or in connection with any Finance Document, the Guarantor shall immediately on demand pay that amount as if it was the principal obligor; and

(c)   agrees with each Finance Party that if any obligation guaranteed by it is or becomes unenforceable, invalid or illegal, it will, as an independent and primary obligation, indemnify that Finance Party immediately on demand against any cost, loss or liability it incurs as a result of the Borrowers not paying any amount which would, but for such unenforceability, invalidity or illegality, have been payable by them under any Finance Document on the date when it would have been due. The amount payable by the Guarantor under this indemnity will not exceed the amount it would have had to pay under this Clause 16 if the amount claimed had been recoverable on the basis of a guarantee.

**16.2   Continuing guarantee**

This guarantee is a continuing guarantee and will extend to the ultimate balance of sums payable by the Borrowers under the Finance Documents, regardless of any intermediate payment or discharge in whole or in part.

**16.3   Reinstatement**

If any discharge, release or arrangement (whether in respect of the obligations of the Borrowers or any security for those obligations or otherwise) is made by a Finance Party in whole or in part on the basis of any payment, security or other disposition which is avoided or must be restored in insolvency, liquidation, administration or otherwise, without limitation, then the liability of the Guarantors under this Clause 16 will continue or be reinstated as if the discharge, release or arrangement had not occurred.

**16.4   Waiver of defences**

- 41 -

The obligations of each Guarantor under this Clause 16 will not be affected by an act, omission, matter or thing which, but for this Clause, would reduce, release or prejudice any of its obligations under this Clause 16 (without limitation and whether or not known to it or any Finance Party) including:

(a) any time, waiver or consent granted to, or composition with, the Borrowers or other person;

(b) the release of either Borrower or any other person under the terms of any composition or arrangement with any creditor of any member of the Guarantor A Group or the Guarantor B Group;

(c) the taking, variation, compromise, exchange, renewal or release of, or refusal or neglect to perfect, take up or enforce, any rights against, or security over assets of either Borrower or other person or any non-presentation or non-observance of any formality or other requirement in respect of any instrument or any failure to realise the full value of any security;

(d) any incapacity or lack of power, authority or legal personality of or dissolution or change in the members or status of either Borrower or any other person;

(e) any amendment, novation, supplement, extension, restatement (however fundamental and whether or not more onerous) or replacement of any Finance Document or any other document or security including without limitation any change in the purpose of, any extension of or any increase in any facility or the addition of any new facility under any Finance Document or other document or security;

(f) any unenforceability, illegality or invalidity of any obligation of any person under any Finance Document or any other document or security; or

(g) any insolvency or similar proceedings.

**16.5    Guarantor Intent**

Without prejudice to the generality of Clause 16.4 (*Waiver of defences*), each Guarantor expressly confirms that it intends that this guarantee shall extend from time to time to any (however fundamental) variation, increase, extension or addition of or to any of the Finance Documents and/or any facility or amount made available under any of the Finance Documents for the purposes of or in connection with any of the following: acquisitions of any nature; increasing working capital; enabling distributions to be made; carrying out restructurings; refinancing existing facilities; refinancing any other indebtedness; making facilities available to new borrowers; any other variation or extension of the purposes for which any facility or amount might be made available from time to time; and any fees, costs and/or expenses associated with any of the foregoing.

**16.6    Immediate recourse**

Each Guarantor waives any right it may have of first requiring any Finance Party (or any trustee or agent on its behalf) to proceed against or enforce any other rights or security or claim payment from any person before claiming from the Borrowers under this Clause 16. This waiver applies irrespective of any law or any provision of a Finance Document to the contrary.

**16.7    Appropriations**

Until all amounts which may be or become payable by the Borrowers under or in connection with the Finance Documents have been irrevocably paid in full, each Finance Party (or any trustee or agent on its behalf) may:

(a)    refrain from applying or enforcing any other moneys, security or rights held or received by that Finance Party (or any trustee or agent on its behalf) in respect of those amounts, or apply and enforce the same in such manner and order as it sees fit (whether against those amounts or otherwise) and the Guarantors shall be entitled to the benefit of the same; and

(b)    hold in an interest-bearing suspense account any moneys received from the Guarantors or on account of the Guarantors' liability under this Clause 16.

### 16.8    Deferral of Guarantors' rights

Until all amounts which may be or become payable by the Obligors under or in connection with the Finance Documents have been irrevocably paid in full and unless the Agent otherwise directs, neither Guarantor will exercise any rights which it may have by reason of performance by it of its obligations under the Finance Documents or by reason of any amount being payable, or liability arising, under this Clause 16:

(a)    to be indemnified by the Borrowers;

(b)    to claim any contribution from any other guarantor of the Borrowers' obligations under the Finance Documents;

(c)    to take the benefit (in whole or in part and whether by way of subrogation or otherwise) of any rights of the Finance Parties under the Finance Documents or of any other guarantee or security taken pursuant to, or in connection with, the Finance Documents by any Finance Party;

(d)    to bring legal or other proceedings for an order requiring the Borrowers to make any payment, or perform any obligation, in respect of which the Borrowers have given a guarantee, undertaking or indemnity under Clause 16.1 (*Guarantee and indemnity*);

(e)    to exercise any right of set-off against the Borrowers; and/or

(f)    to claim or prove as a creditor of the Borrowers in competition with any Finance Party.

If a Guarantor receives any benefit, payment or distribution in relation to such rights it shall hold that benefit, payment or distribution to the extent necessary to enable all amounts which may be or become payable to the Finance Parties by the Borrowers under or in connection with the Finance Documents to be repaid in full on trust for the Finance Parties and shall promptly pay or transfer the same to the Agent or as the Agent may direct for application in accordance with Clause 33 (*Payment mechanics*).

### 16.9    Additional security

This guarantee is in addition to and is not in any way prejudiced by any other guarantee or security, set-off or netting right, now or subsequently held by any Finance Party.

## 17.    JOINT AND SEVERAL LIABILITY OF THE BORROWERS

### 17.1    Joint and several liability

EME_ACTIVE-584940718.11-CEHENDER 12/20/2016 4:04 AM

All liabilities and obligations of the Borrowers under this Agreement shall, whether expressed to be so or not, be joint and several.

**17.2    Waiver of defences**

The liabilities and obligations of a Borrower shall not be impaired by:

(a)    this Agreement being or later becoming void, unenforceable or illegal as regards any other Borrower;

(b)    any Lender or the Security Agent entering into any rescheduling, refinancing or other arrangement of any kind with any other Borrower;

(c)    any Lender or the Security Agent releasing any other Borrower or any Security created by a Finance Document; or

(d)    any time, waiver or consent granted to, or composition with any other Borrower or other person;

(e)    the release of any other Borrower or any other person under the terms of any composition or arrangement with any creditor of any member of the Guarantor A Group or the Guarantor B Group;

(f)    the taking, variation, compromise, exchange, renewal or release of, or refusal or neglect to perfect, take up or enforce, any rights against, or security over assets of, any other Borrower or other person or any non-presentation or non-observance of any formality or other requirement in respect of any instrument or any failure to realise the full value of any security;

(g)    any incapacity or lack of power, authority or legal personality of or dissolution or change in the members or status of any other Borrower or any other person;

(h)    any amendment, novation, supplement, extension, restatement (however fundamental, and whether or not more onerous) or replacement of a Finance Document or any other document or security including, without limitation, any change in the purpose of, any extension of or any increase in any facility or the addition of any new facility under any Finance Document or other document or security;

(i)    any unenforceability, illegality or invalidity of any obligation or any person under any Finance Document or any other document or security; or

(j)    any insolvency or similar proceedings.

**17.3    Principal Debtor**

Each Borrower declares that it is and will, throughout the Security Period, remain a principal debtor for all amounts owing under this Agreement and the Finance Documents and no Borrower shall, in any circumstances, be construed to be a surety for the obligations of any other Borrower under this Agreement.

**17.4    Borrower restrictions**

(a)    Subject to paragraph (b) below, during the Security Period no Borrower shall:

(i)    claim any amount which may be due to it from any other Borrower whether in respect of a payment made under, or matter arising out of, this Agreement

or any Finance Document, or any matter unconnected with this Agreement or any Finance Document; or

(ii) take or enforce any form of security from any other Borrower for such an amount, or in any way seek to have recourse in respect of such an amount against any asset of any other Borrower; or

(iii) set off such an amount against any sum due from it to any other Borrower; or

(iv) prove or claim for such an amount in any liquidation, administration, arrangement or similar procedure involving any other Borrower; or

(v) exercise or assert any combination of the foregoing.

(b) If during the Security Period, the Agent, by notice to a Borrower, requires it to take any action referred to in paragraph (a) above in relation to any other Borrower, that Borrower shall take that action as soon as practicable after receiving the Agent's notice.

### 17.5 Deferral of Borrowers' rights

Until all amounts which may be or become payable by the Borrowers under or in connection with the Finance Documents have been irrevocably paid in full and unless the Agent otherwise directs, no Borrower will exercise any rights which it may have by reason of performance by it of its obligations under the Finance Documents:

(a) to be indemnified by any other Borrower; or

(b) to claim any contribution from any other Borrower in relation to any payment made by it under the Finance Documents.

### 18. REPRESENTATIONS AND WARRANTIES

Each Obligor makes the representations and warranties set out in this Clause 18 to each Finance Party on the date of this Agreement.

### 18.1 Status

(a) It is a private limited liability company or, in the case of the Beneficial Owner, a limited partnership, duly incorporated and validly existing under the law of its jurisdiction of incorporation.

(b) It has the power to own its assets and carry on its business as it is being conducted.

(c) It is not a FATCA FFI or a US Tax Obligor.

### 18.2 Binding obligations

The obligations expressed to be assumed by it in each Transaction Document to which it is a party are, subject to the Legal Reservations, legal, valid, binding and enforceable obligations.

### 18.3 Non-conflict with other obligations

The entry into and performance by it of, and the transactions contemplated by, the Transaction Documents and the granting of the Transaction Security do not and will not conflict with:

- 45 -

(a)     any law or regulation applicable to it;

(b)     its constitutional documents; or

(c)     any agreement or instrument binding upon it or any of its assets or constitute a default or termination event (however described) under any such agreement or instrument.

## 18.4    Power and authority

(a)     It has the power to enter into, perform and deliver, and has taken all necessary action to authorise its entry into, performance and delivery of, the Transaction Documents to which it is or will be a party and the transactions contemplated by those Transaction Documents.

(b)     No limit on its powers will be exceeded as a result of the borrowing, grant of security or giving of guarantees or indemnities contemplated by the Transaction Documents to which it is a party.

## 18.5    Validity and admissibility in evidence

(a)     All authorisations required or desirable:

   (i)     to enable it lawfully to enter into, exercise its rights and comply with its obligations in the Transaction Documents to which it is a party; and

   (ii)    to make the Transaction Documents to which it is a party admissible in evidence in its Relevant Jurisdictions,

   have been obtained or effected and are in full force and effect.

(b)     All authorisations necessary for the conduct of the business, trade and ordinary activities of the Obligors have been obtained or effected and are in full force and effect.

## 18.6    Governing law and enforcement

(a)     The choice of the relevant governing law of the Finance Documents will be recognised and enforced in their Relevant Jurisdictions.

(b)     Any judgment obtained in the jurisdiction of the governing law of that Transaction Document will be recognised and enforced in their Relevant Jurisdictions.

## 18.7    Information

(a)     All information supplied by it or on its behalf to any Finance Party in connection with the Transaction Documents was true and accurate as at the date it was provided or as at any date at which it was stated to be given.

(b)     Any financial projections contained in the information referred to in paragraph (a) above have been prepared as at their date on the basis of recent historical information and on the basis of reasonable assumptions.

(c)     It has not omitted to supply any information which, if disclosed, would make the information referred to in paragraph (a) above untrue or misleading in any respect.

(d)      Nothing has occurred since the date of the information referred to in paragraph (a) above which, if disclosed, would make that information untrue or misleading in any material respect.

**18.8    Financial statements**

(a)      Its Original Financial Statements were prepared in accordance with GAAP consistently applied.

(b)      Its Original Financial Statements give a true and fair view of its financial condition and operations (consolidated in the case of the Guarantors) during the relevant financial year.

(c)      There has been no material adverse change in its business or financial condition (or the business or consolidated financial condition of the Guarantor A Group or the Guarantor B Group, in the case of the Guarantors) since the date of its Original Financial Statements.

(d)      Its most recent financial statements delivered pursuant to Clause 19.1 (*Financial statements*):

(i)       have been prepared in accordance with GAAP as applied to the Original Financial Statements; and

(ii)      give a true and fair view of (if audited) or fairly represent (if unaudited) its financial condition and operations (consolidated in the case of the Guarantors) during the relevant financial year.

(e)      Since the date of the most recent financial statements delivered pursuant to Clause 19.1 (*Financial statements*) there has been no material adverse change in its business, assets or financial condition (or the business or consolidated financial condition of the Guarantor A Group or the Guarantor B Group, in the case of the Guarantors).

**18.9    Pari passu ranking**

Its payment obligations under the Finance Documents rank at least pari passu with the claims of all its other unsecured and unsubordinated creditors, except for obligations mandatorily preferred by law applying to companies generally.

**18.10   Ranking of Security**

The security conferred by each Security Document constitutes a first priority security interest of the type described, over the assets referred to, in that Security Document and those assets are not subject to any prior or pari passu Security.

**18.11   Centre of main interests and establishments**

For the purposes of The Council of the European Union Regulation No. 1346/2000 on Insolvency Proceedings (the "**Regulation**"), its centre of main interest (as that term is used in Article 3(1) of the Regulation) is situated in its jurisdiction of incorporation and it has no "establishment" (as that term is used in Article 2(h) of the Regulations) in any other jurisdiction.

**18.12   No filing or stamp taxes**

(a)     Under the laws of their Relevant Jurisdiction it is not necessary that the Finance Documents be filed, recorded or enrolled with any court or other authority in that jurisdiction or that any stamp, registration or similar tax be paid on or in relation to the Finance Documents or the transactions contemplated by the Finance Documents except:

   (i)     registration of particulars of the Security Documents and payment of associated fees referred to in any legal opinion referred to in Clause 4 (*Conditions to Utilisation*);

   (ii)    registration of the Transaction Security granted under Dutch law over the Vessel at the Dutch ship registry and payment of associated fees; and

   (iii)   registration of the Transaction Security granted under Dutch law with the relevant Dutch tax authorities,

which registrations, filings, taxes and fees will be made and paid by the Borrowers promptly after the date of the relevant Security Document.

(b)     Any disclosure required to be made by it to any relevant taxing authority in relation to stamp duty land tax payable on any transactions contemplated by or being financed by the Transaction Documents has been made.

### 18.13   No proceedings pending or threatened

No litigation, arbitration or administrative or investigative proceedings of or before any court, arbitral body, agency or authority which, if adversely determined, might reasonably be expected to have a Material Adverse Effect have (to the best of its knowledge and belief, following due and careful enquiry) been started or threatened against it.

### 18.14   Taxes and VAT

(a)     It is not required to make any deduction for or on account of Tax from any payment made by it under any of the Finance Documents.

(b)     It is not a member of a value added tax group.

(c)     It is resident for Tax purposes only in the jurisdiction of its incorporation.

(d)     It is not overdue in the filing of any Tax returns or overdue in the payment of any amount of Tax.

(e)     No claims or investigations have been, or are likely to be, initiated or conducted against it with respect to the non-payment of Tax which might have a Material Adverse Effect.

### 18.15   No default

(a)     No Default is continuing or might reasonably be expected to result from the making of the Loan or the entry into, or the performance of, or any transaction contemplated by, any Transaction Document.

(b)     No other event or circumstance is outstanding which constitutes (or, with the expiry of a grace period, the giving of notice, the making of any determination or any combination of any of the foregoing, would constitute) a default or a termination

event (however described) under any other agreement or instrument which is binding on it or to which any of its assets are subject which has or is reasonably likely to have a Material Adverse Effect.

**18.16   Valuation**

(a)   All information supplied by it or on its behalf to the Agent for the purposes of each Valuation was true and accurate as at its date or (if appropriate) as at the date (if any) at which it is stated to be given.

(b)   It has not omitted to supply any information to the Agent which, if disclosed, would adversely affect the Valuation.

(c)   Nothing has occurred since the date the information referred to in paragraph (a) above was supplied which, if it had occurred prior to the relevant Valuation, would have adversely affected that Valuation.

**18.17   No other business**

(a)   Neither Borrower has traded nor carried on any business since the date of its incorporation except for the ownership and operation of the Vessel.

(b)   As at the date of this Agreement, neither Borrower is a party to any material agreement other than the Transaction Documents.

(c)   As at the date of this Agreement neither Borrower has any Subsidiaries (except, in the case of Legal Owner, the Beneficial Owner).

(d)   Neither Borrower:

(i)   has, or has had, any employees; and

(ii)   has any obligation in respect of any retirement benefit or occupational pension scheme.

**18.18   Ownership**

(a)   In the case of the Legal Owner, its entire issued share capital is legally and beneficially owned and controlled by the Shareholder.

(b)   The shares in the capital of the Legal Owner are fully paid and are not subject to any option to purchase or similar rights.

(c)   The limited partner of the Beneficial Owner is KG1 B.V. and the general partner of the Beneficial Owner is the Legal Owner.

(d)   The Legal Owner is the sole legal owner and the Beneficial Owner is the sole beneficial owner of the Vessel, its Earnings and its Insurances.

(e)   As and with effect from the date of its creation or intended creation, each Obligor will be the sole legal and beneficial owner of any other asset that is the subject of any Transaction Security created or intended to be created by it.

**18.19   No Breach of Laws**

It has not breached, nor is it to the best of its knowledge and belief under investigation for breaching, any law or regulation which might have a Material Adverse Effect.

## 18.20    Sanctions

(a)    No Obligor is a Restricted Party, is owned or controlled by or acting directly or indirectly on behalf of or for the benefit of, a Restricted Party or otherwise owns or controls a Restricted Party.

(b)    The proceeds of the Loan shall not be made available, either directly or indirectly, to or for the benefit of any Restricted Party or otherwise be applied in a manner or for a purpose that would result in a breach or violations of any Sanctions.

## 18.21    Environmental

(a)    There is no Environmental Claim pending, or, to the best of its knowledge and belief (following due enquiry), threatened against it or the Vessel;

(b)    No Environmental Incident which could or might give rise to any Environmental Claim has occurred.

(c)    All consents, licences and approvals required under any Environmental Laws have been obtained and remain in full force and effect.

## 18.22    Vessel

(a)    The Vessel is not subject to a charter or employment fixture other than the Charter and the Sub-Charter.

(b)    The Vessel is:

   (i)    permanently registered in the name of the Borrowers under Netherlands flag;

   (ii)    free from Security (other than Permitted Security);

   (iii)    operationally seaworthy and in every way fit for service; and

   (iv)    classed in accordance with the provisions of Schedule 9 (*Details of Vessel*).

(c)    To the best of its knowledge (following due and careful enquiry):

   (i)    no material breach of any law or regulation is outstanding which might have a Material Adverse Effect (including in relation to the value of the Vessel); and

   (ii)    no adverse claim has been made by any person in respect of the ownership of the Vessel or any interest in it.

## 18.23    Completeness of Documents

Copies of all of the documentation delivered to the Agent under Clause 4(*Conditions of Utilisation*) will be true, complete and accurate copies of such documents and include all amendments, supplements or variations at the time of such delivery and that there are no side letters, agreements or arrangements which might materially affect or vary the transaction or arrangements to which they relate.

**18.24   No Immunity**

Neither it, nor any of its assets, is immune to any legal action or proceedings.

**18.25   Shares of Dutch Obligors**

The shares of any Obligor that is a Dutch company and which are subject to Transaction Security are fully paid and not subject to any option to purchase or similar rights. The constitutional documents of such Obligors do not and could not restrict or inhibit any transfer of those shares on creation or enforcement of the Transaction Security save for any share transfer restrictions (*blokkeringsregeling*) pursuant to Section 2:87 or Section 2:195 of the Dutch Civil Code.

**18.26   Repetition**

The Repeating Representations are deemed to be made by each Obligor by reference to the facts and circumstances then existing on the date of the Utilisation Request, on the Utilisation Date and the first day of each Interest Period.

**19.   INFORMATION UNDERTAKINGS**

The undertakings in this Clause 19 remain in force from the date of this Agreement for so long as any amount is outstanding under the Finance Documents or any Commitment is in force.

**19.1   Financial statements**

The Obligors shall supply to the Agent in sufficient copies for all the Lenders:

(a)   as soon as the same become available, but in any event within one hundred and eighty (180) days after the end of each of its financial years:

(i)   the audited consolidated financial statements of each Guarantor for that financial year; and

(ii)   the audited financial statements of each Borrower for that financial year; and

(b)   as soon as the same become available, but in any event within forty five (45) days after the end of each quarter of its financial year, the unaudited quarterly management accounts of each Obligor for that quarter.

**19.2   Compliance Certificate**

(a)   The Borrowers shall supply to the Agent, with each set of financial statements delivered pursuant to paragraph (a) of Clause 19.1 (*Financial statements*), a Compliance Certificate setting out (in reasonable detail) computations as to compliance with Clause 20 (*Financial covenants*) as at the date as at which those financial statements were drawn up and confirming that no Default has occurred and is continuing (or, if that is not the case, any steps being taken to remedy the Default).

(b)   Each Compliance Certificate shall be signed by the chief financial officer or finance director of a Guarantor, or otherwise by two directors of a Guarantor.

**19.3   Requirements as to financial statements**

- 51 -

(a)     Each set of financial statements delivered by an Obligor pursuant to Clause 19.1 (*Financial statements*) shall be certified by a director of the relevant Obligor as giving a true and fair view (if audited) or fairly representing (if unaudited) its financial condition as at the date as at which those financial statements were drawn up.

(b)     The Borrowers shall procure that each set of financial statements of an Obligor delivered pursuant to Clause 19.1 (*Financial statements*) is prepared using GAAP, accounting practices and financial reference periods consistent with those applied in the preparation of the Original Financial Statements for that Obligor unless, in relation to any set of financial statements, it notifies the Agent that there has been a change in GAAP, the accounting practices or reference periods and its auditors (or, if appropriate, the auditors of the Obligor) deliver to the Agent:

(i)      a description of any change necessary for those financial statements to reflect the GAAP, accounting practices and reference periods upon which that Obligor's Original Financial Statements were prepared; and

(ii)     sufficient information, in form and substance as may be reasonably required by the Agent, to enable the Lenders to make an accurate comparison between the financial position indicated in those financial statements and that Obligor's Original Financial Statements.

Any reference in this Agreement to those financial statements shall be construed as a reference to those financial statements as adjusted to reflect the basis upon which the Original Financial Statements were prepared.

## 19.4     Information: miscellaneous

The Borrowers shall supply to the Agent (in sufficient copies for all the Lenders, if the Agent so requests):

(a)     all documents dispatched by any Obligor to its shareholders (or any class of them) or its creditors generally at the same time as they are dispatched;

(b)     promptly upon becoming aware of them, the details of any litigation, arbitration or administrative proceedings which are current, threatened or pending against any member of the Guarantor A Group or the Guarantor B Group, and which might, if adversely determined, have a Material Adverse Effect;

(c)     promptly, such further information regarding the financial condition, business and operations of any Obligor (or any other member of the Guarantor A Group or Guarantor B Group) as any Finance Party (through the Agent) may reasonably request; and

(d)     promptly, such further information regarding the Vessel, its Earnings, its Insurances, the Charged Property and Default or alleged Default, as any Finance Party (through the Agent) may reasonably request.

## 19.5     Notification of default

(a)     Each Obligor shall notify the Agent of any Default (and the steps, if any, being taken to remedy it) promptly upon becoming aware of its occurrence (unless that Obligor is aware that a notification has already been provided by another Obligor).

(b)     Promptly upon a request by the Agent, the Borrowers shall supply to the Agent a certificate signed for each Borrower by two of its directors or senior officers on its behalf certifying that no Default is continuing (or if a Default is continuing, specifying the Default and the steps, if any, being taken to remedy it).

### 19.6    "Know your customer" checks

(a)     If:

(i)     the introduction of or any change in (or in the interpretation, administration or application of) any law or regulation made after the date of this Agreement;

(ii)    any change in the status of an Obligor, or any change in the composition of the shareholders of an Obligor, after the date of this Agreement; or

(iii)   a proposed assignment or transfer by a Lender of any of its rights and obligations under this Agreement to a party that is not a Lender prior to such assignment or transfer,

obliges the Agent or any Lender (or, in the case of paragraph (iii) above, any prospective new Lender) to comply with "know your customer" or similar identification procedures in circumstances where the necessary information is not already available to it, each Obligor shall promptly upon the request of the Agent or any Lender supply, or procure the supply of, such documentation and other evidence as is reasonably requested by the Agent (for itself or on behalf of any Lender) or any Lender (for itself or, in the case of the event described in paragraph (iii) above, on behalf of any prospective new Lender) in order for the Agent, such Lender or, in the case of the event described in paragraph (iii) above, any prospective new Lender to carry out and be satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations pursuant to the transactions contemplated in the Finance Documents.

(b)     Each Lender shall promptly upon the request of the Agent supply, or procure the supply of, such documentation and other evidence as is reasonably requested by the Agent (for itself) in order for the Agent to carry out and be satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations pursuant to the transactions contemplated in the Finance Documents.

## 20.    FINANCIAL COVENANTS

### 20.1   Minimum Liquidity

The Borrowers shall maintain a minimum liquidity in the Earnings Account of the applicable Minimum Liquidity Amount.

## 21.    GENERAL UNDERTAKINGS

The undertakings in this Clause 21 remain in force from the date of this Agreement for so long as any amount is outstanding under the Finance Documents or any Commitment is in force.

### 21.1   Authorisations

Each Obligor shall promptly:

(a)     obtain, comply with, renew and do all that is necessary to maintain in full force and effect; and

(b)     supply certified copies to the Agent of any authorisation required under any law or regulation of its jurisdiction of incorporation to:

      (i)     enable it to perform its obligations under the Transaction Documents and to ensure the legality, validity, enforceability or admissibility in evidence in its jurisdiction of incorporation of any Transaction Document; or

      (ii)    own its assets and carry on its business as it is being conducted (including in relation to the Borrowers, the ownership, operation and chartering of the Vessel).

## 21.2    Compliance with laws

Each Obligor shall comply in all respects with all laws, regulations and directives (including Environmental Laws) to which it may be subject.

## 21.3    Negative pledge

No Borrower shall create or permit to subsist any Security over any of its assets (including the Vessel, its Earnings, its Insurances and the Charter (or any subsequent charter or employment of the Vessel), other than Permitted Security. Each Borrower shall procure that no Security is created or is permitted to subsist over the Sub-Charter, other than Permitted Security.

## 21.4    Maintenance of Status

(a)     Each Obligor will do all such things as are necessary to maintain its corporate existence and remain in goodstanding in its jurisdiction of incorporation.

(b)     No Obligor shall enter into any amalgamation, demerger, consolidation or corporate restructuring without the prior written consent of the Agent.

## 21.5    Pari Passu Ranking

Each Obligor shall ensure that any payment obligations under each of the Finance Documents rank and will at all times rank at least pari passu in right and priority of payment with all its other present and future unsecured and unsubordinated indebtedness (actual or contingent), except indebtedness preferred solely by laws of general application.

## 21.6    Disposals

No Borrower shall enter into a single transaction or a series of transactions (whether related or not and whether voluntary or involuntary) to sell, dispose, lease or transfer all or a substantial part of its assets (including any assets the subject of any Security Documents).

## 21.7    Financial Indebtedness

(a)     No Borrower will incur or permit to be incurred any Financial Indebtedness other than under the Finance Documents without the prior written consent of the Agent.

(b)     Paragraph (a) does not apply to:

      (i)      any Financial Indebtedness incurred under the Finance Documents;

      (ii)     any Financial Indebtedness repaid prior to the Utilisation;

      (iii)    liability for the payment for goods and services acquired in the ordinary course of business in connection with the day-to-day ownership, operation and chartering of the Vessel.

**21.8 Lending and guarantees**

(a)    No Borrower may be the creditor in respect of any loan or any form of credit to any person.

(b)    No Obligor may give or allow to be outstanding any guarantee or indemnity to or for the benefit of any person in respect of any obligation of any other person or enter into any document under which that Obligor assumes any liability of any other person other than any guarantee or indemnity given under the Finance Documents.

**21.9 Merger**

No Obligor shall enter into any amalgamation, demerger, merger or corporate reconstruction.

**21.10 Corporate matters**

(a)    Each Obligor shall ensure that no substantial change will be made to the general nature of its business from that carried on at the date of this Agreement without the prior written consent of the Agent.

(b)    The Borrowers shall not engage in any business other than the ownership and ownership of the Vessel.

(c)    The Borrowers may not have any Subsidiary (except, in the case of the Legal Owner, the Beneficial Owner).

**21.11 Acquisitions**

No Borrower may make any acquisition or investment other than as permitted under this Agreement.

**21.12 Other agreements**

No Borrower may enter into any material agreement other than:

(a)    the Transaction Documents;

(b)    any other agreement expressly allowed under any other term of this Agreement; and

(c)    on arm's length normal commercial terms.

**21.13 Accounts**

No Borrower shall open or maintain any accounts with any bank or financial institution save as provided for under the Finance Documents.

**21.14 Shares, dividends and share redemption**

(a)    The Legal Owner shall not issue any further shares or amend any rights attaching to its issued shares.

(b)    The Legal Owner shall not:

    (i)    declare, make or pay any dividend, charge, fee or other distribution (or interest on any unpaid dividend, charge, fee or other distribution) (whether in cash or in kind) on or in respect of its share capital (or any class of its share capital) without the prior written consent of the Agent (acting on the instructions of the Majority Lenders, which consent they shall have full power to withhold);

    (ii)    repay or distribute any dividend or share premium reserve;

    (iii)    pay any management, advisory or other fee to or to the order of any of the shareholders of a Guarantor A Group member or Guarantor B Group member;

    (iv)    redeem, repurchase, defease, retire or repay any of its share capital or resolve to do so;

    (v)    increase or reduce its authorised share capital; or

    (vi)    appoint a further or new director or officer unless the provisions of the Share Pledge have been complied with.

## 21.15   VAT group

No Obligor may be a member of a value added tax group.

## 21.16   Taxes

(a)    Each Obligor must pay all Taxes due and payable by it prior to the accrual of any fine or penalty for late payment, unless (and only to the extent that):

    (i)    payment of those Taxes is being contested in good faith;

    (ii)    adequate reserves are being maintained for those Taxes and the costs required to contest them;

    (iii)    payment can be lawfully withheld; and

    (iv)    failure to pay those Taxes is not reasonably likely to have a Material Adverse Effect.

(b)    Each Obligor must ensure that its residence for Tax purposes is in the jurisdiction of its incorporation.

(c)    Each Obligor shall procure that, unless otherwise agreed by all the Finance Parties, it shall not become a US Tax Obligor.

## 21.17   Ownership

The Shareholder must at all times be the legal and beneficial owner and controller of the entire share capital of the Legal Owner.

**21.18   Further Assurance**

(a)   Each Obligor shall promptly, and in any event within the time period specified by the Security Agent do all such acts (including procuring or arranging any registration, notarisation or authentication or the giving of any notice) or execute or procure execution of all such documents (including assignments, transfers, mortgages, charges, notices, instructions, acknowledgments, proxies and powers of attorney), as the Security Agent may specify (and in such form as the Security Agent may require in favour of the Security Agent or its nominee(s)):

   (i)   to create, perfect, vest in favour of the Security Agent or protect the priority of the Security or any right or any kind created or intended to be created under or evidenced by the Finance Documents (which may include the execution of a mortgage, charge, assignment or other Security over all or any of the assets which are, or are intended to be, the subject of the Transaction Security) or for the exercise of any rights, powers and remedies of the Security Agent, any Receiver or the Secured Parties provided by or pursuant to the Finance Documents or by law;

   (ii)   to confer on the Security Agent or confer on the Secured Parties, Security over any property and assets of that Obligor located in any jurisdiction equivalent or similar to the Security intended to be conferred by or pursuant to the Finance Documents;

   (iii)   to facilitate or expedite the realisation and/or sale of, the transfer of title to or the grant of, any interest in or right relating to the assets which are, or are intended to be, the subject of the Transaction Security or to exercise any power specified in any Finance Document in respect of which the Security has become enforceable; and/or

   (iv)   to enable or assist the Security Agent to enter into any transaction to commence, defend or conduct any proceedings and/or to take any other action relating to any item of the Security Property.

(b)   Each Obligor shall take all such action as is available to it (including making all filings and registrations) as may be necessary for the purpose of the creation, perfection, protection or maintenance of any Security conferred or intended to be conferred on the Security Agent or the Secured Parties by or pursuant to the Finance Documents.

(c)   At the same time as an Obligor delivers to the Security Agent any document executed under this Clause 21.18, that Obligor shall deliver to the Security Agent reasonable evidence that that Obligor's execution of such document has been duly authorised by it.

**22.   VESSEL UNDERTAKINGS**

**22.1   General**

The Borrowers undertakes with the Agent to comply with the following provisions of this Clause 22 for so long as any amount is outstanding under any Finance Document or except as the Agent may otherwise permit.

**22.2   Vessel Name and Registration**

- 57 -

The Borrower shall:

(a)   keep the Vessel registered in the name of the Legal Owner with the Approved Flag;

(b)   not do or allow to be done anything as a result of which such registration might be cancelled or imperilled; and

(c)   not change the name or port of registry of the Vessel without the prior written consent of the Agent.

## 22.3   Repair and Classification

The Borrowers shall keep the Vessel:

(a)   in a good and safe condition and state of repair;

(b)   consistent with first class ship ownership and management practice;

(c)   as to maintain the class of the Vessel free of overdue recommendations and conditions; and

(d)   so as to comply with all laws and regulations applicable to vessels registered under Netherlands flag or to vessels trading to any jurisdiction to which the Vessel  may trade from time to time including but not limited to ISM Code and the ISPS Code.

## 22.4   Modification

The Borrowers shall not make, permit to be made, any modification or repairs to, or replacement of, the Vessel or equipment installed on the Vessel that would or might materially alter the structure, type or performance characteristics of the Vessel or materially reduce its value.

## 22.5   Removal of Parts

The Borrowers shall not remove, nor permit the removal, of any material part of the Vessel, or any item of equipment installed on the Vessel, unless the part or item so removed is forthwith replaced by a suitable part or item which is in the same condition as or better condition than the part or item removed, is free from any Security or any right in favour of any person other than the Security Agent and becomes on installation on the Vessel, the property of the Borrowers, and subject to the security constituted by the Mortgage relating to the Vessel PROVIDED THAT the Borrowers may install equipment owned by a third party if the equipment can be removed without any risk of damage to the Vessel.

## 22.6   Surveys

The Borrowers shall submit the Vessel regularly to all periodical or other surveys which may be required for classification purposes and, if so required by the Agent, provide the Agent with copies of all survey reports.

## 22.7   Inspection

The Borrowers shall permit the Agent and/or the Security Agent (by surveyors or other persons appointed by it for that purpose) to board the Vessel at all reasonable times to inspect its condition or to satisfy themselves about proposed or executed repairs and shall afford all proper facilities for such inspections. Any costs, fees or expenses relating to such inspections shall be for the account of the Borrowers, provided that, so long as no Event of Default has

- 58 -

occurred and is continuing, the Borrowers shall not be required to pay for more than two inspections in any calendar year.

**22.8    Prevention and Release from Arrest**

The Borrowers shall promptly when due discharge:

(a)    all liabilities which give or may give rise to maritime or possessory liens on or claims enforceable against the Vessel, its Earnings or its Insurances;

(b)    all Taxes, dues and other amounts charged in respect of the Vessel, its Earnings or its Insurances; and

(c)    all other outgoings whatsoever in respect of the Vessel, its Earnings or its Insurances,

and, forthwith upon receiving notice of the arrest of the Vessel, or of its detention in exercise or purported exercised of any lien or claim, the Borrowers shall procure its release by providing bail or otherwise as the circumstances may require.

**22.9    Compliance with Laws**

The Borrowers shall:

(a)    comply, or procure compliance with all Environmental Laws, the ISM Code, the ISPS Code, Sanctions and all other laws and regulations relating to the Vessel, its ownership, operation and management or to its business;

(b)    not employ the Vessel nor allow its employment in any manner contrary to any law or regulation in any relevant jurisdiction including but not limited to the ISM Code and the ISPS Code; and

(c)    in the event of hostilities in any part of the world (whether war is declared or not), not cause or permit the Vessel to enter or trade to any zone which is declared a war zone by any government or by the war risks insurers of the Vessel unless the prior written consent of the Agent has been given and the Borrowers have (at their expense) effected any special, additional or modified insurance cover which the Agent may require.

**22.10   Provision of Information**

The Borrowers shall promptly provide the Lender with any information which it requests regarding:

(a)    the Vessel, its employment, position and engagements;

(b)    its Earnings;

(c)    payments and amounts due to the master and crew of the Vessel;

(d)    any expenses incurred, or likely to be incurred, in connection with the operation, maintenance or repair of the Vessel and any payments made in respect of the Vessel;

(e)    any towages and salvages; and

(f)    the Borrowers', the Approved Managers' or the Vessel's compliance with the ISM Code and the ISPS Code.

EME_ACTIVE-564940718.11-CEHENDER 12/20/2016 4:04 AM

**22.11    Notification of Certain Events**

The Borrowers shall immediately notify the Agent by fax, confirmed forthwith by letter, of:

(a)     any casualty relating to the Vessel which is or is likely to be or to become a Major Casualty;

(b)     any occurrence as a result of which the Vessel has become or is, by the passing of time or otherwise, likely to become a Total Loss;

(c)     any requirement or recommendation made by any insurer or classification society or by any competent authority which is not immediately complied with;

(d)     any arrest or detention of the Vessel, any exercise or purported exercise of any lien on the Vessel or its Earnings or any requisition of the Vessel for hire;

(e)     any intended dry docking of the Vessel;

(f)     any Environmental Claim made against any Borrower or in connection with any Vessel, or any Environmental Incident;

(g)     any claim for breach of the ISM Code or the ISPS Code being made against any Borrower, the Approved Managers or otherwise in connection with the Vessel; and

(h)     any other matter, event or incident, actual or threatened, the effect of which will or could lead to the ISM Code or the ISPS Code not being complied with,

and the Borrowers shall keep the Agent advised in writing on a regular basis and in such detail as the Agent shall require of the Borrowers', the Approved Managers' or any other person's response to any of those events or matters.

**22.12    Restrictions on Chartering; Appointment of Managers etc.**

The Borrowers shall not:

(a)     let the Vessel on demise charter for any period;

(b)     enter into any time or consecutive voyage charter in respect of the Vessel for a term which exceeds, or which by virtue of any option of extensions may exceed 13 months but in the case of this paragraph (b) the Agent's permission referred to in Clause 23.1 (*General*) shall not be unreasonably withheld);

(c)     enter into any charter in relation to the Vessel under which more than 2 months' hire (or the equivalent) is payable in advance;

(d)     charter the Vessel otherwise than on bona fide arm's length terms at the time when the Vessel is fixed;

(e)     appoint a manager of the Vessel other than an Approved Manager or agree to any alteration to the terms of an Approved Manager's appointment;

(f)     deactivate or lay-up the Vessel; or

(g)     put the Vessel into the possession of any person for the purpose of work being done upon her in an amount exceeding or likely to exceed $100,000 (or the equivalent in any other currency) unless that person has first given to the Agent in terms

EME_ACTIVE-564040718.11-CEHENDER 12/20/2016 4:04 AM

satisfactory to it a written undertaking not to exercise any lien on the Vessel or its Earnings for the cost of such work or for any other reason.

**22.13    Notice of Mortgage**

The Borrowers shall keep the Mortgage registered against the Vessel as a valid first preferred mortgage, carry on board the Vessel a certified copy of the Mortgage and place and maintain in a conspicuous place in the navigation room and the Master's cabin of the Vessel a framed printed notice stating that the Vessel is mortgaged by the Borrowers to the Lender.

**22.14    Sharing of Earnings**

The Borrowers shall not enter into any agreement or arrangement for the sharing of any Earnings relating to any Vessel.

**23.    INSURANCE**

**23.1    General**

The Borrowers undertake with the Agent to comply with the following provisions of this Clause 23 for so long as any amount is outstanding under the Finance Documents or except as the Lender may otherwise permit.

**23.2    Maintenance of Obligatory Insurances**

The Borrowers will keep the Vessel at all times insured at their own cost and expense against:

(a)    fire and usual marine risks (including excess risks and increased value) and war risks (including the London blocking and trapping addendum or equivalent coverage and including war and terrorism risks excluded from the protection and indemnity risks coverage) for an amount on an agreed value basis at least the greater of:

　(i)    such amount as will equal 120% of the Loan; and

　(ii)    the market value of the Vessel;

(b)    protection and indemnity risks (including pollution risks), on "full entry terms" for the highest available amount in the insurance market for vessels of a similar age and type as the Vessel (but, in relation to liability for oil pollution, for an amount not less than US$1,000,000,000); and

(c)    any other risks against which the Agent considers, having regard to practices and other circumstances prevailing at the relevant time, it would in the opinion of the Agent be reasonable for the Borrowers to insure and which are specified by the Agent by notice to the Borrowers.

**23.3    Terms of Obligatory Insurances**

The obligatory insurances shall:

(a)    be in Euros;

(b)    be on terms approved by the Agent in writing;

- 61 -

(c)     be through brokers and with insurance companies and/or underwriters or, in the case of war risks and protection and indemnity risks, in war risks and protection and indemnity risks associations approved by the Agent in writing;

(d)     whenever required by the Agent, name (or be amended to name) the Security Agent as additional named assured for its rights and interests, warranted no operational interest and with full waiver of rights of subrogation against the Security Agent (as the case may be), but without the Security Agent thereby being liable to pay (but having the right to pay) premiums, calls or other assessments in respect of such insurance;

(e)     name the Security Agent as loss payee with such directions for payment as the Security Agent may specify;

(f)     provide that all payments by or on behalf of the insurers under the obligatory insurances to the Security Agent shall be made without set off, counterclaim or deductions or condition whatsoever;

(g)     provide that such obligatory insurances shall be primary without right of contribution from other insurances which may be carried by the Security Agent and/or the Agent; and

(h)     provide that the Security Agent may make proof of loss if the Borrowers fail to do so.

**23.4    Renewal**

The Borrowers shall:

(a)     at least fourteen (14) days before the expiry of any obligatory insurance relating to the Vessel;

        (i)     notify the Agent of the approved brokers (or other insurers) and any protection and indemnity or war risks association through or with whom the Borrowers propose to renew that obligatory insurance and of the proposed terms of renewal; and

        (ii)    obtain the Agent's approval to the matters referred to in paragraph (a)(i);

(b)     at least seven (7) days before the expiry of any obligatory insurance relating to the Vessel, renew that obligatory insurance in accordance with the Agent's approval pursuant to paragraph (a); and

(c)     not add any (other) assured to any obligatory insurance without the prior written consent of the Agent.

**23.5    Copies of Policies**

The Borrowers shall provide to the Agent pro forma copies of all insurance policies and other documentation issued by brokers, insurance and protection and indemnity associations as soon as they are available after they have been placed or renewed.

**23.6    Copies of Certificates of Entry**

The Borrowers shall ensure that any protection and indemnity and/or war risks association in which the Vessel is entered provides the Agent with:

EME_ACTIVE·564940718.11·CEHENDER 12/20/2016 4:04 AM

(a)     a certified copy of the certificate of entry for the Vessel;

(b)     a letter or letters of undertaking in such form as may be required by the Security Agent; and

(c)     where required to be issued under the terms of insurance or indemnity provided by the Borrowers' protection and indemnity association, a certified copy of each certificate of financial responsibility for pollution by oil or other Environmentally Sensitive Material issued by the relevant certifying authority in relation to the Vessel.

**23.7    Letters of Undertaking**

The Borrowers shall ensure that all approved brokers provide the Security Agent a letter or letters or undertaking in a form required by the Security Agent and including undertakings by the approved brokers that:

(a)     they will have endorsed on each policy, immediately upon issue, a loss payable clause and a notice of assignment in the agreed form or in such other forms as the Security Agent may require;

(b)     they will hold such policies, and the benefit of such insurances, to the order of the Security Agent in accordance with the said loss payable clause;

(c)     they will advise the Security Agent immediately of any material change to the terms of the obligatory insurances;

(d)     they will notify the Security Agent, not less than seven (7) days before the expiry of the relevant obligatory insurances, in the event of their not having received notice of renewal instructions from the Borrowers or their agents and, in the event of their receiving instructions to renew, they will promptly notify the Security Agent of the terms of the instructions; and

(e)     they will not set off against any sum recoverable in respect of a claim relating to the Vessel under such obligatory insurances any premiums or other amounts due to them or any other person whether in respect of the Vessel or otherwise, they waive any lien on the policies, or any sums received under them, which they might have in respect of such premiums or other amounts, and they will not cancel such obligatory insurances by reason of non-payment of such premiums or other amounts, and will arrange for a separate policy to be issued in respect of the Vessel forthwith upon being so requested by the Security Agent.

**23.8    Deposit Original Policies**

The Borrowers shall ensure that the originals of all policies relating to obligatory insurances are deposited with the approved brokers through which the insurances are effected or renewed.

**23.9    Payment of Premiums**

The Borrowers shall punctually pay all premiums or other sums payable in respect of the obligatory insurances and produce all relevant receipts when so required by the Agent.

**23.10   P&I Guarantees**

The Borrowers shall ensure that any guarantees required by a protection and indemnity or war risks association are promptly issued and remain in full force and effect.

**23.11   Additional Assureds**

The Borrowers shall not add any (other) assured to any obligatory insurance without the prior written consent of the Security Agent.

**23.12   Compliance with Terms of Obligatory Insurances**

The Borrowers shall not do or omit to do (or permit to be done or not to be done) any act or thing which would or might render any obligatory insurance invalid, void, voidable or unenforceable or render any sum payable under an obligatory insurance repayable in whole or in part; and, in particular:

(a)     The Borrowers shall take all necessary action and comply with all requirements which may from time to time be applicable to the obligatory insurances, and (without limiting the obligation contained in Clause 23.6(*Copies of Certificates of Entry*) ensure that the obligatory insurances are not made subject to any exclusions or qualifications to which the Agent has not given its prior written approval;

(b)     The Borrowers shall not make any changes relating to the classification or classification society or manager or operator of the Vessel approved by the underwriters of the obligatory insurances;

(c)     The Borrowers shall make (and promptly supply copies to the Agent of) all quarterly or other voyage declarations which may be required by the protection and indemnity risks association in which the Vessel is entered to maintain cover for trading to the United States of America and Exclusive Economic Zone (as defined in the United States Oil Pollution Act 1990 or any other applicable legislation); and

(d)     The Borrowers shall not employ the Vessel, nor allow it to be employed, otherwise than in conformity with the terms and conditions of the obligatory insurances, without first obtaining the consent of the Agent and the insurers and complying with any requirements (as to extra premium or otherwise) which the Agent and the insurers specify.

**23.13   Alteration to Terms of Obligatory Insurances**

The Borrowers shall not make nor agree to any alteration to the terms of any obligatory insurance nor waive any right relating to any obligatory insurance.

**23.14   Settlement of Claims**

The Borrowers shall not settle, compromise or abandon any claim under any obligatory insurance for a Total Loss or for a Major Casualty without the prior written consent of the Security Agent, and shall do all things necessary and provide all documents, evidence and information to enable the Security Agent to collect or recover any moneys which at any time become payable in respect of the obligatory insurances.

**23.15   Application of recoveries**

Any sums paid under the obligatory insurances other than to the Security Agent shall be applied in repairing the damage and/or discharging the liability in respect of which they have

- 64 -

been paid, save to the extent that the repairs have already been completed and paid for and/or the liability has already been fully discharged.

**23.16   Provision of Copies of Communications**

The Borrowers shall provide the Agent, at the time of each such communication, copies of all written communications between the Borrowers and each of the following:

(a)   the approved brokers; and

(b)   the approved protection and indemnity and/or war risks associations; and

(c)   the approved insurance companies and/or underwriters,

which relate directly or indirectly to:

(i)   The Borrowers' obligations relating to the obligatory insurances including, without limitation, all requisite declarations and payments of additional premiums or calls; and

(ii)   any credit arrangements made between the Borrowers and any of the persons referred to in paragraphs (a) or (b) relating wholly or partly to the effecting or maintenance of the obligatory insurances.

**23.17   Provision of Information**

In addition, the Borrowers shall promptly provide the Agent (or any persons which the Agent may designate) with any information which the Agent (or any such designated person) requests for the purpose of:

(a)   obtaining or preparing any report from an independent marine insurance broker as to the adequacy of the obligatory insurances effected or proposed to be effected; and/or

(b)   effecting, maintaining or renewing any such insurances as are referred to in Clause 23.18 (*Mortgagee's Interest and Additional Perils*) or dealing with or considering any matters relating to any such insurances,

and the Borrowers shall, forthwith upon demand, indemnify the Agent  in respect of all fees and other expenses incurred by or for the account of the Agent in connection with any such report as is referred to in paragraph (a).

**23.18   Mortgagee's Interest and Additional Perils**

The Security Agent shall be entitled, at the cost and expense of the Borrowers, from time to time to effect, maintain and renew:

(a)   a Mortgagee's Interest Additional Perils Insurance and a Mortgagee's Interest Marine Insurance in such amounts, on such terms, through such insurers and generally in such manner as the Security Agent may from time to time consider appropriate; and

(b)   any other insurance cover which the Security Agent reasonable requires in respect of an Finance Party's interests and potential liabilities (whether as mortgagee of the Vessel or beneficiary of the Security Documents),

and the Borrowers shall supply, or procure that there is supplied, to the Security Agent such information as the Security Agent may require in connection with the matters referred to in this Clause 23.18.

**23.19   Change in insurance requirements**

The Agent shall have the right, by giving notice to the Borrowers, to change the terms and requirements of this Clause 23 in such manner as it considers appropriate as a result of a change of circumstances or practice after the date of this Agreement, in which case, from the date being fourteen (14) days after such notice is provided, this Clause 23 shall be automatically be deemed modified in accordance with the terms of that notice.

**24.   ACCOUNTS**

**24.1   Maintenance**

The Borrowers shall maintain an Earnings Account, a Dry Dock Reserve Account and a Retention Account with the Account Bank, each free of Security and rights of set-off (other than as created under the Account Security), until no amount remains outstanding under the Finance Documents.

**24.2   Location of Accounts**

The Borrowers shall promptly:

(a)   comply with any requirement of the Agent as to the location or relocation of the Accounts; and

(b)   execute any documents which the Agent specifies to create or maintain in favour of the Security Agent, Security over (and/or rights of set-off, consolidation or other rights in relation to) each Account.

**24.3   Application of Account**

The Borrowers shall procure that transfers are made from each Account (and irrevocably authorises the Agent to instruct an Account Bank to transfer from each Account) in order to facilitate the payment of amounts required and/or contemplated by this Agreement.

**24.4   Earnings and Requisition Compensation**

(a)   The Borrowers shall procure that all Earnings and Requisition Compensation in relation to the Vessel are credited to the Earnings Account, unless and until the Agent shall otherwise direct.

(b)   Subject to clause (c) below, the Earnings Account shall be a blocked account and the Borrowers shall not be permitted to withdraw any sums from the Earnings Account without the prior written consent of the Agent (acting on the instructions of the Majority Lenders).

(c)   On the date falling 1 month after the Utilisation Date and monthly thereafter, the Borrowers shall procure that amounts standing to the credit of the Earnings Account are as applied follows:

(i)   FIRST, transfer to the Retention Account of:

- 66 -

(A)     one-third of the amount of the next Repayment Instalment due and payable under Clause 6.1 (*Repayment*); and

(B)     one-third of the amount of interest accruing on the Loan and due and payable on the next Interest Payment Date;

(ii)     SECOND, subject to no Default having occurred and being continuing and that all fees, expenses and other amounts then due under the Finance Documents have been paid, payment to the Approved Managers of the Operating Expenses of the Vessel for the following calendar month in an amount equal to the sum of the number of days in the following calendar month multiplied by the then applicable Daily OPEX Cap; and

(iii)     THIRD, to retain or ensure the Minimum Liquidity Amount in the Earnings Account.

(d)     The Borrowers shall only be permitted to withdraw sums from the Accounts in accordance with the provisions of the Finance Documents or as otherwise permitted by the Agent.

(e)     The Agent shall be entitled to debit the Earnings Account from time to time (without notice to the Borrowers) in order to discharge any amount then due and payable under the Finance Document.

**24.5**     **Retention and repayment**

(a)     The Borrowers shall procure that on the date falling 1 month after the Utilisation Date and monthly thereafter, there is transferred to the Retention Account out of the Earnings Account:

(i)     one-third of the amount of the next Repayment Instalment due and payable under Clause 6.1 (*Repayment*); and

(ii)     one-third of the amount of interest accruing on the Loan and due and payable on the next Interest Payment Date,

provided that this paragraph (a) shall only apply following opening of the Retention Account by the Borrowers with the Account Bank in accordance with the terms of this Agreement.

(b)     If the aggregate amount standing to the credit of the Earnings Account is not sufficient for the required amount to be transferred to the Retention Account under Clause 24.5(a), the Borrowers shall promptly make up the balance of such amount.

(c)     On the date of payment of each Repayment Instalment and on each Interest Payment Date, the Borrowers shall procure that the amount of the Repayment Instalment and of the interest then due and payable is paid to the Agent out of the Retention Account in discharge of such Repayment Instalment and interest.

**24.6**     **Dry dock reserves**

(a)     The Borrowers shall procure that on the date falling 3 months after the Utilisation Date and quarterly thereafter, there is transferred to the Dry Dock Reserves Account out of the Earnings Account an amount of US$17,500.

- 67 -

(b) Sums held in the Dry Dock Reserves Account may be used only for the payment by the Borrowers of scheduled dry dock expenses relating to the Vessel.

## 25. SECURITY SHORTFALL

### 25.1 Minimum Security Value

(a) If, at any time during the Facility Period, the Security Value (as determined in accordance with Clause 25.2 (*Valuation of Vessel*)) shall be less than the Security Requirement, the Agent may give notice to the Borrowers requiring such deficiency to be remedied and the Borrowers shall within thirty (30) days of receipt by the Borrowers of the Agent's said notice either:

  (i) prepay such sum in Dollars as will result in the Security Requirement after such prepayment (taking into account any other repayment of the Loan made between the date of the notice and the date of such prepayment) being equal to the Security Value; or

  (ii) constitute to the satisfaction of the Agent such further security for the Loan as shall be acceptable to the Agent having a value for security purposes (as determined by the Agent in its absolute discretion) at the date upon which such further security shall be constituted which, when added to the Security Value, shall not be less than the Security Requirement as at such date.

(b) Clause 7 (*Prepayment and Cancellation*) shall apply to prepayments under paragraph (a).

### 25.2 Valuation of Vessel

The Market Value of the Vessel at any time is that shown by the relevant Valuation.

### 25.3 Valuation of Additional Vessel Security

The net realisable value of any additional security which is provided under Clause 25.1(a)(ii) (*Minimum Security Value*) and which consists of Security over a vessel shall be that shown by a Valuation.

### 25.4 Valuations Binding

(a) Any valuation under Clause 25.2 (*Valuation of Vessel*) shall be binding and conclusive as regards the Borrowers, as shall any valuation which the Agent makes of any additional security which does not consist of or include Security.

(b) If a dispute arises over any valuation, a further valuation will be obtained from an independent sale and purchase broker acceptable to the Agent and the average of the two valuations will prevail.

### 25.5 Provision of Information

The Borrowers shall promptly provide (or procure the provision to, as the case may be) the Agent and any shipbroker or expert acting under Clause 25.2(*Valuation of Vessel*) with any information which the Agent or the shipbroker or expert may reasonably require for the purposes of the valuation; and, if the Borrowers fail to provide the information by the dates specified in the request, the valuation will be made on any basis and assumptions which the Agent (or the shipbroker or expert appointed by it) considers prudent.

EME_ACTIVE-564940718.11-CEHENDER 12/20/2016 4:04 AM

**25.6    Payment of Valuation Expenses**

The Borrowers shall, on demand, pay the Agent the amount of the fees and expenses of any shipbroker or expert instructed by the Agent under this Clause 25 (*Security Shortfall*) and all legal and other expenses incurred by the Agent in connection with any matter arising out of this Clause 25 (*Security Shortfall*).

**25.7    Provision of Valuations**

The Borrowers shall, at their own cost and on the Agent's request, provide a Valuation of the Vessel and any other vessel over which additional security has been created in accordance with Clause 25.3 (*Valuation of Additional Vessel Security*) to enable the Agent to determine the Market Value of the Vessel; provided that, as long as no Default has occurred and is existing, the Agent may not request such Valuations more frequently than on a quarterly basis.

**26.    EVENTS OF DEFAULT**

Each of the events or circumstances set out in this Clause 26 is an Event of Default (save for Clause 26.16 (*Acceleration*)).

**26.1    Non-payment**

An Obligor does not pay on the due date any amount payable pursuant to a Finance Document at the place and in the currency in which it is expressed to be payable unless its failure to pay is caused by a Disruption Event and is paid within five (5) Business Days of its due date.

**26.2    Breach of Other Obligations**

(a)    Any requirement of Clause 20 (*Financial covenants*) is not satisfied.

(b)    An Obligor does not comply with any term of:

   (i)    Clause 19.5 (*Notification of default*);

   (ii)    Clause 4.4 (*Conditions Subsequent*);

   (iii)    the obligatory insurances of the Vessel are not placed and kept in full force and effect in accordance with the requirements of Clause 23 (*Insurance*); or

   (iv)    the Borrowers are not in compliance with Clause 25.1 (*Minimum Security Value*).

(c)    An Obligor does not comply with any provision of the Finance Documents (other than those referred to in Clause 26.1 (*Non-payment*), paragraph (b) above and Clause 21.16 (*Taxes*).

(d)    No Event of Default under paragraph (c) above will occur if the failure to comply is capable of remedy and is remedied within ten (10) Business Days of the earlier of (i) the Agent giving notice to the Borrowers and (ii) any Obligor becoming aware of the failure to comply.

**26.3    Misrepresentation**

Any representation or statement made or deemed to be made by an Obligor in the Finance Documents or any other document delivered by or on behalf of any Obligor under or in

- 69 -

connection with any Finance Document is or proves to have been incorrect or misleading in any material respect when made or deemed to be made (save that this Clause 26.3 shall not apply to Clause 18.1(*Status*)).

**26.4    Cross default**

(a)    Any Financial Indebtedness of any Obligor, the Charterer or the Sub-Charterer is not paid when due nor within any originally applicable grace period.

(b)    Any Financial Indebtedness of any Obligor, the Charterer or the Sub-Charterer is declared to be or otherwise becomes due and payable prior to its specified maturity as a result of an event of default (however described).

(c)    Any commitment for any Financial Indebtedness of any Obligor. the Charterer or the Sub-Charterer is cancelled or suspended by a creditor of any Obligor, the Charterer or the Sub-Charterer as a result of an event of default (however described).

(d)    Any creditor of any Obligor, the Charterer or the Sub-Charterer becomes entitled to declare any Financial Indebtedness of any Obligor, the Charterer or the Sub-Charterer due and payable prior to its specified maturity as a result of an event of default (however described).

(e)    No Event of Default shall occur under this Clause 26.4 unless, in respect of the Charterer, the Sub-Charterer or any Obligor other than the Borrowers, the aggregate amount of Financial Indebtedness or commitment (as the case may be) falling within (a) to (d) above is more than US$500,000 or its equivalent in any other currency.

**26.5    Insolvency**

(a)    Any Obligor or the Charterer:

(i)    is unable or admits inability to pay its debts as they fall due;

(ii)    is deemed to, or is declared to, be unable to pay its debts under applicable law;

(iii)    suspends or threatens to suspend making payments on any of its debts; or

(iv)    by reason of actual or anticipated financial difficulties, commences negotiations with one or more of its creditors (excluding any Finance Party in its capacity as such) with a view to rescheduling any of its indebtedness.

(b)    The value of the assets of any Obligor or the Charterer is less than its liabilities (taking into account contingent and prospective liabilities).

(c)    A moratorium is declared in respect of any indebtedness of any Obligor or the Charterer. If a moratorium occurs, the ending of the moratorium will not remedy any Event of Default covered by that moratorium.

**26.6    Insolvency proceedings**

(a)    Any corporate action, legal proceedings or other procedure or step is taken in relation to:

(i)    the suspension of payments, a moratorium of any indebtedness, winding-up, dissolution, administration or reorganisation (by way of voluntary

- 70 -

arrangement, scheme of arrangement or otherwise) of any Obligor, the Charterer or the Sub-Charterer;

(ii)     a composition, compromise, assignment or arrangement with any creditor of any Obligor, the Charterer or the Sub-Charterer;

(iii)    the appointment of a liquidator, receiver, administrative receiver, administrator, compulsory manager or other similar officer in respect of any Obligor, the Charterer or the Sub-Charterer or any of its assets; or

(iv)     enforcement of any Security over any assets of any Obligor, the Charterer or the Sub-Charterer,

or any analogous procedure or step is taken in any jurisdiction.

(b)   Paragraph (a) above shall not apply to any winding-up petition which is frivolous or vexatious and is discharged, stayed or dismissed within fourteen (14) days of commencement.

**26.7   Creditors' process**

(i)     Any expropriation, attachment, sequestration, distress or execution affects any asset or assets of any Obligor, the Charterer of the Sub-Charterer and is not discharged within fourteen (14) days.

(ii)    No Event of Default shall occur under this Clause 26.7 unless, in respect of the Charterer, the Sub-Charterer or any Obligor other than the Borrowers, the value of the relevant assets is less than US$500,000 or its equivalent in any other currency.

**26.8   Cessation of business**

Any Obligor ceases, or threatens to cease, to carry on business except as a result of any disposal allowed under this Agreement.

**26.9   Unlawfulness and invalidity**

(a)   It is or becomes unlawful for any Obligor to perform any of its obligations under the Finance Documents or any Transaction Security created or expressed to be created or evidenced by the Security Documents ceases to be effective or any subordination created under a Subordination Agreement is or becomes unlawful.

(b)   Any obligation or obligations of any Obligor under any Finance Documents are not (subject to the Legal Reservations) or cease to be legal, valid, binding or enforceable and the cessation individually or cumulatively materially and adversely affects the interests of the Finance Parties under the Finance Documents.

(c)   Any Finance Document or Security created or expressed to be created or intended to be created by the Finance Documents ceases to be in full force and effect or is alleged by a party to it (other than a Finance Party) to be ineffective for any reason.

(d)   Any Transaction Security proves to have ranked after or lost its priority to any other Security.

**26.10   Repudiation and rescission of agreements**

- 71 -

Any Obligor (or any other relevant party) rescinds or purports to rescind or repudiates or purports to repudiate a Finance Document or any of the Transaction Security or evidences an intention to rescind or repudiate a Finance Document or any Transaction Security.

**26.11   Expropriation**

The authority or ability of any Obligor to conduct its business is limited or is wholly or substantially curtailed by seizure, expropriation, nationalisation, intervention, restriction or other action by or on behalf of any government or agency in relation to an Obligor or any of its assets.

**26.12   Change of Control**

(a)     Any Borrower is not or ceases to be a legally and beneficially wholly owned Subsidiary of Guarantor B.

(b)     A Change of Control occurs in relation to either Guarantor.

**26.13   Vessel Defaults**

(a)     The Vessel is arrested, detained, seized, impounded in exercise or purported exercise of any possessory lien or other claim or interest and the Vessel is not released within five (5) days of the occurrence of the same.

(b)     The Charter or the Sub-Charter is terminated, cancelled, suspended, rescinded or revoked or otherwise ceases to be in full force and effect for any reason.

(c)     The Vessel is managed by a person other than the Approved Managers.

(d)     Any accident or other incident involving the Vessel occurs in the light of which the Agent considers there is a significant risk that the Borrowers are, or will become, unable to discharge their liabilities under the Finance Documents.

(e)     The Vessel is off-hire under the Charter and/or the Sub-Charter for a continuous period of 30 days or for 90 days in any 12 month period and the lost hire is not covered by appropriate insurances.

**26.14   Litigation**

Any litigation, arbitration or administrative or regulatory proceeding is commenced by or against any Obligor which, if adversely determined, could reasonably be expected to have a Material Adverse Effect.

**26.15   Material adverse change**

Any event or circumstance occurs which, in the opinion of the Majority Lenders, has or is reasonably likely to have a Material Adverse Effect.

**26.16   Acceleration**

On and at any time after the occurrence of an Event of Default which is continuing the Agent may, and shall if so directed by the Majority Lenders, by notice to the Borrowers:

(a)     cancel the Total Commitments whereupon they shall immediately be cancelled;

- 72 -

(b)     declare that all or part of the Loan, together with accrued interest, and all other amounts accrued or outstanding under the Finance Documents be immediately due and payable, whereupon they shall become immediately due and payable;

(c)     declare that all or part of the Loan be payable on demand, whereupon all or part of the Loan (as the case may be) shall immediately become payable on demand by the Agent on the instructions of the Majority Lenders;

(d)     declare that no withdrawal may be made from any Account; and/or

(e)     exercise or direct the Security Agent to exercise any or all of its rights, remedies, powers or discretions under the Finance Documents.

**26.17    Approved Managers**

Without prejudice to Clause 26.16, the Borrowers will, at the request of the Agent, at any time when an Event of Default is outstanding, replace the Approved Managers appointed by the Borrowers in relation to the Vessel with an alternative entity identified by the Agent as appropriate.

**27.      CHANGES TO THE LENDERS**

**27.1    Assignments and transfers by the Lenders**

Subject to this Clause 27, a Lender (the "**Existing Lender**") may:

(a)     assign any of its rights; or

(b)     transfer by novation any of its rights and obligations,

to any other bank or financial institution or to a trust or fund or other entity which is regularly engaged in or established for the purpose of making, purchasing or investing in loans, securities or other financial assets (the "**New Lender**").

**27.2    Conditions of assignment or transfer**

(a)     An assignment will only be effective on:

(i)     receipt by the Agent (whether in the Assignment Agreement or otherwise) of written confirmation from the New Lender (in form and substance satisfactory to the Agent) that the New Lender will assume the same obligations to the other Finance Parties as it would have been under if it was an Original Lender; and

(ii)    performance by the Agent of all necessary "know your customer" or other similar checks under all applicable laws and regulations in relation to such assignment to a New Lender, the completion of which the Agent shall *promptly notify* to the Existing Lender and the New Lender.

(b)     A transfer will only be effective if the procedure set out in Clause 27.5(*Procedure for transfer*) is complied with.

(c)     If:

(i)     a Lender assigns or transfers any of its rights or obligations under the Finance Documents or changes its Facility Office; and

- 73 -

(ii) as a result of circumstances existing at the date the assignment, transfer or change occurs, an Obligor would be obliged to make a payment to the New Lender or Lender acting through its new Facility Office under Clause 11 (*Tax gross up and indemnities*) or Clause 12 (*Increased costs*),

then the New Lender or Lender acting through its new Facility Office is only entitled to receive payment under those Clauses to the same extent as the Existing Lender or Lender acting through its previous Facility Office would have been if the assignment, transfer or change had not occurred.  This paragraph (c) shall not apply:

(iii) in respect of an assignment or transfer made in the ordinary course of the primary syndication of the Facility;

(iv) in relation to Clause 11.2(*Tax gross-up*), to a Treaty Lender that has included a confirmation of its scheme reference number and its jurisdiction of tax reference in accordance with paragraph 11.2(f) of Clause 11.2(*Tax gross-up*) if the Obligor making the payment has not made a Borrower DTTP Filing in respect of that Treaty Lender; or

(v) to the extent that the payment under Clause 11 (*Tax gross-up and indemnities*) relates to a FATCA Deduction.

(d) Each New Lender, by executing the relevant Transfer Certificate or Assignment Agreement, confirms, for the avoidance of doubt, that the Agent has authority to execute on its behalf any amendment or waiver that has been approved by or on behalf of the requisite Lender or Lenders in accordance with this Agreement on or prior to the date on which the transfer or assignment becomes effective in accordance with this Agreement and that it is bound by that decision to the same extent as the Existing Lender would have been had it remained a Lender.

**27.3    Assignment or transfer fee**

The New Lender shall, on the date upon which an assignment or transfer takes effect, pay to the Agent (for its own account) a fee of $10,000.

**27.4    Limitation of responsibility of Existing Lenders**

(a) Unless expressly agreed to the contrary, an Existing Lender makes no representation or warranty and assumes no responsibility to a New Lender for:

(i) the legality, validity, effectiveness, adequacy or enforceability of the Finance Documents or any other documents;

(ii) the financial condition of any Obligor;

(iii) the performance and observance by any Obligor of its obligations under the Finance Documents or any other documents; or

(iv) the accuracy of any statements (whether written or oral) made in or in connection with any Finance Document or any other document,

and any representations or warranties implied by law are excluded.

(b) Each New Lender confirms to the Existing Lender and the other Finance Parties that it:

(i)    has made (and shall continue to make) its own independent investigation and assessment of the financial condition and affairs of each Obligor and its related entities in connection with its participation in this Agreement and has not relied exclusively on any information provided to it by the Existing Lender in connection with any Finance Document; and

(ii)    will continue to make its own independent appraisal of the creditworthiness of each Obligor and its related entities whilst any amount is or may be outstanding under the Finance Documents or any Commitment is in force.

(c)    Nothing in any Finance Document obliges an Existing Lender to:

(i)    accept a re-transfer or re-assignment from a New Lender of any of the rights and obligations assigned or transferred under this Clause 27; or

(ii)    support any losses directly or indirectly incurred by the New Lender by reason of the non-performance by any Obligor of its obligations under the Finance Documents or otherwise.

**27.5    Procedure for transfer**

(a)    Subject to the conditions set out in Clause 27.2 (*Conditions of assignment or transfer*) a transfer is effected in accordance with paragraph (c) below when the Agent executes an otherwise duly completed Transfer Certificate delivered to it by the Existing Lender and the New Lender. The Agent shall, subject to paragraph (b) below, as soon as reasonably practicable after receipt by it of a duly completed Transfer Certificate appearing on its face to comply with the terms of this Agreement and delivered in accordance with the terms of this Agreement, execute that Transfer Certificate.

(b)    The Agent shall only be obliged to execute a Transfer Certificate delivered to it by the Existing Lender and the New Lender once it is satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations in relation to the transfer to such New Lender.

(c)    Subject to Clause 27.9 (*Pro rata interest settlement*), on the Transfer Date:

(i)    to the extent that in the Transfer Certificate the Existing Lender seeks to transfer by novation its rights and obligations under the Finance Documents, each of the Obligors and the Existing Lender shall be released from further obligations towards one another under the Finance Documents and their respective rights against one another under the Finance Documents shall be cancelled (being the "**Discharged Rights and Obligations**");

(ii)    each of the Obligors and the New Lender shall assume obligations towards one another and/or acquire rights against one another which differ from the Discharged Rights and Obligations only insofar as that Obligor and the New Lender have assumed and/or acquired the same in place of that Obligor and the Existing Lender;

(iii)    the Agent, the Arranger, the New Lender and other Lenders shall acquire the same rights and assume the same obligations between themselves as they would have acquired and assumed had the New Lender been an Original Lender with the rights and/or obligations acquired or assumed by it as a result of the transfer and to that extent the Agent, the Arranger and the Existing

EME_ACTIVE-564940718.11-CEHENDER 12/20/2016 4:04 AM

Lender shall each be released from further obligations to each other under the Finance Documents; and

(iv)    the New Lender shall become a Party as a "Lender".

**27.6    Procedure for assignment**

(a)    Subject to the conditions set out in Clause 27.2(*Conditions of assignment or transfer*) an assignment may be effected in accordance with paragraph (c) below when the Agent executes an otherwise duly completed Assignment Agreement delivered to it by the Existing Lender and the New Lender. The Agent shall, subject to paragraph (b) below, as soon as reasonably practicable after receipt by it of a duly completed Assignment Agreement appearing on its face to comply with the terms of this Agreement and delivered in accordance with the terms of this Agreement, execute that Assignment Agreement.

(b)    The Agent shall only be obliged to execute an Assignment Agreement delivered to it by the Existing Lender and the New Lender once it is satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations in relation to the assignment to such New Lender.

(c)    Subject to Clause 27.9 (*Pro rata interest settlement*), on the Transfer Date:

    (i)    the Existing Lender will assign absolutely to the New Lender the rights under the Finance Documents expressed to be the subject of the assignment in the Assignment Agreement;

    (ii)    the Existing Lender will be released by each Obligor and the other Finance Parties from the obligations owed by it (the **"Relevant Obligations"**) and expressed to be the subject of the release in the Assignment Agreement; and

    (iii)    the New Lender shall become a Party as a "Lender" and will be bound by obligations equivalent to the Relevant Obligations.

(d)    The Lenders may utilise procedures other than those set out in this Clause 27.6 to assign their rights under the Finance Documents (but not, without the consent of the relevant Obligor or unless in accordance with Clause 27.5(*Procedure for transfer*), to obtain a release by that Obligor from the obligations owed to that Obligor by the Lenders nor the assumption of equivalent obligations by a New Lender) provided that they comply with the conditions set out in Clause 27.2(*Conditions of assignment or transfer*).

**27.7    Copy of Transfer Certificate or Assignment Agreement to Borrowers**

The Agent shall, as soon as reasonably practicable after it has executed a Transfer Certificate or an Assignment Agreement, send to the Borrowers a copy of that Transfer Certificate or Assignment Agreement.

**27.8    Security over Lenders' rights**

In addition to the other rights provided to Lenders under this Clause 27, each Lender may without consulting with or obtaining consent from any Obligor, at any time charge, assign or otherwise create Security in or over (whether by way of collateral or otherwise) all or any of its rights under any Finance Document to secure obligations of that Lender including, without limitation:

- 76 -

(a) any charge, assignment or other Security to secure obligations to a federal reserve or central bank; and

(b) in the case of any Lender which is a fund, any charge, assignment or other Security granted to any holders (or trustee or representatives of holders) of obligations owed, or securities issued, by that Lender as security for those obligations or securities,

except that no such charge, assignment or Security shall:

(i) release a Lender from any of its obligations under the Finance Documents or substitute the beneficiary of the relevant charge, assignment or Security for the Lender as a party to any of the Finance Documents; or

(ii) require any payments to be made by an Obligor other than or in excess of, or grant to any person any more extensive rights than, those required to be made or granted to the relevant Lender under the Finance Documents.

**27.9   Pro rata interest settlement**

If the Agent has notified the Lenders that it is able to distribute interest payments on a "pro rata basis" to Existing Lenders and New Lenders then (in respect of any transfer pursuant to Clause 27.5(*Procedure for transfer*) or any assignment pursuant to Clause 27.6(*Procedure for assignment*) the Transfer Date of which, in each case, is after the date of such notification and is not on the last day of an Interest Period):

(a) any interest or fees in respect of the relevant participation which are expressed to accrue by reference to the lapse of time shall continue to accrue in favour of the Existing Lender up to but excluding the Transfer Date ("**Accrued Amounts**") and shall become due and payable to the Existing Lender (without further interest accruing on them) on the last day of the current Interest Period (or, if the Interest Period is longer than 6 months, on the next of the dates which falls at 6 monthly intervals after the first day of that Interest Period); and

(b) the rights assigned or transferred by the Existing Lender will not include the right to the Accrued Amounts, so that, for the avoidance of doubt:

(i) when the Accrued Amounts become payable, those Accrued Amounts will be payable to the Existing Lender; and

(ii) the amount payable to the New Lender on that date will be the amount which would, but for the application of this Clause 27.9, have been payable to it on that date, but after deduction of the Accrued Amounts.

**28.   CHANGES TO THE OBLIGORS**

**28.1   Assignments and transfer by Obligors**

No Obligor may assign any of its rights or transfer any of its rights or obligations under the Finance Documents.

**28.2   Compulsory resignation of FATCA FFIs and US Tax Obligors**

If so directed by the Agent (acting on the instructions of the Majority Lenders) the Borrowers shall procure that any Obligor which is a FATCA FFI or a US Tax Obligor shall resign as a Borrower or Guarantor (as the case may be) prior to the earliest FATCA Application Date

relating to any payment by that Obligor (or any payment by the Agent which relates to a payment by that Obligor).

## 29. ROLE OF THE AGENT, THE SECURITY AGENT AND THE ARRANGER

### 29.1 The Agent and the Security Agent

(a) Each of the Arranger and the Lenders appoints the Agent to act as its agent under and in connection with the Finance Documents.

(b) The Security Agent declares that it holds the Security Property on trust for the Secured Parties on the terms contained in this Agreement.

(c) Each of the Finance Parties authorises the Agent and the Security Agent:

    (i) to exercise the rights, powers, authorities and discretions specifically given to the Agent and the Security Agent (as applicable) under or in connection with the Finance Documents together with any other incidental rights, powers, authorities and discretions; and

    (ii) to execute each of the Security Documents and all other documents approved by the Majority Lenders or all Lenders (as the case may be) for execution by it.

### 29.2 Enforcement through Security Agent only

The Secured Parties shall not have any independent power to enforce, or have recourse to, any of the Transaction Security or to exercise any right, power, authority or discretion arising under the Security Documents except through the Security Agent.

### 29.3 Instructions

(a) Each of the Agent and the Security Agent shall:

    (i) unless a contrary indication appears in a Finance Document, exercise or refrain from exercising any right, power, authority or discretion vested in it as Agent or Security Agent (as applicable) in accordance with any instructions given to it by:

        (A) all Lenders if the relevant Finance Document stipulates the matter is an all Lender decision; and

        (B) in all other cases, the Majority Lenders; and

    (ii) not be liable for any act (or omission) if it acts (or refrains from acting) in accordance with paragraph (i) above (or, if this Agreement stipulates the matter is a decision for any other Finance Party or group of Finance Parties, from that Finance Party or group of Finance Parties).

(b) Each of the Agent and the Security Agent shall be entitled to request instructions, or clarification of any instruction, from the Majority Lenders (or, if the relevant Finance Document stipulates the matter is a decision for any other Finance Party or group of Finance Parties, from that Finance Party or group of Finance Parties) as to whether, and in what manner, it should exercise or refrain from exercising any right, power,

authority or discretion and the Agent or Security Agent (as applicable) may refrain from acting unless and until it receives those instructions or that clarification.

(c)     Save in the case of decisions stipulated to be a matter for any other Finance Party or group of Finance Parties under the relevant Finance Document and unless a contrary indication appears in a Finance Document, any instructions given to the Agent or Security Agent (as applicable) by the Majority Lenders shall override any conflicting instructions given by any other Parties and will be binding on all Finance Parties.

(d)     Paragraph (a) above shall not apply:

        (i)     where a contrary indication appears in a Finance Document;

        (ii)    where a Finance Document requires the Agent or the Security Agent to act in a specified manner or to take a specified action;

        (iii)   in respect of any provision which protects the Agent's or Security Agent's own position in its personal capacity as opposed to its role of Agent or Security Agent for the relevant Finance Parties or Secured Parties (as applicable) including, without limitation, Clause 29.6 (*No fiduciary duties*) to Clause 29.11 (*Exclusion of liability*), Clause 29.14 (*Confidentiality*) to Clause 29.21 (*Custodians and nominees*) and Clause 29.24 (*Acceptance of title*) to Clause 29.28 (*Disapplication of Trustee Acts*);

        (iv)    in respect of the exercise of the Security Agent's discretion to exercise a right, power or authority under any of:

                (A)     Clause 30.2 (*Deductions from receipts*); and

                (B)     Clause 30.3 (*Prospective liabilities*).

(e)     If giving effect to instructions given by the Majority Lenders would (in the Agent's or (as applicable) the Security Agent's opinion) have an effect equivalent to an amendment or waiver referred to in Clause 38 (*Remedies and waivers*), the Agent or (as applicable) Security Agent shall not act in accordance with those instructions unless consent to it so acting is obtained from each Party (other than the Agent or Security Agent) whose consent would have been required in respect of that amendment or waiver.

(f)     In exercising any discretion to exercise a right, power or authority under the Finance Documents where either:

        (i)     it has not received any instructions as to the exercise of that discretion; or

        (ii)    the exercise of that discretion is subject to paragraph (d)(iv) above,

        the Agent or Security Agent shall do so having regard to the interests of (in the case of the Agent) all the Finance Parties and (in the case of the Security Agent) all the Secured Parties.

(g)     The Agent or the Security Agent (as applicable) may refrain from acting in accordance with any instructions of any Finance Party or group of Finance Parties until it has received any indemnification and/or security that it may in its discretion require (which may be greater in extent than that contained in the Finance Documents

EME_ACTIVE-564940718.11-CEHENDER 12/20/2016 4:04 AM

and which may include payment in advance) for any cost, loss or liability (together with any applicable VAT) which it may incur in complying with those instructions.

(h)     Without prejudice to the remainder of this Clause 29.3 (*Instructions*), in the absence of instructions, each of the Agent and the Security Agent may act (or refrain from acting) as it considers to be in the best interest of (in the case of the Agent) the Finance Parties and (in the case of the Security Agent) the Secured Parties.

(i)     Neither the Agent nor the Security Agent is authorised to act on behalf of a Finance Party (without first obtaining that Finance Party's consent) in any legal or arbitration proceedings relating to any Finance Document.  This paragraph (i) shall not apply to any legal or arbitration proceeding relating to the perfection, preservation or protection of rights under the Security Documents or enforcement of the Security or Security Documents.

## 29.4   Duties of the Agent and Security Agent

(a)     The duties of the Agent and the Security Agent under the Finance Documents are solely mechanical and administrative in nature.

(b)     Subject to paragraph (c) below, each of the Agent and the Security Agent shall promptly forward to a Party the original or a copy of any document which is delivered to the Agent or Security Agent (as applicable) for that Party by any other Party.

(c)     Without prejudice to Clause 27.7 (*Copy of Transfer Certificate or Assignment Agreement to Borrowers*), paragraph (b) above shall not apply to any Transfer Certificate or any Assignment Agreement.

(d)     Except where a Finance Document specifically provides otherwise, neither the Agent nor the Security Agent is obliged to review or check the adequacy, accuracy or completeness of any document it forwards to another Party.

(e)     If the Agent or the Security Agent receives notice from a Party referring to any Finance Document, describing a Default and stating that the circumstance described is a Default, it shall promptly notify the other Finance Parties.

(f)     If the Agent is aware of the non-payment of any principal, interest, commitment fee or other fee payable to a Finance Party (other than the Agent, the Arranger or the Security Agent) under this Agreement, it shall promptly notify the other Finance Parties.

(g)     Each of the Agent and the Security Agent shall have only those duties, obligations and responsibilities expressly specified in the Finance Documents to which it is expressed to be a party (and no others shall be implied).

## 29.5   Role of the Arranger

Except as specifically provided in the Finance Documents, the Arranger has no obligations of any kind to any other Party under or in connection with any Finance Document.

## 29.6   No fiduciary duties

(a)     Nothing in any Finance Document constitutes:

    (i)    the Agent or the Arranger as a trustee or fiduciary of any other person; or

    (ii)    the Security Agent as an agent, trustee or fiduciary of any Obligor.

    (iii)    None of the Agent, the Security Agent or the Arranger shall be bound to account to any other Finance Party or (in the case of the Security Agent) any Secured Party or the profit element of any sum received by it for its own account.

    (iv)    The provisions of this Clause 29.6 shall apply even if, notwithstanding and contrary to this Clause 29.6, any provision of any Finance Document by operation of law has the effect of constituting the Agent as a true or fiduciary of any person, or the Security Agent as an agent, trustee or fiduciary of any Obligor or otherwise requiring the Agent, the Security Agent or the Arranger to account to any other Finance Party or Secured Party (as the case may be).

## 29.7   Business with the Group

The Agent, the Security Agent and the Arranger may accept deposits from, lend money to and generally engage in any kind of banking or other business with any Obligor or Affiliate of an Obligor.

## 29.8   Rights and discretions

(a)    Each of the Agent and the Security Agent may:

    (i)    rely on any representation, communication, notice or document believed by it to be genuine, correct and appropriately authorised;

    (ii)    assume that:

        (A)    any instructions received by it from the Majority Lenders, any Finance Parties or any group of Finance Parties are duly given in accordance with the terms of the Finance Documents; and

        (B)    unless it has received notice of revocation, that those instructions have not been revoked; and

        (C)    rely on a certificate from any person:

            (1)    as to any matter of fact or circumstance which might reasonably be expected to be within the knowledge of that person; or

            (2)    to the effect that such person approves of any particular dealing, transaction, step, action or thing,

        as sufficient evidence that that is the case and, in the case of paragraph (1) above, may assume the truth and accuracy of that certificate.

(b)    Each of the Agent and the Security Agent may assume (unless it has received notice to the contrary in its capacity as agent or security trustee for the Finance Parties or Secured Parties) that:

EME_ACTIVE-554940718.11-CEHENDER 12/20/2016 4:04 AM

  (i)  no Default has occurred (unless, in the case of the Agent, it has actual knowledge of a Default arising under Clause 26.1 (*Non-payment*));

  (ii)  any right, power, authority or discretion vested in any Party or any group of Finance Parties has not been exercised; and

  (iii)  any notice or request made by an Obligor (other than an Utilisation Request) is made on behalf of and with the consent and knowledge of all the Obligors.

(c)  Each of the Agent and the Security Agent may engage and pay for the advice or services of any lawyers, accountants, tax advisers, surveyors or other professional advisers or experts.

(d)  Without prejudice to the generality of paragraph (e) below, each of the Agent and the Security Agent may at any time engage and pay for the services of any lawyers to act as independent counsel to the Agent or Security Agent (as applicable), (and so separate from any lawyers instructed by the Lenders) if the Agent or Security Agent (as applicable), in its reasonable opinion deems this to be desirable.

(e)  Each of the Agent and the Security Agent may rely on the advice or services of any lawyers, accountants, tax advisers, surveyors or other professional advisers or experts (whether obtained by the Agent or by the Security Agent or by any other Party) and shall not be liable for any damages, costs or losses to any person, any diminution in value or any liability whatsoever arising as a result of its so relying.

(f)  Each of the Agent and the Security Agent may act in relation to the Finance Documents and the Security Property through its officers, employees and agents and shall not:

  (i)  be liable for any error of judgment made by any such person; or

  (ii)  be bound to supervise, or be in any way responsible for any loss incurred by reason of misconduct, omission or default on the part, of any such person,

unless such error or such loss was directly caused by the Agent's or the Security Agent's (as applicable) gross negligence or wilful misconduct.

(g)  Unless a Finance Document expressly provides otherwise each of the Agent and the Security Agent may disclose to any other Party any information it reasonably believes it has received as agent or security trustee under the Finance Documents.

(h)  Notwithstanding any other provision of any Finance Document to the contrary, none of the Agent, the Security Agent or the Arranger is obliged to do or omit to do anything if it would, or might in its reasonable opinion, constitute a breach of any law or regulation or a breach of a fiduciary duty or duty of confidentiality.

(i)  Notwithstanding any provision of any Finance Document to the contrary, neither the Agent nor the Security Agent is obliged to expend or risk its own funds or otherwise incur any financial liability in the performance of its duties, obligations or responsibilities or the exercise of any right, power, authority or discretion if it has grounds for believing the repayment of such funds or adequate indemnity against, or security for, such risk or liability is not reasonably assured to it.

**29.9  Responsibility for documentation**

None of the Agent, the Security Agent or the Arranger, is responsible or liable for:

(a)   the adequacy, accuracy or completeness of any information (whether oral or written) supplied by the Agent, the Security Agent, the Arranger, an Obligor or any other person in or in connection with any Finance Document or the transactions contemplated in the Finance Documents or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document;

(b)   the legality, validity, effectiveness, adequacy or enforceability of any Finance Document or the Security Property or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document or the Security Property; or

(c)   any determination as to whether any information provided or to be provided to any Finance Party or Secured Party is non-public information the use of which may be regulated or prohibited by applicable law or regulation relating to insider dealing or otherwise.

**29.10   No duty to monitor**

Neither, the Agent nor the Security Agent shall not be bound to enquire:

(a)   whether or not any Default has occurred;

(b)   as to the performance, default or any breach by any Party of its obligations under any Finance Document; or

(c)   whether any other event specified in any Finance Document has occurred.

**29.11   Exclusion of liability**

(a)   Without limiting paragraph (b) below (and without prejudice to any other provision of any Finance Document excluding or limiting the liability of the Agent, the Security Agent or any Receiver or Delegate), none of the Agent, the Security Agent nor any Receiver or Delegate will be liable (including, without limitation, for negligence or any other category of liability whatsoever) for:

(i)   any damages, costs or losses to any person, any diminution in value, or any liability whatsoever arising as a result of taking or not taking any action under or in connection with any Finance Document or the Security Property, unless directly caused by its gross negligence or wilful misconduct;

(ii)   exercising, or not exercising, any right, power, authority or discretion given to it by, or in connection with, any Finance Document, the Security Property or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with, any Finance Document or the Security Property;

(iii)   any shortfall which arises on the enforcement or realisation of the Security Property; or

(iv)   without prejudice to the generality of paragraphs (i) to (iii) above, any damages, costs or losses to any person, any diminution in value or any liability whatsoever arising as a result of:

EME_ACTIVE-564940718.11-CEHENDER 12/20/2016 4:04 AM

(A)    any act, event or circumstance not reasonably within its control; or

(B)    the general risks of investment in, or the holding of assets in, any jurisdiction,

including (in each case and without limitation) such damages, costs, losses, diminution in value or liability arising as a result of: nationalisation, expropriation or other governmental actions; any regulation, currency restriction, devaluation or fluctuation; market conditions affecting the execution or settlement of transactions or the value of assets (including any Disruption Event); breakdown, failure or malfunction of any third party transport, telecommunications, computer services or systems; natural disasters or acts of God; war, terrorism, insurrection or revolution; or strikes or industrial action.

(b)    No Party (other than the Agent, the Security Agent, that Receiver or that Delegate (as applicable)) may take any proceedings against any officer, employee or agent of the Agent, the Security Agent, a Receiver or a Delegate, in respect of any claim it might have against the Agent, the Security Agent, a Receiver or a Delegate or in respect of any act or omission of any kind by that officer, employee or agent in relation to any Finance Document or any Security Property and any officer, employee or agent of the Agent, the Security Agent, a Receiver or a Delegate may rely on this Clause.

(c)    Neither the Agent nor the Security Agent will not be liable for any delay (or any related consequences) in crediting an account with an amount required under the Finance Documents to be paid by the Agent or the Security Agent (as applicable) if the Agent or Security Agent (as applicable) has taken all necessary steps as soon as reasonably practicable to comply with the regulations or operating procedures of any recognised clearing or settlement system used by the Agent or the Security Agent (as applicable) for that purpose.

(d)    Nothing in this Agreement shall oblige the Agent, the Security Agent or the Arranger to carry out:

(i)    any "know your customer" or other checks in relation to any person; or

(ii)    any check on the extent to which any transaction contemplated by this Agreement might be unlawful for any Finance Party,

on behalf of any Finance Party and each Finance Party confirms to the Agent, the Security Agent or the Arranger that it is solely responsible for any such checks it is required to carry out and that it may not rely on any statement in relation to such checks made by the Agent, the Security Agent or the Arranger.

(e)    Without prejudice to any provision of any Finance Document excluding or limiting the liability of the Agent, the Security Agent, any Receiver or Delegate, any liability of the Agent, the Security Agent, any Receiver or Delegate arising under or in connection with any Finance Document or the Security Property shall be limited to the amount of actual loss which has been finally judicially determined to have been suffered (as determined by reference to the date of default of the Agent, the Security Agent, Receiver or Delegate or, if later, the date on which the loss arises as a result of such default) but without reference to any special conditions or circumstances known to the Agent, the Security Agent, any Receiver or Delegate at any time which increase the amount of that loss. In no event shall the Agent, the Security Agent, any Receiver or Delegate be liable for any loss of profits, goodwill, reputation, business

EME_ACTIVE-564940716.11-CEHENDER 12/20/2016 4:04 AM

opportunity or anticipated saving, or for special, punitive, indirect or consequential damages, whether or not the Agent, the Security Agent, the Receiver or Delegate has been advised of the possibility of such loss or damages.

**29.12   Lenders' indemnity to the Agent and Security Agent**

(a)   Each Lender shall (in proportion to its share of the Total Commitments or, if the Total Commitments are then zero, to its share of the Total Commitments immediately prior to their reduction to zero) indemnify the Agent, the Security Agent and every Receiver and every Delegate, within three (3) Business Days of demand, against any cost, loss or liability (including, without limitation, for negligence or any other category of liability whatsoever) incurred by any of them (otherwise than by reason of the Agent's, Security Agent's Receiver's or Delegate's gross negligence or wilful misconduct) (or, in the case of any cost, loss or liability pursuant to Clause 33.10 (*Disruption to Payment Systems etc.*), notwithstanding the Agent's negligence, gross negligence or any other category of liability whatsoever but not including any claim based on the fraud of the Agent) in acting as Agent, Security Agent, Receiver or Delegate under the Finance Documents (unless the relevant Agent, Security Agent, Receiver or Delegate has been reimbursed by an Obligor pursuant to a Finance Document).

(b)   Subject to paragraph (c) below, the Borrowers shall immediately on demand reimburse any Lender for any payment that Lender makes to the Agent or the Security Agent pursuant to paragraph (a) above.

(c)   Paragraph (b) above shall not apply to the extent that the indemnity payment in respect of which the Lender claims reimbursement relates to a liability of the Agent or the Security Agent to an Obligor.

**29.13   Resignation of the Agent and the Security Agent**

(a)   Each of the Agent and the Security Agent may resign and appoint one of its Affiliates as successor by giving notice to the other Finance Parties and the Borrowers.

(b)   Alternatively the Agent or the Security Agent may resign by giving thirty (30) days' notice to the other Finance Parties and the Borrowers, in which case the Majority Lenders (after consultation with the other Finance Parties and the Borrowers) may appoint a successor Agent or Security Agent (as applicable).

(c)   If the Majority Lenders have not appointed a successor Agent or Security Agent in accordance with paragraph (b) above within twenty (20) days after notice of resignation was given, the retiring Agent or Security Agent (as applicable) (after consultation with the other Finance Parties and the Borrowers) may appoint a successor Agent or Security Agent (as applicable).

(d)   If the Agent wishes to resign because (acting reasonably) it has concluded that it is no longer appropriate for it to remain as agent and the Agent is entitled to appoint a successor Agent under paragraph (c) above, the Agent may (if it concludes (acting reasonably) that it is necessary to do so in order to persuade the proposed successor Agent to become a party to this Agreement as Agent) agree with the proposed successor Agent amendments to this Clause 29 and any other term of this Agreement dealing with the rights or obligations of the Agent consistent with then current market practice for the appointment and protection of corporate trustees together with any reasonable amendments to the agency fee payable under this Agreement which are

- 85 -

consistent with the successor Agent's normal fee rates and those amendments will bind the Parties.

(e)     The retiring Agent or Security Agent (as applicable) shall make available to the successor Agent or Security Agent (as applicable) such documents and records and provide such assistance as the successor Agent or Security Agent may reasonably request for the purposes of performing its functions as Agent or Security Agent (as applicable) under the Finance Documents. The Borrowers shall, within three (3) Business Days of demand, reimburse the retiring Agent or Security Agent (as applicable) for the amount of all costs and expenses (including legal fees) properly incurred by it in making available such documents and records and providing such assistance.

(f)     The resignation notice of the Agent or Security Agent (as applicable) shall only take effect upon:

(i)      the appointment of a successor; and

(ii)     (in the case of the Security Agent) the transfer of the Security Property to that successor.

(g)     Upon the appointment of a successor, the retiring Agent or Security Agent (as applicable) shall be discharged from any further obligation in respect of the Finance Documents (other than its obligations under paragraph (b) of Clause 29.25 (*Winding up of trust*) and (e) above) but shall remain entitled to the benefit of Clause 13.3 (*Indemnity to the Agent*), Clause 13.4 (*Indemnity to the Security Agent*) and this Clause 29 (and any fees for the account of the retiring Agent or Security Agent (as applicable) shall cease to accrue from (and shall be payable on) that date). Any successor and each of the other Parties shall have the same rights and obligations amongst themselves as they would have had if such successor had been an original Party.

(h)     After consultation with the Borrowers, the Majority Lenders may, by giving thirty (30) days' notice to the Agent or Security Agent (as applicable), require it to resign in accordance with paragraph (b) above. In this event, the Agent or Security Agent (as applicable) shall resign in accordance with paragraph (b) above but the cost referred to in paragraph (e) above shall be for the account of the Borrowers.

(i)     The Agent shall resign in accordance with paragraph (b) above (and, to the extent applicable, shall use reasonable endeavours to appoint a successor Agent pursuant to paragraph (c) above) if on or after the date which is 3 months before the earliest FATCA Application Date relating to any payment to the Agent under the Finance Documents, either:

(i)      the Agent fails to respond to a request under Clause 11.8 (*FATCA Information*) and the Borrowers or a Lender reasonably believe that the Agent will not be (or will have ceased to be) a FATCA Exempt Party on or after that FATCA Application Date;

(ii)     the information supplied by the Agent pursuant to Clause 11.8 (*FATCA Information*) indicates that the Agent will not be (or will have ceased to be) a FATCA Exempt Party on or after that FATCA Application Date; or

(iii)    the Agent notifies the Borrowers and the Lenders that the Agent will not be (or will have ceased to be) a FATCA Exempt Party on or after that FATCA Application Date;

and (in each case) the Borrowers or a Lender reasonably believe that a Party will be required to make a FATCA Deduction that would not be required if the Agent were a FATCA Exempt Party, and the Borrowers or that Lender, by notice to the Agent, require it to resign.

**29.14    Confidentiality**

(a)    In acting as agent or trustee for the Finance Parties, the Agent or Security Agent (as applicable) shall be regarded as acting through its agency division which shall be treated as a separate entity from any other of its divisions or departments.

(b)    If information is received by another division or department of the Agent or Security Agent, it may be treated as confidential to that division or department and the Agent or Security Agent (as applicable) shall not be deemed to have notice of it.

(c)    Notwithstanding any other provision of any Finance Document to the contrary, none of the Agent, the Security Agent or the Arranger is obliged to disclose to any other person (i) any confidential information or (ii) any other information if the disclosure would, or might in its reasonable opinion, constitute a breach of any law or regulation or a breach of a fiduciary duty.

**29.15    Relationship with the other Finance Parties**

(a)    Subject to Clause 27.9 (*Pro rata interest settlement*), the Agent may treat the person shown in its records as Lender at the opening of business (in the place of the Agent's principal office as notified to the Finance Parties from time to time) as the Lender acting through its Facility Office:

(i)    entitled to or liable for any payment due under any Finance Document on that day; and

(ii)    entitled to receive and act upon any notice, request, document or communication or make any decision or determination under any Finance Document made or delivered on that day,

unless it has received not less than five (5) Business Days' prior notice from that Lender to the contrary in accordance with the terms of this Agreement.

(b)    Any Lender may by notice to the Agent appoint a person to receive on its behalf all notices, communications, information and documents to be made or despatched to that Lender under the Finance Documents. Such notice shall contain the address, fax number and (where communication by electronic mail or other electronic means is permitted under Clause 35.5 (*Electronic communication*)) electronic mail address and/or any other information required to enable the sending and receipt of information by that means (and, in each case, the department or officer, if any, for whose attention communication is to be made) and be treated as a notification of a substitute address, fax number, electronic mail address, department and officer by that Lender for the purposes of Clause 35.2 (*Addresses*) and paragraph (a)(ii) of Clause 35.5 (*Electronic communication*) and the Agent shall be entitled to treat such person as the person entitled to receive all such notices, communications, information and documents as though that person were that Lender.

(c)  Each Finance Party shall supply the Security Agent with any information that the Security Agent may reasonably specify as being necessary or desirable to enable the Security Agent to perform its functions as Security Agent.

### 29.16   Credit appraisal by the Lenders

Without affecting the responsibility of any Obligor for information supplied by it or on its behalf in connection with any Finance Document, each Lender confirms to the Agent, the Security Agent and the Arranger that it has been, and will continue to be, solely responsible for making its own independent appraisal and investigation of all risks arising under or in connection with any Finance Document including but not limited to:

(a)  the financial condition, status and nature of each member of the Group A Group and Guarantor B Group;

(b)  the legality, validity, effectiveness, adequacy or enforceability of any Finance Document, the Security Property and any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document or the Security Property;

(c)  whether that Finance Party has recourse, and the nature and extent of that recourse, against any Party or any of its respective assets under or in connection with any Finance Document, the Security Property, the transactions contemplated by the Finance Documents or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document or the Security Property;

(d)  the adequacy, accuracy or completeness of any information provided by the Agent, the Security Agent, any Party or by any other person under or in connection with any Finance Document, the transactions contemplated by any Finance Document or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document; and

(e)  the right or title of any person in or to, or the value or sufficiency of any part of, the Security Property, the priority of any of the Transaction Security or the existence of any Security affecting the Security Property.

### 29.17   Agent's and Security Agent's management time

(a)  Any amount payable to the Agent or Security Agent under Clause 13.3 (*Indemnity to the Agent*), Clause 13.4 (*Indemnity to the Security Agent*), Clause 15 (*Costs and expenses*) and Clause 29.12 (*Lenders' indemnity to the Agent and Security Agent*) shall include the cost of utilising the management time or other resources of the Agent or Security Agent (as applicable) and will be calculated on the basis of such reasonable daily or hourly rates as the Agent or Security Agent may notify to the Borrowers and the other Finance Parties, and is in addition to any fee paid or payable to the Agent or Security Agent under Clause 10 (*Fees*).

(b)  Without prejudice to paragraph (a) above, in the event of:

(i)  a Default;

(ii)  the Security Agent being requested by an Obligor or the Majority Lenders to undertake duties which the Security Agent and the Borrowers agree to be of

an exceptional nature or outside the scope of the normal duties of the Security Agent under the Finance Documents; or

(iii)    the Security Agent and the Borrowers agreeing that it is otherwise appropriate in the circumstances,

the Borrowers shall pay to the Security Agent any additional remuneration that may be agreed between them or determined pursuant to paragraph (c) below.

(c)    If the Security Agent and the Borrowers fail to agree upon the nature of the duties, or upon the additional remuneration referred to in paragraph (b) above or whether additional remuneration is appropriate in the circumstances, any dispute shall be determined by an investment bank (acting as an expert and not as an arbitrator) selected by the Security Agent and approved by the Borrowers or, failing approval, nominated (on the application of the Security Agent) by the President for the time being of the Law Society of England and Wales (the costs of the nomination and of the investment bank being payable by the Borrowers) and the determination of any investment bank shall be final and binding upon the Parties.

**29.18    Deduction from amounts payable by the Agent**

If any Party owes an amount to the Agent under the Finance Documents the Agent may, after giving notice to that Party, deduct an amount not exceeding that amount from any payment to that Party which the Agent would otherwise be obliged to make under the Finance Documents and apply the amount deducted in or towards satisfaction of the amount owed.  For the purposes of the Finance Documents that Party shall be regarded as having received any amount so deducted.

**29.19    No responsibility to perfect Transaction Security**

The Security Agent shall not be liable for any failure to:

(a)    require the deposit with it of any deed or document certifying, representing or constituting the title of any Obligor to any of the Security Property;

(b)    obtain any licence, consent or other authority for the execution, delivery, legality, validity, enforceability or admissibility in evidence of any Finance Document or the Transaction Security;

(c)    register, file or record or otherwise protect any of the Transaction Security (or the priority of any of the Transaction Security) under any law or regulation or to give notice to any person of the execution of any Finance Document or of the Transaction Security;

(d)    take, or to require any Obligor to take, any step to perfect its title to any of the Security Property or to render the Transaction Security effective or to secure the creation of any ancillary Security under any law or regulation; or

(e)    require any further assurance in relation to any Security Document.

**29.20    Insurance by Security Agent**

(a)    The Security Agent shall not be obliged:

(i)     to insure any of the Security Property;

(ii)    to require any other person to maintain any insurance; or

(iii)   to verify any obligation to arrange or maintain insurance contained in any Finance Document,

and the Security Agent shall not be liable for any damages, costs or losses to any person as a result of the lack of, or inadequacy of, any such insurance.

(b)     Where the Security Agent is named on any insurance policy as an insured party, it shall not be liable for any damages, costs or losses to any person as a result of its failure to notify the insurers of any material fact relating to the risk assumed by such insurers or any other information of any kind, unless the Majority Lenders request it to do so in writing and the Security Agent fails to do so within fourteen (14) days after receipt of that request.

### 29.21   Custodians and nominees

The Security Agent may appoint and pay any person to act as a custodian or nominee on any terms in relation to any asset of the trust as the Security Agent may determine, including for the purpose of depositing with a custodian this Agreement or any document relating to the trust created under this Agreement and the Security Agent shall not be responsible for any loss, liability, expense, demand, cost, claim or proceedings incurred by reason of the misconduct, omission or default on the part of any person appointed by it under this Agreement or be bound to supervise the proceedings or acts of any person.

### 29.22   Delegation by the Security Agent

(a)     Each of the Security Agent, any Receiver and any Delegate may, at any time, delegate by power of attorney or otherwise to any person for any period, all or any right, power, authority or discretion vested in it in its capacity as such.

(b)     That delegation may be made upon any terms and conditions (including the power to sub-delegate) and subject to any restrictions that the Security Agent, that Receiver or that Delegate (as the case may be) may, in its discretion, think fit in the interests of the Secured Parties.

(c)     No Security Agent, Receiver or Delegate shall be bound to supervise, or be in any way responsible for any damages, costs or losses incurred by reason of any misconduct, omission or default on the part of, any such delegate or sub-delegate.

### 29.23   Additional Security Agents

(a)     The Security Agent may at any time appoint (and subsequently remove) any person to act as a separate trustee or as a co-trustee jointly with it:

(i)     if it considers that appointment to be in the interests of the Secured Parties;

(ii)    for the purposes of conforming to any legal requirement, restriction or condition which the Security Agent deems to be relevant; or

(iii)   for obtaining or enforcing any judgment in any jurisdiction,

EME_ACTIVE-564940718.11-CEHENDER 12/20/2016 4:04 AM

and the Security Agent shall give prior notice to the Borrowers and the Finance Parties of that appointment.

(b)     Any person so appointed shall have the rights, powers, authorities and discretions (not exceeding those given to the Security Agent under or in connection with the Finance Documents) and the duties, obligations and responsibilities that are given or imposed by the instrument of appointment.

(c)     The remuneration that the Security Agent may pay to that person, and any costs and expenses (together with any applicable VAT) incurred by that person in performing its functions pursuant to that appointment shall, for the purposes of this Agreement, be treated as costs and expenses incurred by the Security Agent.

## 29.24    Acceptance of title

The Security Agent shall be entitled to accept without enquiry, and shall not be obliged to investigate, any right and title that any Obligor may have to any of the Security Property and shall not be liable for, or bound to require any Obligor to remedy, any defect in its right or title.

## 29.25    Winding up of trust

If the Security Agent, with the approval of the Agent, determines that:

(a)     all of the Secured Liabilities and all other obligations secured by the Security Documents have been fully and finally discharged; and

(b)     no Secured Party is under any commitment, obligation or liability (actual or contingent) to make advances or provide other financial accommodation to any Obligor pursuant to the Finance Documents,

then:

(i)     the trusts set out in this Agreement shall be wound up and the Security Agent shall release, without recourse or warranty, all of the Transaction Security and the rights of the Security Agent under each of the Security Documents; and

(ii)    any Security Agent which has resigned pursuant to Clause 29.13(*Resignation of the Agent and the Security Agent*) shall release, without recourse or warranty, all of its rights under each Security Document.

## 29.26    Perpetuity period

The trusts constituted by this Agreement are governed by English law and the perpetuity period under the rule against perpetuities, if applicable to this Agreement, shall be the period of 125 years from the date of this Agreement.

## 29.27    Powers supplemental to Trustee Acts

The rights, powers, authorities and discretions given to the Security Agent under or in connection with the Finance Documents shall be supplemental to the Trustee Act 1925 and the Trustee Act 2000 and in addition to any which may be vested in the Security Agent by law or regulation or otherwise.

**29.28    Disapplication of Trustee Acts**

Section 1 of the Trustee Act 2000 shall not apply to the duties of the Security Agent in relation to the trusts constituted by this Agreement.  Where there are any inconsistencies between the Trustee Act 1925 or the Trustee Act 2000 and the provisions of this Agreement, the provisions of this Agreement shall, to the extent permitted by law and regulation, prevail and, in the case of any inconsistency with the Trustee Act 2000, the provisions of this Agreement shall constitute a restriction or exclusion for the purposes of that Act.

**29.29    Parallel Debt**

(a)     Each Obligor irrevocably and unconditionally undertakes to pay to the Security Agent an amount equal to the aggregate amount of its Corresponding Debt (as may exist from time to time).

(b)     The Parallel Debt of an Obligor:

(i)      shall become due and payable at the same time as its Corresponding Debt;

(ii)     is independent and separate from, and without prejudice to, its Corresponding Debt.

(c)     For purposes of this Clause 29.29(*Parallel Debt*), the Security Agent:

(i)      is the independent and separate creditor of each Parallel Debt;

(ii)     acts in its own name and not as agent, representative or trustee of the Finance Parties and its claims in respect of each Parallel Debt shall not be held on trust; and

(iii)    shall have the independent and separate right to demand payment of each Parallel Debt in its own name (including, without limitation, through any suit, execution, enforcement of security, recovery of guarantees and applications for and voting in any kind of insolvency proceeding).

(d)     The Parallel Debt of an Obligor shall be:

(i)      decreased to the extent that its Corresponding Debt has been irrevocably and unconditionally paid or discharged; and

(ii)     increased to the extent that its Corresponding Debt has increased,

and the Corresponding Debt of an Obligor shall be:

(iii)    decreased to the extent that its Parallel Debt has been irrevocably and unconditionally paid or discharged; and

(iv)    increased to the extent that its Parallel Debt has increased,

in each case provided that the Parallel Debt of an Obligor shall never exceed its Corresponding Debt.

(e)     All amounts received or recovered by the Security Agent in connection with this Clause 29.29(*Parallel Debt*) to the extent permitted by applicable law, shall be applied in accordance with Clause 30.1 (*Application of receipts – Security Agent* ).

(f)     This Clause 29.29(*Parallel Debt*) shall apply, with any necessary modifications, to each Finance Document.

## 30.    APPLICATION OF PROCEEDS

### 30.1    Application of receipts – Security Agent

(a)     Except as expressly stated to the contrary in any Finance Document, any moneys which the Security Agent receives or recovers and which are, or are attributable to, Security Property (for the purposes of this Clause 30 (*Application of Proceeds*), the "**Recoveries**") shall be transferred to the Agent for application in accordance with Clause 33.5 (*Application of receipts - Agent*).

(b)     Paragraph (a) above is without prejudice to the rights of the Security Agent, each Receiver and each Delegate:

    (i)      to be indemnified out of the Charged Property in accordance with any provision of any Finance Document; and

    (ii)     under any Finance Document to credit any moneys received or recovered by it to any suspense account.

(c)     Any transfer by the Security Agent to the Facility Agent in accordance with paragraph (a) above shall be a good discharge, to the extent of that payment, by the Security Agent.

(d)     The Security Agent is under no obligation to make the payments to the Facility Agent under paragraph (a) of this Clause 30.1(*Application of receipts – Security Agent*) in the same currency as that in which the obligations and liabilities owing to the relevant Finance Party are denominated.

### 30.2    Deductions from receipts

(a)     Before transferring any moneys to the Facility Agent under Clause 30.1(*Application of Receipts – Security Agent*), the Security Agent may, in its discretion:

    (i)      deduct any sum then due and payable under this Agreement or any other Finance Documents to the Security Agent or any Receiver or Delegate and retain that sum for itself or, as the case may require, pay it to another person to whom it is then due and payable;

    (ii)     set aside by way of reserve amounts required to meet, and to make and pay, any deductions and withholdings (on account of Taxes or otherwise) which it is or may be required by any applicable law to make from any distribution or payment made by it under this Agreement; and

    (iii)    pay all Taxes which may be assessed against it in respect of any of the Security Property, or as a consequence of performing its duties, or by virtue of its capacity as Security Agent under any of the Finance Documents or otherwise (other than in connection with its remuneration for performing its duties under this Agreement).

(b)     For the purposes of paragraph (a)(i) above, if the Security Agent has become entitled to require a sum to be paid to it on demand, that sum shall be treated as due and payable, even if no demand has yet been served.

EME_ACTIVE-564940718.11-CEHENDER 12/20/2016 4:04 AM

### 30.3 Prospective liabilities

(a) Following acceleration of any of the Transaction Security, the Security Agent may, in its discretion, or at the request of the Agent, hold any Recoveries in an interest bearing suspense or impersonal account(s) in the name of the Security Agent with such financial institution (including itself) and for so long as the Security Agent shall think fit acting reasonably (the interest being credited to the relevant account) for later payment to the Agent for application in accordance with Clause 33.5 (*Application of receipts - Agent*) in respect of:

    (i) any sum to the Security Agent, any Receiver or any Delegate; and

    (ii) any part of the Secured Liabilities,

    (iii) that the Security Agent or, in the case of paragraph (ii) only, the Agent, reasonably considers, in each case, might become due or owing at any time in the future.

### 30.4 Investment of proceeds

Prior to the application of the proceeds of the Recoveries in accordance with Clause 30.1 (*Application of Receipts – Security Agent*) the Security Agent may, in its discretion, hold all or part of those proceeds in an interest bearing suspense or impersonal account(s) in the name of the Security Agent with such financial institution (including itself) and for so long as the Security Agent shall think fit (the interest being credited to the relevant account) pending the application from time to time of those moneys in the Security Agent's discretion in accordance with the provisions of this Clause 30.

### 30.5 Currency Conversion

(a) For the purpose of, or pending the discharge of, any of the Secured Liabilities the Security Agent may convert any moneys received or recovered by the Security Agent from one currency to another, at a market rate of exchange.

(b) The obligations of any Obligor to pay in the due currency shall only be satisfied to the extent of the amount of the due currency purchased after deducting the costs of conversion.

### 30.6 Good Discharge

(a) Any payment to be made in respect of the Secured Liabilities by the Security Agent may be made to the Agent on behalf of the Finance Parties and any payment made in that way shall be a good discharge, to the extent of that payment, by the Security Agent.

(b) The Security Agent is under no obligation to make the payments to the Agent under paragraph (a) of this Clause 30.6 in the same currency as that in which the obligations and liabilities owing to the relevant Finance Party are denominated.

### 31. CONDUCT OF BUSINESS BY THE FINANCE PARTIES

No provision of this Agreement will:

(a) interfere with the right of any Finance Party to arrange its affairs (tax or otherwise) in whatever manner it thinks fit;

(b)     oblige any Finance Party to investigate or claim any credit, relief, remission or repayment available to it the extent, order and manner of any claim; or

(c)     oblige any Finance Party to disclose any information relating to its affairs (tax or otherwise) or any computations in respect of Tax.

## 32.    SHARING AMONG THE FINANCE PARTIES

### 32.1    Payments to Finance Parties

If a Finance Party (a "**Recovering Finance Party**") receives or recovers any amount from an Obligor other than in accordance with Clause 33 (*Payment mechanics*) (a "**Recovered Amount**") and applies that amount to a payment due under the Finance Documents then:

(a)     the Recovering Finance Party shall, within three (3) Business Days, notify details of the receipt or recovery to the Agent;

(b)     the Agent shall determine whether the receipt or recovery is in excess of the amount the Recovering Finance Party would have been paid had the receipt or recovery been received or made by the Agent and distributed in accordance with Clause 33 (*Payment mechanics*), without taking account of any Tax which would be imposed on the Agent in relation to the receipt, recovery or distribution; and

(c)     the Recovering Finance Party shall, within three (3) Business Days of demand by the Agent, pay to the Agent an amount (the "**Sharing Payment**") equal to such receipt or recovery less any amount which the Agent determines may be retained by the Recovering Finance Party as its share of any payment to be made, in accordance with Clause 33.5 (*Application of Receipts – Agent*).

### 32.2    Redistribution of payments

The Agent shall treat the Sharing Payment as if it had been paid by the relevant Obligor and distribute it between the Finance Parties (other than the Recovering Finance Party) (the "**Sharing Finance Parties**") in accordance with Clause 33.5 (*Application of Receipts – Agent*) towards the obligations of that Obligor to the Sharing Finance Parties.

### 32.3    Recovering Finance Party's rights

On a distribution by the Agent under Clause 32.2 (*Redistribution of payments*) of a payment received by a Recovering Finance Party from an Obligor, as between the relevant Obligor and the Recovering Finance Party, an amount of the Recovered Amount equal to the Sharing Payment will be treated as not having been paid by that Obligor.

### 32.4    Reversal of redistribution

If any part of the Sharing Payment received or recovered by a Recovering Finance Party becomes repayable and is repaid by that Recovering Finance Party, then:

(a)     each Sharing Finance Party shall, upon request of the Agent, pay to the Agent for the account of that Recovering Finance Party an amount equal to the appropriate part of its share of the Sharing Payment (together with an amount as is necessary to reimburse that Recovering Finance Party for its proportion of any interest on the Sharing Payment which that Recovering Finance Party is required to pay) (the "**Redistributed Amount**"); and

- 95 -

(b)     as between the relevant Obligor and each relevant Sharing Finance Party, an amount equal to the relevant Redistributed Amount will be treated as not having been paid by that Obligor.

**32.5    Exceptions**

(a)     This Clause 32.5 (*Exceptions*) shall not apply to the extent that the Recovering Finance Party would not, after making any payment pursuant to this Clause, have a valid and enforceable claim against the relevant Obligor.

(b)     A Recovering Finance Party is not obliged to share with any other Finance Party any amount which the Recovering Finance Party has received or recovered as a result of taking legal or arbitration proceedings, if:

   (i)      it notified that other Finance Party of the legal or arbitration proceedings; and

   (ii)     that other Finance Party had an opportunity to participate in those legal or arbitration proceedings but did not do so as soon as reasonably practicable having received notice and did not take separate legal or arbitration proceedings.

**33.     PAYMENT MECHANICS**

**33.1    Payments to the Agent**

(a)     On each date on which an Obligor or a Lender is required to make a payment under a Finance Document, that Obligor or Lender shall make the same available to the Agent (unless a contrary indication appears in a Finance Document) for value on the due date at the time and in such funds specified by the Agent as being customary at the time for settlement of transactions in the relevant currency in the place of payment.

(b)     Payment shall be made to such account in the principal financial centre of the country of that currency (or, in relation to euro, in a principal financial centre in such Participating Member State or London, as specified by the Agent) and with such bank as the Agent, in each case, specifies.

**33.2    Distributions by the Agent**

Each payment received by the Agent under the Finance Documents for another Party shall, subject to Clause 33.3 (*Distributions to an Obligor*) and Clause 33.4 (*Clawback and pre-funding*) be made available by the Agent as soon as practicable after receipt to the Party entitled to receive payment in accordance with this Agreement (in the case of a Lender, for the account of its Facility Office), to such account as that Party may notify to the Agent by not less than five (5) Business Days' notice with a bank specified by that Party in the principal financial centre of the country of that currency (or, in relation to euro, in the principal financial centre of a Participating Member State or London, as specified by that Party).

**33.3    Distributions to an Obligor**

The Agent may (with the consent of the Obligor or in accordance with Clause 34 (*Set-off*)) apply any amount received by it for that Obligor in or towards payment (on the date and in the currency and funds of receipt) of any amount due from that Obligor under the Finance Documents or in or towards purchase of any amount of any currency to be so applied.

**33.4    Clawback and pre-funding**

    (a)    Where a sum is to be paid to the Agent under the Finance Documents for another Party, the Agent is not obliged to pay that sum to that other Party (or to enter into or perform any related exchange contract) until it has been able to establish to its satisfaction that it has actually received that sum.

    (b)    Unless paragraph (c) below applies, if the Agent pays an amount to another Party and it proves to be the case that the Agent had not actually received that amount, then the Party to whom that amount (or the proceeds of any related exchange contract) was paid by the Agent shall on demand refund the same to the Agent together with interest on that amount from the date of payment to the date of receipt by the Agent, calculated by the Agent to reflect its cost of funds.

    (c)    If the Agent has notified the Lenders that it is willing to make available amounts for the account of a Borrower before receiving funds from the Lenders then if and to the extent that the Agent does so but it proves to be the case that it does not then receive funds from a Lender in respect of a sum which it paid to a Borrower:

        (i)    the Agent shall notify the Borrower of that Lender's identity and the Borrower to whom that sum was made available shall on demand refund it to the Agent; and

        (ii)    the Lender by whom those funds should have been made available or, if that Lender fails to do so, the Borrower to whom that sum was made available, shall on demand pay to the Agent the amount (as certified by the Agent) which will indemnify the Agent against any funding cost incurred by it as a result of paying out that sum before receiving those funds from that Lender.

**33.5    Application of Receipts – Agent**

    (a)    Subject to paragraph (b) below, and save as the Finance Documents may otherwise provide, any payment that is received by any Finance Party under or in connection with any Finance Document, shall be paid to the Agent, which shall apply the same in the following order:

        (i)    first, in or towards payment of any amounts then due and payable under any of the Finance Documents; and

        (ii)    secondly, any surplus shall be paid to the Borrowers or to any other person who appears to be entitled to it.

    (b)    If the Agent receives a payment that is insufficient to discharge all the amounts then due and payable by an Obligor under the Finance Documents, the Agent shall apply that payment towards the obligations of that Obligor under the Finance Documents in the following order:

        (i)    first, in or towards payment pro rata of any unpaid fees, costs and expenses of, and any other amounts owing to, the Agent, the Security Agent, any Receiver and any Delegate under the Finance Documents;

        (ii)    second, in or towards payment pro rata of any accrued interest and fees due but unpaid to the Lenders under this Agreement;

(iii)    third, in or towards payment pro rata of any principal due but unpaid to the Lenders under this Agreement; and

(iv)    fourth, in or towards payment pro rata of any other sum due to any Finance Party but unpaid under the Finance Documents.

**33.6    No set-off by Obligors**

All payments to be made by an Obligor under the Finance Documents shall be calculated and be made without (and free and clear of any deduction for) set-off or counterclaim.

**33.7    Business Days**

(a)    Any payment which is due to be made on a day that is not a Business Day shall be made on the next Business Day in the same calendar month (if there is one) or the preceding Business Day (if there is not).

(b)    During any extension of the due date for payment of any principal or Unpaid Sum under this Agreement interest is payable on the principal or Unpaid Sum at the rate payable on the original due date.

**33.8    Currency of account**

(a)    Subject to paragraphs (b) and (c) below, US$ is the currency of account and payment for any sum due from an Obligor under any Finance Document.

(b)    Each payment in respect of costs, expenses or Taxes shall be made in the currency in which the costs, expenses or Taxes are incurred.

(c)    Any amount expressed to be payable in a currency other than US$ shall be paid in that other currency.

**33.9    Change of currency**

(a)    Unless otherwise prohibited by law, if more than one currency or currency unit are at the same time recognised by the central bank of any country as the lawful currency of that country, then:

(i)    any reference in the Finance Documents to, and any obligations arising under the Finance Documents in, the currency of that country shall be translated into, or paid in, the currency or currency unit of that country designated by the Agent (after consultation with the Borrowers); and

(ii)    any translation from one currency or currency unit to another shall be at the official rate of exchange recognised by the central bank for the conversion of that currency or currency unit into the other, rounded up or down by the Agent (acting reasonably).

(iii)    If a change in any currency of a country occurs, this Agreement will, to the extent the Agent (acting reasonably and after consultation with the Borrowers) specifies to be necessary, be amended to comply with any generally accepted conventions and market practice and otherwise to reflect the change in currency.

**33.10    Disruption to Payment Systems etc.**

- 98 -

If either the Agent determines (in its discretion) that a Disruption Event has occurred or the Agent is notified by the Borrowers that a Disruption Event has occurred:

(a)     the Agent may, and shall if requested to do so by the Borrowers, consult with the Borrowers with a view to agreeing such changes to the operation or administration of the Facility as the Agent may deem necessary in the circumstances;

(b)     the Agent shall not be obliged to consult with the Borrowers in relation to any changes mentioned in paragraph (a) if, in its opinion, it is not practicable to do so in the circumstances and, in any event, shall have no obligation to agree to such changes;

(c)     the Agent may consult with the Finance Parties in relation to any changes mentioned in paragraph (a) but shall not be obliged to do so if, in its opinion, it is not practicable to do so in the circumstances;

(d)     any such changes agreed upon by the Agent and the Borrowers shall (whether or not it is finally determined that a Disruption Event has occurred) be binding upon the Parties as an amendment to (or, as the case may be, waiver of) the terms of the Finance Documents notwithstanding the provisions of Clause 39 (*Amendments and waivers*);

(e)     the Agent shall not be liable for any damages, costs or losses to any person, any diminution in value or any liability whatsoever (including, without limitation for negligence, gross negligence or any other category of liability whatsoever but not including any claim based on the fraud of the Agent) arising as a result of its taking, or failing to take, any actions pursuant to or in connection with this Clause 33.10; and

(f)     the Agent shall notify the Finance Parties of all changes agreed pursuant to paragraph (d) above.

## 34.   SET-OFF

A Finance Party may set off any matured obligation due from an Obligor under the Finance Documents (to the extent beneficially owned by that Finance Party) against any matured obligation owed by that Finance Party to that Obligor, regardless of the place of payment, booking branch or currency of either obligation. If the obligations are in different currencies, the Finance Party may convert either obligation at a market rate of exchange in its usual course of business for the purpose of the set-off.

## 35.   NOTICES

### 35.1   Communications in writing

Any communication to be made under or in connection with the Finance Documents shall be made in writing and, unless otherwise stated, may be made by fax or letter.

### 35.2   Addresses

The address and fax number (and the department or officer, if any, for whose attention the communication is to be made) of each Party for any communication or document to be made or delivered under or in connection with the Finance Documents is:

(a)     in the case of each Borrower, that specified in Schedule 1 (*The Original Parties*);

EME_ACTIVE-584940718.11-CEHENDER 12/20/2016 4:04 AM

(b)    in the case of each Lender, that specified in Schedule 1 (*The Original Parties*) or, if it becomes a Party after the date of this Agreement, that notified in writing to the Agent on or before the date it becomes a Party;

(c)    in the case of the Arranger, the Agent and the Security Agent, that specified in Schedule 1 (*The Original Parties*);

or, in each case, any substitute address or fax number or department or officer as the Party may notify to the Agent (or the Agent may notify to the other Parties, if a change is made by the Agent) by not less than five (5) Business Days' notice.

**35.3    Delivery**

(a)    Any communication or document made or delivered by one person to another under or in connection with the Finance Documents will only be effective:

(i)    if by way of fax, when received in legible form; or

(ii)    if by way of letter, when it has been left at the relevant address or five (5) Business Days after being deposited in the post postage prepaid in an envelope addressed to it at that address;

and, if a particular department or officer is specified as part of its address details provided under Clause 35.2(*Addresses*), if addressed to that department or officer.

(b)    Any communication or document to be made or delivered to the Agent or the Security Agent will be effective only when actually received by the Agent or the Security Agent and then only if it is expressly marked for the attention of the department or officer identified with the Agent's or the Security Agent's signature below (or any substitute department or officer as the Agent or Security Agent shall specify for this purpose).

(c)    All notices from or to an Obligor shall be sent through the Agent.

(d)    Any communication or document made or delivered to the Borrowers in accordance with this Clause will be deemed to have been made or delivered to each of the Obligors.

(e)    Any communication or document which becomes effective, in accordance with paragraphs (a) to (d) above, after 5 p.m. in the place of receipt shall be deemed only to become effective on the following day.

**35.4    Notification of address and fax number**

Promptly upon receipt of notification of an address or fax number or change of address or fax number pursuant to Clause 35.2(*Addresses*) or changing its own address or fax number, the Agent shall notify the other Parties.

**35.5    Electronic communication**

(a)    Any communication to be made between any two Parties under or in connection with the Finance Documents may be made by electronic mail or other electronic means to the extent that those two Parties agree that, unless and until notified to the contrary, this is to be an accepted form of communication and if those two Parties:

     (i)     notify each other in writing of their electronic mail address and/or any other information required to enable the sending and receipt of information by that means; and

     (ii)    notify each other of any change to their address or any other such information supplied by them by not less than five (5) Business Days' notice.

(b)     Any electronic communication made between those two Parties will be effective only when actually received in readable form and in the case of any electronic communication made by a Party to the Agent or the Security Agent only if it is addressed in such a manner as the Agent or the Security Agent shall specify for this purpose.

(c)     Any electronic communication which becomes effective, in accordance with paragraph (b) above, after 5 p.m. in the place of receipt shall be deemed only to become effective on the following day.

**35.6**     **English language**

(a)     Any notice given under or in connection with any Finance Document must be in English.

(b)     All other documents provided under or in connection with any Finance Document must be:

     (i)     in English; or

     (ii)    if not in English, and if so required by the Agent, accompanied by a certified English translation and, in this case, the English translation will prevail unless the document is a constitutional, statutory or other official document.

## 36.     CALCULATIONS AND CERTIFICATES

**36.1**     **Accounts**

In any litigation or arbitration proceedings arising out of or in connection with a Finance Document, the entries made in the accounts maintained by a Finance Party are *prima facie* evidence of the matters to which they relate.

**36.2**     **Certificates and Determinations**

Any certification or determination by a Finance Party of a rate or amount under any Finance Document is, in the absence of manifest error, conclusive evidence of the matters to which it relates.

**36.3**     **Day count convention**

Any interest, commission or fee accruing under a Finance Document will accrue from day to day and is calculated on the basis of the actual number of days elapsed and a year of three hundred and sixty (360) days.

## 37.     PARTIAL INVALIDITY

If, at any time, any provision of the Finance Documents is or becomes illegal, invalid or unenforceable in any respect under any law of any jurisdiction, neither the legality, validity or

- 101 -

enforceability of the remaining provisions nor the legality, validity or enforceability of such provision under the law of any other jurisdiction will in any way be affected or impaired.

## 38.   REMEDIES AND WAIVERS

No failure to exercise, nor any delay in exercising, on the part of any Finance Party, any right or remedy under the Finance Documents shall operate as a waiver of any such right or remedy or constitute an election to affirm any of the Finance Documents. No election to affirm any of the Finance Documents on the part of any Finance Party shall be effective unless it is in writing. No single or partial exercise of any right or remedy shall prevent any further or other exercise or the exercise of any other right or remedy. The rights and remedies provided in this Agreement are cumulative and not exclusive of any rights or remedies provided by law.

## 39.   AMENDMENTS AND WAIVERS

### 39.1   Required consents

(a)    (Subject to Clause 39.2 (*All Lender matters*) and Clause 39.3 (*Other exceptions*), any term of the Finance Documents may be amended or waived only with the consent of the Majority Lenders and any such amendment or waiver will be binding on all Parties.

(b)    The Agent may effect, on behalf of any Finance Party, any amendment or waiver permitted by this Clause 39.

(c)    Without prejudice to the generality of paragraphs 29.8(c), 29.8(d) and 29.8(e) of Clause 29.8 (*Rights and discretions*), the Agent may engage, pay for and rely on the services of lawyers in determining the consent level required for and effecting any amendment, waiver or consent under this Agreement.

(d)    Each Obligor agrees to any such amendment or waiver permitted by this Clause 39.1 which is agreed to by the Borrowers. This includes any amendment or waiver which would, but for this paragraph (d), require the consent of all of the Obligors.

### 39.2   All Lender matters

An amendment, waiver or (in the case of a Transaction Security Document) a consent of, or in relation to, any term of any Finance Document that has the effect of changing or which relates to:

(a)    the definition of "Majority Lenders" in Clause 1.1 (*Definitions*);

(b)    a postponement or extension to the date of payment of any amount under the Finance Documents;

(c)    a reduction in the Fixed Rate or a reduction in the amount of any payment of principal, interest, fees or commission payable;

(d)    a change in currency of payment of any amount under the Finance Documents;

(e)    an increase in any Commitment or the Total Commitments, an extension of any Availability Period or any requirement that a cancellation of Commitments reduces the Commitments rateably under the Facility;

(f)    a change to any Obligor;

- 102 -

(g)     any provision which expressly requires the consent of all the Lenders;

(h)     any change to the preamble (*Background*), Clause 2 (*The Facility*), Clause 3 (*Purpose*), Clause 5 (*Utilisation*), Clause 8 (*Interest*), Clause 27 (*Changes to the Lenders*) this Clause 39, Clause 42 (*Governing law*) or Clause 43.1 (*Jurisdiction*).

(i)     (other than as expressly permitted by the provisions of any Finance Document) the nature or scope of:

    (i)     the guarantee and indemnity granted under Clause 16 (*Guarantee and Indemnity*);

    (ii)    the Security Property; or

    (iii)   the manner in which the proceeds of enforcement of the Transaction Security are distributed

    (except in the case of paragraphs (ii)and (iii) above, insofar as it relates to a sale or disposal of an asset which is the subject of the Transaction Security where such sale or disposal is expressly permitted under this Agreement or any other Finance Document); or

(j)     the release of, or material variation to, any guarantee and indemnity granted under Clause 16 (*Guarantee and Indemnity*) or of any Transaction Security unless permitted under this Agreement or any other Finance Document or relating to a sale or disposal of an asset which is the subject of the Transaction Security where such sale or disposal is expressly permitted under this Agreement or any other Finance Document,

shall not be made, or given, without the prior consent of all the Lenders.

**39.3   Other exceptions**

(a)     An amendment or waiver which relates to the rights or obligations of the Agent, the Security Agent or the Arranger (each in their capacity as such) may not be effected without the consent of the Agent, the Security Agent or, as the case may be, the Arranger.

**40.     CONFIDENTIALITY**

**40.1   Confidential Information**

Each Finance Party agrees to keep all Confidential Information confidential and not to disclose it to anyone, save to the extent permitted by Clause 40.2 (*Disclosure of Confidential Information*) and Clause 40.3 (*Disclosure to numbering service providers*), and to ensure that all Confidential Information is protected with security measures and a degree of care that would apply to its own confidential information.

**40.2   Disclosure of Confidential Information**

Any Finance Party may disclose:

(a)     to any of its Affiliates and Related Funds and any of its or their officers, directors, employees, professional advisers, auditors, partners and Representatives such Confidential Information as that Finance Party shall consider appropriate if any person to whom the Confidential Information is to be given pursuant to this paragraph

EME_ACTIVE-564940718.11-CEHENDER 12/20/2018 4:04 AM

(a) is informed in writing of its confidential nature and that some or all of such Confidential Information may be price-sensitive information except that there shall be no such requirement to so inform if the recipient is subject to professional obligations to maintain the confidentiality of the information or is otherwise bound by requirements of confidentiality in relation to the Confidential Information;

(b)   to any person:

(i)   to (or through) whom it assigns or transfers (or may potentially assign or transfer) all or any of its rights and/or obligations under one or more Finance Documents or which succeeds (or which may potentially succeed) it as Agent or Security Agent and, in each case, to any of that person's Affiliates, Related Funds, Representatives and professional advisers;

(ii)   with (or through) whom it enters into (or may potentially enter into), whether directly or indirectly, any sub-participation in relation to, or any other transaction under which payments are to be made or may be made by reference to, one or more Finance Documents and/or one or more Obligors and to any of that person's Affiliates, Related Funds, Representatives and professional advisers;

(iii)   appointed by any Finance Party or by a person to whom paragraph (b)(i) or (b)(ii) above applies to receive communications, notices, information or documents delivered pursuant to the Finance Documents on its behalf;

(iv)   who invests in or otherwise finances (or may potentially invest in or otherwise finance), directly or indirectly, any transaction referred to in paragraph (b)(i) or (b)(ii) above;

(v)   to whom information is required or requested to be disclosed by any court of competent jurisdiction or any governmental, banking, taxation or other regulatory authority or similar body, the rules of any relevant stock exchange or pursuant to any applicable law or regulation;

(vi)   to whom information is required to be disclosed in connection with, and for the purposes of, any litigation, arbitration, administrative or other investigations, proceedings or disputes;

(vii)   to whom or for whose benefit that Finance Party charges, assigns or otherwise creates Security (or may do so) pursuant to Clause 27.8 (*Security over Lenders' rights*);

(viii)   who is a Party, a member of the Guarantor A Group or Guarantor B Group or any related entity of an Obligor; or

(ix)   with the consent of the Borrowers;

in each case, such Confidential Information as that Finance Party shall consider appropriate if:

(A)   in relation to paragraphs (b)(i), (b)(ii) and (b)(iii) above, the person to whom the Confidential Information is to be given has entered into a Confidentiality Undertaking except that there shall be no requirement for a Confidentiality Undertaking if the recipient is a professional

EME_ACTIVE-564940/18.11-CEHENDER 12/20/2016 4:04 AM

adviser and is subject to professional obligations to maintain the confidentiality of the Confidential Information;

(B)     in relation to paragraph (b)(iv) above, the person to whom the Confidential Information is to be given has entered into a Confidentiality Undertaking or is otherwise bound by requirements of confidentiality in relation to the Confidential Information they receive and is informed that some or all of such Confidential Information may be price-sensitive information;

(C)     in relation to paragraphs (b)(v), and (b)(vi) and (b)(vii) above, the person to whom the Confidential Information is to be given is informed of its confidential nature and that some or all of such Confidential Information may be price-sensitive information except that there shall be no requirement to so inform if, in the opinion of that Finance Party, it is not practicable so to do in the circumstances;

(c)     to any person appointed by that Finance Party or by a person to whom paragraph (b)(i) or (b)(ii) above applies to provide administration or settlement services in respect of one or more of the Finance Documents including without limitation, in relation to the trading of participations in respect of the Finance Documents, such Confidential Information as may be required to be disclosed to enable such service provider to provide any of the services referred to in this paragraph (c) if the service provider to whom the Confidential Information is to be given has entered into a confidentiality agreement substantially in the form of the LMA Master Confidentiality Undertaking for Use With Administration/Settlement Service Providers or such other form of confidentiality undertaking agreed between the Borrowers and the relevant Finance Party;

(d)     to any rating agency (including its professional advisers) such Confidential Information as may be required to be disclosed to enable such rating agency to carry out its normal rating activities in relation to the Finance Documents and/or the Obligors if the rating agency to whom the Confidential Information is to be given is informed of its confidential nature and that some or all of such Confidential Information may be price-sensitive information.

**40.3     Disclosure to numbering service providers**

(a)     Any Finance Party may disclose to any national or international numbering service provider appointed by that Finance Party to provide identification numbering services in respect of this Agreement, the Facility and/or one or more Obligors the following information:

(i)     names of Obligors;

(ii)     country of domicile of Obligors;

(iii)     place of incorporation of Obligors;

(iv)     date of this Agreement;

(v)     the names of the Agent and the Arranger;

(vi)     date of each amendment of this Agreement;

- 105 -

(vii)    amount of Total Commitments;

(viii)    currency of the Facility;

(ix)    type of Facility;

(x)    ranking of Facility;

(xi)    Termination Date for Facility;

(xii)    changes to any of the information previously supplied pursuant to paragraphs (i) to (xi) above; and

(xiii)    such other information agreed between such Finance Party and the Borrowers,

to enable such numbering service provider to provide its usual syndicated loan numbering identification services.

(b)    The Parties acknowledge and agree that each identification number assigned to this Agreement, the Facility and/or one or more Obligors by a numbering service provider and the information associated with each such number may be disclosed to users of its services in accordance with the standard terms and conditions of that numbering service provider.

(c)    Each Obligor represents that none of the information set out in paragraphs (a)(i) to (a)(xiii) of paragraph (a) above is, nor will at any time be, unpublished price-sensitive information.

(d)    The Agent shall notify the Borrowers and the other Finance Parties of:

(i)    the name of any numbering service provider appointed by the Agent in respect of this Agreement, the Facility and/or one or more Obligors; and

(ii)    the number or, as the case may be, numbers assigned to this Agreement, the Facility and/or one or more Obligors by such numbering service provider.

**40.4**    **Entire agreement**

This Clause 40 (*Confidentiality*) constitutes the entire agreement between the Parties in relation to the obligations of the Finance Parties under the Finance Documents regarding Confidential Information and supersedes any previous agreement, whether express or implied, regarding Confidential Information.

**40.5**    **Inside information**

Each of the Finance Parties acknowledges that some or all of the Confidential Information is or may be price-sensitive information and that the use of such information may be regulated or prohibited by applicable legislation including securities law relating to insider dealing and market abuse and each of the Finance Parties undertakes not to use any Confidential Information for any unlawful purpose.

**40.6**    **Notification of disclosure**

Each of the Finance Parties agrees (to the extent permitted by law and regulation) to inform the Borrowers:

(a)   of the circumstances of any disclosure of Confidential Information made pursuant to paragraph 40.2(b)(iv) of Clause 40.2 (*Disclosure of Confidential Information*) except where such disclosure is made to any of the persons referred to in that paragraph during the ordinary course of its supervisory or regulatory function; and

(b)   upon becoming aware that Confidential Information has been disclosed in breach of this Clause 40 (*Confidentiality*).

**40.7   Continuing obligations**

The obligations in this Clause 40 (*Confidentiality*) are continuing and, in particular, shall survive and remain binding on each Finance Party for a period of 12 months from the earlier of:

(a)   the date on which all amounts payable by the Obligors under or in connection with the Finance Documents have been paid in full and all Commitments have been cancelled or otherwise cease to be available; and

(b)   the date on which such Finance Party otherwise ceases to be a Finance Party.

**41.   COUNTERPARTS**

Each Finance Document may be executed in any number of counterparts, and this has the same effect as if the signatures on the counterparts were on a single copy of the Finance Document.

**42.   GOVERNING LAW**

This Agreement, and any non-contractual obligations arising out of or in connection with it, is governed by English law.

**43.   ENFORCEMENT**

**43.1   Jurisdiction**

(a)   The courts of England have exclusive jurisdiction to settle any dispute arising out of or in connection with this Agreement (including a dispute relating to the existence, validity or termination of this Agreement or any non-contractual obligation arising out of or in connection with this Agreement) (a "**Dispute**").

(b)   The Parties agree that the courts of England are the most appropriate and convenient courts to settle Disputes and accordingly no Party will argue to the contrary.

(c)   This Clause 43.1 is for the benefit of the Finance Parties only.  As a result, no Finance Party shall be prevented from taking proceedings relating to a Dispute in any other courts with jurisdiction.  To the extent allowed by law, the Finance Parties may take concurrent proceedings in any number of jurisdictions.

**43.2   Service of process**

(a)   Without prejudice to any other mode of service allowed under any relevant law, each Obligor:

(i)   irrevocably appoints Law Debenture Corporate Services Limited (currently of Fifth Floor, 100 Wood Street, London, EC2V 7EX) as its agent for service of

process in relation to any proceedings before the English courts in connection with any Finance Document; and

(ii)    agrees that failure by a process agent to notify the relevant Obligor of the process will not invalidate the proceedings concerned.

(b)    If any person appointed as an agent for service of process is unable for any reason to act as agent for service of process, the Borrowers (on behalf of all the Obligors) must immediately (and in any event within five (5) days of such event taking place) appoint another agent on terms acceptable to the Agent. Failing this, the Agent may appoint another agent for this purpose.

**THIS AGREEMENT** has been entered into on the date stated at the beginning of this Agreement.

SCHEDULE 1
THE ORIGINAL PARTIES

PART I
THE OBLIGORS

BORROWERS

| Name of Borrower | Jurisdiction of Incorporation | Registered Address and, if applicable, Registration No. | Address for Communication |
|---|---|---|---|
| CFL Momentum Beheer B.V. | Netherlands | Hoge der A 3-b, 9712 AC Groningen, The Netherlands<br><br>Registration No: 01169092 | Hoge der A 3-b, 9712 AC Groningen, The Netherlands |
| C.V. CFL Momentum | Netherlands | Hoge der A 3-b, 9712 AC Groningen, The Netherlands<br><br>Registration No: 01169500 | Hoge der A 3-b, 9712 AC Groningen, The Netherlands |

GUARANTORS

| Name of Guarantor | Jurisdiction of Incorporation | Registered Address and, if applicable, Registration No. | Address for Communication |
|---|---|---|---|
| Canada Feeder Lines B.V. | Netherlands | Hoge der A 3-b 9712 AC Groningen The Netherlands<br><br>Registration No: 02091435 | Hoge der A 3-b, 9712 AC Groningen, The Netherlands |
| CFL Offshore Participations II B.V. | Netherlands | Hoge der A 3-b 9712 AC Groningen The Netherlands<br><br>Registration No: 63736306 | Hoge der A 3-b, 9712 AC Groningen, The Netherlands |

EME_ACTIVE-564940718.11-CEHENDER 12/20/2016 4:04 AM

PART II
THE ORIGINAL LENDERS

A. ORIGINAL LENDERS

| Name of Original Lender | Commitment | Address for Communication |
|---|---|---|
| ICON Equipment and Corporate Infrastructure Fund Fourteen, L.P. | US$1,258,000 | 3 Park Avenue, 36th Floor New York, NY 10016 U.S.A |
| ICON ECI Fund Fifteen, L.P. | US$5,550,000 | 3 Park Avenue, 36th Floor New York, NY 10016 U.S.A |
| ICON ECI Fund Sixteen | US$592,000 | 3 Park Avenue, 36th Floor New York, NY 10016 U.S.A |

EME_ACTIVE-564940718.11-CEHENDER 12/20/2016 4:04 AM

PART III
ARRANGER, AGENT AND SECURITY AGENT

**ARRANGER**

| Name of Agent | Address for Communication |
|---|---|
| ICON Agent, LLC | 3 Park Avenue, 36th Floor<br>New York, NY 10016<br>U.S.A. |

**AGENT**

| Name of Agent | Address for Communication |
|---|---|
| ICON Agent, LLC | 3 Park Avenue, 36th Floor<br>New York, NY 10016<br>U.S.A. |

**SECURITY AGENT**

| Name of Security Agent | Address for Communication |
|---|---|
| ICON Agent, LLC | 3 Park Avenue, 36th Floor<br>New York, NY 10016<br>U.S.A. |

EME_ACTIVE-564940718.11-CEHENDER 12/20/2016 4:04 AM

## SCHEDULE 2
## CONDITIONS PRECEDENT

### PART I
### INITIAL CONDITIONS PRECEDENT

(1)   **Obligors**

(a)   A copy of the constitutional documents of each Obligor.

(b)   A copy of a resolution of the board of directors of each Obligor or, in the case of the Beneficial Owner, a copy of the resolution of all partners of the Beneficial Owner:

    (i)   approving the terms of, and the transactions contemplated by, the Finance Documents to which it is a party and resolving that it execute, deliver and perform the Finance Documents to which it is a party;

    (ii)   authorising a specified person or persons to execute the Finance Documents to which it is a party on its behalf; and

    (iii)   authorising a specified person or persons, on its behalf, to sign and/or despatch all documents and notices (including, if relevant, any Utilisation Request) to be signed and/or despatched by it under or in connection with the Finance Documents to which it is a party.

(c)   A copy of a resolution of the general meeting of each Obligor (to the extent applicable), approving the terms of, and the transactions contemplated by, the Finance Documents to which that Obligor is a party.

(d)   An original of the power of attorney, if necessary notarised and legalised or apostilled, of any Obligor authorising a specified person or persons to execute the Finance Documents to which it is a party.

(e)   A specimen of the signature of each person authorised by the resolution referred to in paragraph (b) above.

(f)   A certificate of goodstanding for each Obligor (or equivalent in its jurisdiction of incorporation) or, for any Dutch Obligor, an extract from the Dutch trade register, in each case dated not more than ten (10) days prior to the Utilisation Date;

(g)   A certificate of each Obligor (signed by a director) confirming that borrowing or guaranteeing or securing, as appropriate, the Total Commitments would not cause any borrowing, guarantee, security or similar limit binding on it to be exceeded.

(h)   A certificate of an authorised signatory of the relevant Obligor certifying that each copy document relating to it specified in this Part I is correct, complete and in full force and effect as at a date no earlier than the date of this Agreement.

(2)   **Documents**

(a)   Copies of the Charter and the Sub-Charter.

(b)   A duly executed original of this Agreement.

(c)   A duly executed original of any Fee Letter.

- 112 -

(d)     A duly executed original of the Share Pledge together with all certificates in respect of the shares of the Legal Owner and any other documents required thereunder.

(e)     A duly executed original of the Account Security in respect of the Earnings Account.

**(3)     Financial Information**

(a)     The Original Financial Statements.

(b)     Copy of the bank mandate for the Earnings Account.

**(4)     Valuations and Surveys**

(a)     A copy of the Initial Valuation.

**(5)     Insurance**

(a)     Evidence that the insurance cover in force in respect of the Vessel complies with the terms of this Agreement and the necessary premia have been paid.

**(6)     Other documents and evidence**

(a)     Evidence that any process agent referred to in Clause 43.2 (*Service of process*) (if not an Obligor) has accepted its appointment.

(b)     Evidence that any other fees, and the costs and expenses then due from the Borrowers pursuant to 10 (*Fees*) and Clause 15 (*Costs and expenses*) have been paid or will be paid by the Utilisation Date.

(c)     If applicable, a copy of (i) the request for advice from each works council (*ondernemingsraad*) or central or European works council with jurisdiction over the transactions contemplated by the Finance Documents and (ii) the unconditional positive advice from such works council.

(d)     A copy of any other authorisation or other document, opinion or assurance which the Agent considers to be necessary or desirable (if it has notified the Borrowers accordingly) in connection with the entry into and performance of the transactions contemplated by any Finance Document or for the validity and enforceability of any Finance Document.

(d)     Such evidence as the Agent may require for the Finance Parties to be able to satisfy each of their "know your customer" or similar identification procedures in relation to the transactions contemplated by the Finance Documents.

**PART II**
**CONDITIONS PRECEDENT TO UTILISATION**

(1)     **Corporate documents**

A certificate of an authorised signatory of each Borrower certifying that each copy document relating to it specified in this Part II is correct, complete and in full force and effect as at a date no earlier than the Utilisation Date.

(2)     **Borrowers**

A certificate of an authorised signatory of each other Obligor which is a party to the Security Documents required to be executed prior to the Utilisation Date certifying that each copy document relating to it specified in this Part II is correct, complete and in full force and effect as at a date no earlier than the Utilisation Date

(3)     **Release of Existing Security**

An original of the Deed of Release, together with evidence satisfactory to the Agent of its due execution by the parties to it.

(4)     **Ship and other security**

(a)     A duly executed original of the Mortgage, together with documentary evidence that the Mortgage has been duly recorded as a valid first preferred ship mortgage in accordance with the laws of the jurisdiction of its Approved Flag.

(b)     Duly executed originals of the General Assignment, Owner Assignment, the Charterer Assignment and Direct Agreement and of each document to be delivered thereunder.

(c)     Documentary evidence that the Vessel:

(i)     is definitively and permanently registered in the name of the Legal Owner under the Approved Flag;

(ii)    is in the absolute and unencumbered ownership of the Borrowers save as contemplated by the Finance Documents; and

(iii)   maintains its Classification with the Classification Society free of all overdue recommendations and conditions of the Classification Society.

(d)     Documents establishing that the Vessel will, as from the Utilisation Date, be managed technically by the Approved Technical Manager on terms acceptable to the Agent acting with the authorisation of all of the Lenders, together with:

(i)     a Manager's Undertaking for the Approved Technical Manager; and

(ii)    copies of the Approved Technical Manager's Document of Compliance and of the Vessel's Safety Management Certificate (together with any other details of the applicable safety management system which the Agent requires) and of any other documents required under the ISM Code and the ISPS Code in relation to the Vessel including, without limitation, an ISSC.

(4)     **Legal opinions**

- 114 -

(a)   A legal opinion of Reed Smith LLP, legal advisers to the Arranger and the Agent in England, substantially in the form distributed to the Original Lenders prior to signing this Agreement.

(b)   A legal opinion of Loyens & Loeff N.V., legal advisers to the Arranger and the Agent in the Netherlands, substantially in the form distributed to the Original Lenders prior to signing this Agreement.

(c)   A legal opinion of Gorrissen Federspiel Advokatpartnerselskab, legal advisers to the Arranger and the Agent in Denmark, substantially in the form distributed to the Original Lenders prior to signing this Agreement.

(d)   A legal opinion of Conyers Dill & Pearman Limited, legal advisers to the Arranger and the Agent in Bermuda, substantially in the form distributed to the Original Lenders prior to signing this Agreement.

## PART III
## CONDITIONS SUBSEQUENT

(1)     **Financial Information**

Copies of the bank mandates for the Retention Account and Dry Dock Reserve Account.

(2)     **Documents**

A duly executed original of the Account Security in respect of the Retention Account and the Dry Dock Reserve Account (the **"Further Account Security"**).

(3)     **Corporate Documents**

(a)     A copy of the resolution of the board of directors of the Legal Owner and a copy of the resolution of all partners of the Beneficial Owner:

(i)      approving the terms of, and the transactions contemplated by, the Further Account Security and resolving that it execute, deliver and perform the     Further Account Security;

(ii)     authorising a specified person or persons to execute the Further Account Security on its behalf; and

(iii)    authorising a specified person or persons, on its behalf, to sign and/or     despatch all documents and notices to be signed and/or despatched by it under or in connection with the Further Account Security.

(b)     If applicable, a copy of a resolution of the general meeting of each Borrower, approving the terms of, and the transactions contemplated by, the Further Account Security.

(c)     An original of the power of attorney, if necessary notarised and legalised or apostilled, of any Borrower authorising a specified person or persons to execute the Further Account Security.

(d)     A specimen of the signature of each person authorised by the resolutions referred to in paragraph 3(a) above.

(e)     A certificate of an authorised signatory of each Borrower certifying that each copy document relating to it specified in this Part III is correct, complete and in full force and effect.

(d)     **Legal Opinion**

A legal opinion of Loyens & Loeff N.V., legal advisers to the Arranger and the Agent in the Netherlands, in relation to the Further Account Security.

EME_ACTIVE-564940718.11-CEHENDER 12/20/2018 4:04 AM

**SCHEDULE 3**
**UTILISATION REQUEST**

From:   CFL Momentum Beheer B.V.

        C.V. CFL Momentum

To:   ICON Agent, LLC

Dated:

Dear Sirs

**CFL Momentum Beheer B.V. and C.V. CFL Momentum  – Term Loan Facility Agreement for up to US$7,400,000 dated [        ] 2016 (the "Agreement")**

(1)   We refer to the Agreement.  This is an Utilisation Request.  Terms defined in the Agreement have the same meaning in this Utilisation Request unless given a different meaning in this Utilisation Request.

(2)   We wish to borrow the Loan in relation to the Vessel on the following terms:

    Proposed Utilisation Date:        [     ] (or, if that is not a Business Day, the next Business Day)

    Amount:        [     ] or, if less, the Available Facility

(3)   We confirm that each condition specified in Clause 4.1 (*Initial Conditions Precedent*) is satisfied on the date of this Utilisation Request.

(4)   The proceeds of the Loan should be credited to [account].

(5)   The purpose of the Loan is [                ].

(6)   [We confirm that you may [disburse the Loan through [     ] and] deduct from the Loan (although the amount of the Loan will remain the amount requested above):

    (a)   the outstanding balance of the arrangement fee being £[            ];

    (b)   any commitment fee due and payable at the Utilisation Date;

    (c)   [              ] fees].

(7)   This Utilisation Request is irrevocable.

Yours faithfully

.......................................
authorised signatory for
**CFL Momentum Beheer B.V.**

.......................................
authorised signatory for
**C.V. CFL Momentum**
represented by its general partner
**CFL Momentum Beheer B.V.**

EME_ACTIVE-564940718.11-CEHENDER 12/20/2016 4:04 AM

**SCHEDULE 4**
**FORM OF TRANSFER CERTIFICATE**

To:    ICON Agent, LLC as Agent

From:  [*The Existing Lender*] (the "**Existing Lender**") and [*The New Lender*] (the "**New Lender**")

Dated:

**CFL Momentum Beheer B.V. and C.V. CFL Momentum – Term Loan Facility Agreement of up to US$7,400,000 dated [     ] 2016 (the "Agreement")**

(1)    We refer to the Agreement.  This is a Transfer Certificate.  Terms defined in the Agreement have the same meaning in this Transfer Certificate unless given a different meaning in this Transfer Certificate.

(2)    We refer to 27.5 (*Procedure for transfer*):

(a)    The Existing Lender and the New Lender agree to the Existing Lender transferring to the New Lender by novation and in accordance with Clause 27.5 (*Procedure for transfer*) all of the Existing Lender's rights and obligations under the Agreement and the other Finance Documents which relate to that portion of the Existing Lender's Commitment and participation in the Loan under the Agreement as specified in the Schedule.

(b)    The proposed Transfer Date is [     ].

(c)    The Facility Office and address, fax number and attention details for notices of the New Lender for the purposes of Clause 35.2 (*Addresses*) are set out in the Schedule.

(3)    The New Lender expressly acknowledges the limitations on the Existing Lender's obligations set out in paragraph (iii) of Clause 27.4 (*Limitation of responsibility of Existing Lenders*).

(4)    The New Lender confirms, for the benefit of the Agent and without liability to any Obligor, that it is:

(a)    [a Qualifying Lender (other than a Treaty Lender);]

(b)    [a Treaty Lender;]

(c)    [not a Qualifying Lender].[1]

(5)    [The New Lender confirms that the person beneficially entitled to interest payable to that Lender in respect of an advance under a Finance Document is either:

(a)    a company resident in the United Kingdom for United Kingdom tax purposes;

(b)    a partnership each member of which is:

(i)    a company so resident in the United Kingdom; or

(ii)    a company not so resident in the United Kingdom which carries on a trade in the United Kingdom through a permanent establishment and which brings

---

[1] Delete as applicable - each New Lender is required to confirm which of these three categories it falls within.

EME_ACTIVE-564940718.11-CEHENDER 12/20/2016 4:04 AM

into account in computing its chargeable profits (within the meaning of section 19 of the CTA) the whole of any share of interest payable in respect of that advance that falls to it by reason of Part 17 of the CTA; or

(c)    a company not so resident in the United Kingdom which carries on a trade in the United Kingdom through a permanent establishment and which brings into account interest payable in respect of that advance in computing the chargeable profits (within the meaning of section 19 of the CTA) of that company.][2]

(6)    [The New Lender confirms that it holds a passport under the HMRC DT Treaty Passport scheme (reference number [     ]) and is tax resident in [     ][3], so that interest payable to it by borrowers is generally subject to full exemption from UK withholding tax, and requests that the Borrowers are notified that the New Lender wishes that scheme to apply to this Agreement.][4]

[6/7].    This Transfer Certificate may be executed in any number of counterparts and this has the same effect as if the signatures on the counterparts were on a single copy of this Transfer Certificate.

[7/8].    This Transfer Certificate and any non-contractual obligations arising out of or in connection with it is governed by English law.

[8/9].    This Transfer Certificate has been entered into on the date stated at the beginning of this Transfer Certificate.

Note:  The execution of this Transfer Certificate may not transfer a proportionate share of the Existing Lender's interest in the Transaction Security in all jurisdictions. It is the responsibility of the New Lender to ascertain whether any other documents or other formalities are required to perfect a transfer of such a share in the Existing Lender's Transaction Security in any jurisdiction and, if so, to arrange for execution of those documents and completion of those formalities.

---

[2] Include if New Lender comes within paragraph (i)(B) of the definition of Qualifying Lender in Clause 11.1(*Definitions*).
[3] Insert jurisdiction of tax residence.
[4] Include if New Lender holds a passport under the HMRC DT Treaty Passport Scheme and wishes that scheme to apply to the Agreement.

**COMMITMENT/RIGHTS AND OBLIGATIONS TO BE TRANSFERRED**

*[insert relevant details]*

*[Facility Office address, fax number and attention details for notices and account details for payments,]*

[Existing Lender]          [New Lender]

By:                        By:

This Transfer Certificate is accepted by the Agent and the Transfer Date is confirmed as [ ].

[Agent]

By:

**SCHEDULE 5**
**FORM OF ASSIGNMENT AGREEMENT**

To:     ICON Agent, LLC as Agent and CFL Momentum Beheer B.V. and C.V. CFL Momentum as
         Borrowers, for and on behalf of each Obligor

From:   [the *Existing Lender*] (the "**Existing Lender**") and [the *New Lender*] (the "**New Lender**")

Dated:

**CFL Momentum Beheer B.V. and C.V. CFL Momentum – Term Loan Facility**
**Agreement of up to US$7,400,000 dated [      ] 2016 (the "Agreement")**

(1)     We refer to the Agreement. This is an Assignment Agreement.  Terms defined in the
         Agreement have the same meaning in this Assignment Agreement unless given a different
         meaning in this Assignment Agreement.

(2)     We refer to Clause 27.6(*Procedure for assignment*):

    (a)     The Existing Lender assigns absolutely to the New Lender all the rights of the
         Existing Lender under the Agreement and the other Finance Documents which relate
         to that portion of the Existing Lender's Commitment and participations in the Loan
         under the Agreement as specified in the Schedule.

    (b)     The Existing Lender is released from all the obligations of the Existing Lender which
         correspond to that portion of the Existing Lender's Commitment and participations in
         the Loan under the Agreement specified in the Schedule.

    (c)     The New Lender becomes a Party as a Lender and is bound by obligations equivalent
         to those from which the Existing Lender is released under paragraph (b) above.[5]

(3)     The proposed Transfer Date is [      ].

(4)     On the Transfer Date the New Lender becomes Party to the Finance Documents as a Lender.

(5)     The Facility Office and address, fax number and attention details for notices of the New
         Lender for the purposes of Clause 35.2(*Addresses*) are set out in the Schedule.

(6)     The New Lender expressly acknowledges the limitations on the Existing Lender's obligations
         set out in paragraph (c) of Clause 27.4(*Limitation of responsibility of Existing Lenders*).

(7)     The New Lender confirms, for the benefit of the Agent and without liability to any Obligor,
         that it is:

    (a)     [a Qualifying Lender falling (other than a Treaty Lender);]

    (b)     [a Treaty Lender;]

    (c)     [not a Qualifying Lender].[6]

---

[5] If the Assignment Agreement is used in place of a Transfer Certificate in order to avoid a novation of
rights/obligations for reasons relevant to a civil jurisdiction, local law advice should be sought to check the
suitability of the Assignment Agreement due to the assumption of obligations contained in paragraph 2(c). This
issue should be addressed at primary documentation stage.
[6] Delete as applicable - each New Lender is required to confirm which of these three categories it falls within.

- 122 -

(8)     [The New Lender confirms that the person beneficially entitled to interest payable to that Lender in respect of an advance under a Finance Document is either:

    (a)     a company resident in the United Kingdom for United Kingdom tax purposes; or

    (b)     a partnership each member of which is:

        (i)     a company so resident in the United Kingdom; or

        (ii)    a company not so resident in the United Kingdom which carries on a trade in the United Kingdom through a permanent establishment and which brings into account in computing its chargeable profits (within the meaning of section 19 of the CTA) the whole of any share of interest payable in respect of that advance that falls to it by reason of Part 17 of the CTA; or

    (c)     a company not so resident in the United Kingdom which carries on a trade in the United Kingdom through a permanent establishment and which brings into account interest payable in respect of that advance in computing the chargeable profits (within the meaning of section 19 of the CTA) of that company.][7]

(9)     [The New Lender confirms that it holds a passport under the HMRC DT Treaty Passport scheme (reference number [    ]) and is tax resident in [    ][8], so that interest payable to it by borrowers is generally subject to full exemption from UK withholding tax, and requests that that the Borrowers are notified that the New Lender wishes that scheme to apply to this Agreement.][9]

[8/9].   This Assignment Agreement acts as notice to the Agent (on behalf of each Finance Party) and, upon delivery in accordance with Clause 27.7 (*Copy of Transfer Certificate or Assignment Agreement to Borrowers*), to the Borrowers (on behalf of each Obligor) of the assignment referred to in this Assignment Agreement.

[9/10].  This Assignment Agreement may be executed in any number of counterparts and this has the same effect as if the signatures on the counterparts were on a single copy of this Assignment Agreement.

[10/11]  This Assignment Agreement and any non-contractual obligations arising out of or in connection with it is governed by English law.

[11/12]  This Assignment Agreement has been entered into on the date stated at the beginning of this Assignment Agreement.

---

[7] Include only if New Lender is a UK Non-Bank Lender - i.e. falls within paragraph (i)(B) of the definition of Qualifying Lender in Clause 11.1(*Definitions*).
[8] Insert jurisdiction of tax residence.
[9] Include if New Lender holds a passport under the HMRC DT Treaty Passport Scheme and wishes that scheme to apply to the Agreement.

**RIGHTS TO BE ASSIGNED AND OBLIGATIONS TO BE RELEASED AND UNDERTAKEN**

[*insert relevant details*]

[*Facility office address, fax number and attention details for notices and account details for payments*]

[Existing Lender]                                        [New Lender]

By:                                                              By:

This Assignment Agreement is accepted by the Agent and the Transfer Date is confirmed as [ ].

Signature of this Assignment Agreement by the Agent constitutes confirmation by the Agent of receipt of notice of the assignment referred to herein, which notice the Agent receives on behalf of each Finance Party.

[Agent]

By:

Note: The execution of this Assignment Agreement may not transfer a proportionate share of the Existing Lender's interest in the Security in all jurisdictions. It is the responsibility of the New Lender to ascertain whether any other documents or other formalities are required to perfect a transfer of such a share in the Existing Lender's Security in any jurisdiction and, if so, to arrange for execution of those documents and completion of those formalities.

EME_ACTIVE-564940718.11-CEHENDER 12/20/2016 4:04 AM

SCHEDULE 6
FORM OF COMPLIANCE CERTIFICATE

To:     ICON Agent, LLC as Agent

From:   CFL Momentum Beheer B.V.
        C.V. CFL Momentum

Dated:

Dear Sirs

**CFL Momentum Beheer B.V. and C.V. CFL Momentum –Term Loan Facility Agreement of up to US$7,400,000 dated [       ] 2016 (the "Agreement")**

(1)     We refer to the Agreement.  This is a Compliance Certificate.  Terms defined in the Agreement have the same meaning when used in this Compliance Certificate unless given a different meaning in this Compliance Certificate.

(2)     We confirm that:

        (a)     [     ]; [and]

        (b)     [     ]; [and]

        (c)     [     ].

(3)     We set out below calculations establishing the figures in paragraph (2):

        [     ].

(4)     [We confirm that no Default is continuing.][10]

        Signed: …................          …………………...............

        Director                         Director
        of [Borrowers]                   of [Borrower]

        [insert applicable certification language][11]

        …..................

        for and on behalf of

        [name of auditors of the Borrowers][12]

---

[10] If this statement cannot be made, the certificate should identify any Default that is continuing and the steps, if any, being taken to remedy it.
[11] To be agreed with the Borrower's auditors and the Lenders prior to signing the Agreement.
[12] Only applicable if the Compliance Certificate accompanies the audited financial statements and is to be signed by the auditors.  To be agreed with the Borrower's auditors prior to signing the Agreement.

EME_ACTIVE-564940718.11-CEHENDER 12/20/2016 4:04 AM

**SCHEDULE 7**
**LMA FORM OF CONFIDENTIALITY UNDERTAKING**

**THIS CONFIDENTIALITY UNDERTAKING** is dated [    ] and made between:

(1)   [    ]; and

(2)   [    ].

Either party (in this capacity the **"Purchaser"**) may from time to time consider acquiring an interest from the other party (in this capacity the **"Seller"**) in certain Agreements which, subject to the Agreements, may be by way of novation, assignment, the entering into, whether directly or indirectly, of a sub-participation or any other transaction under which payments are to be made or may be made by reference to one or more relevant Finance Documents and/or one or more relevant Obligors or by way of investing in or otherwise financing, directly or indirectly, any such novation, assignment, sub-participation or other transaction (each an **"Acquisition"**). In consideration of the Seller agreeing to make available to the Purchaser certain information in relation to each Acquisition it is agreed as follows:

1.   CONFIDENTIALITY UNDERTAKING

The Purchaser undertakes in relation to each Acquisition made or which may be made by it (a) to keep all Confidential Information which the Seller supplies to the Purchaser in relation to that Acquisition confidential and not to disclose it to anyone, save to the extent permitted by paragraph 2 below and to ensure that all Confidential Information which the Seller supplies to the Purchaser in relation to that Acquisition is protected with security measures and a degree of care that would apply to the Purchaser's own confidential information and (b) until that Acquisition is completed, to use the Confidential Information which the Seller supplies to the Purchaser in relation to that Acquisition only for the Permitted Purpose.

2.   PERMITTED DISCLOSURE

The Purchaser may disclose in relation to each Acquisition made or which may be made by it:

2.1   to any of its Affiliates and any of its or their officers, directors, employees, professional advisers and auditors such Confidential Information as the Purchaser shall consider appropriate if any person to whom such Confidential Information is to be given pursuant to this paragraph 2.1 is informed in writing of its confidential nature and that some or all of such Confidential Information may be price-sensitive information except that there shall be no such requirement to so inform if the recipient is subject to professional obligations to maintain the confidentiality of the information or is otherwise bound by requirements of confidentiality in relation to such Confidential Information;

2.2   subject to the requirements of the relevant Agreement, to any person:

(a)   to (or through) whom the Purchaser assigns or transfers (or may potentially assign or transfer) all or any of its rights and/or obligations which it may acquire under that Agreement such Confidential Information which the Seller supplies to the Purchaser in relation to that Acquisition as the Purchaser shall consider appropriate if the person

- 126 -

to whom such Confidential Information is to be given pursuant to this sub-paragraph (a) of paragraph 2.2 has delivered a letter to the Purchaser in equivalent form to this undertaking;

(b)     with (or through) whom the Purchaser enters into (or may potentially enter into) any sub-participation in relation to, or any other transaction under which payments are to be made or may be made by reference to that Agreement or any relevant Obligor such Confidential Information which the Seller supplies to the Purchaser in relation to that Acquisition as the Purchaser shall consider appropriate if the person to whom such Confidential Information is to be given pursuant to this sub-paragraph (b) of paragraph 2.2 has delivered a letter to the Purchaser in equivalent form to this undertaking;

(c)     to whom information is required or requested to be disclosed by any governmental, banking, taxation or other regulatory authority or similar body, the rules of any relevant stock exchange or pursuant to any applicable law or regulation such Confidential Information which the Seller supplies to the Purchaser in relation to that Acquisition as the Purchaser shall consider appropriate; and

2.3     notwithstanding paragraphs 2.1 and 2.2. above, Confidential Information to such persons to whom, and on the same terms as, a Finance Party is permitted to disclose such Confidential Information under the Agreement to which that Acquisition relates, as if such permissions were set out in full in this undertaking for the purposes of that Acquisition and as if references in those permissions to Finance Party were references to the Purchaser for the purposes of that Acquisition.

3.     NOTIFICATION OF DISCLOSURE

The Purchaser agrees in relation to each Acquisition made or which may be made by it (to the extent permitted by law and regulation) to inform the Seller:

3.1     of the circumstances of any disclosure of Confidential Information made pursuant to sub-paragraph (c) of paragraph 2.2 above except where such disclosure is made to any of the persons referred to in that paragraph during the ordinary course of its supervisory or regulatory function; and

3.2     upon becoming aware that Confidential Information relating to that Acquisition has been disclosed in breach of this undertaking.

4.     RETURN OF COPIES

If the Purchaser does not enter into an Acquisition and the Seller so requests in writing, the Purchaser shall return or destroy all Confidential Information supplied to the Purchaser by the Seller in relation to that Acquisition and destroy or permanently erase (to the extent technically practicable) all copies of such Confidential Information made by the Purchaser and use its reasonable endeavours to ensure that anyone to whom the Purchaser has supplied any such Confidential Information destroys or permanently erases (to the extent technically practicable) such Confidential Information and any copies made by them, in each case save to the extent that the Purchaser or the recipients are required to retain any such Confidential Information by any applicable law, rule or regulation or by any competent judicial, governmental, supervisory or regulatory body or in accordance with internal policy, or where the Confidential Information has been disclosed under sub-paragraph (c) of paragraph 2.2 above.

EME_ACTIVE-564940718.11-CEHENDER 12/20/2018 4:04 AM

5.      CONTINUING OBLIGATIONS

The obligations in this undertaking are continuing and, in particular, shall survive and remain binding on the Purchaser in relation to each Acquisition made or which may be made by it until (a) if the Purchaser becomes a party to the Agreement to which that Acquisition relates as a lender of record, the date on which the Purchaser becomes such a party to such Agreement; (b) if the Purchaser enters into that Acquisition but it does not result in the Purchaser becoming a party to the Agreement to which that Acquisition relates as a lender of record, the date falling [twelve] months after the date on which all of the Purchaser's rights and obligations contained in the documentation entered into to implement that Acquisition have terminated; or (c) in any other case the date falling [twelve] months after the date of the Purchaser's final receipt (in whatever manner) of any Confidential Information in relation to that Acquisition.

6.      NO REPRESENTATION; CONSEQUENCES OF BREACH, ETC

The Purchaser acknowledges and agrees that, in relation to each Acquisition made or which may be made by it:

6.1     neither the Seller, nor any member of the relevant Group nor any of the Seller's or the relevant Group's respective officers, employees or advisers (each a "**Relevant Person**") (i) make any representation or warranty, express or implied, as to, or assume any responsibility for, the accuracy, reliability or completeness of any of the Confidential Information supplied by the Seller to the Purchaser in relation to that Acquisition or any other information supplied by the Seller to the Purchaser in relation to that Acquisition or the assumptions on which it is based or (ii) shall be under any obligation to update or correct any inaccuracy in the Confidential Information supplied by the Seller to the Purchaser in relation to that Acquisition or any other information supplied by the Seller to the Purchaser in relation to that Acquisition or be otherwise liable to the Purchaser or any other person in respect of the Confidential Information supplied by the Seller to the Purchaser in relation to that Acquisition or any such information; and

6.2     the Seller or members of the relevant Group may be irreparably harmed by the breach of the terms of this undertaking and damages may not be an adequate remedy; each Relevant Person may be granted an injunction or specific performance for any threatened or actual breach of the provisions of this undertaking by the Purchaser.

7.      ENTIRE AGREEMENT: NO WAIVER; AMENDMENTS, ETC

7.1     This undertaking constitutes the entire agreement between the Seller and the Purchaser in relation to the Purchaser's obligations regarding Confidential Information and supersedes any previous agreement, whether express or implied, regarding Confidential Information.

7.2     No failure to exercise, nor any delay in exercising any right or remedy under this undertaking will operate as a waiver of any such right or remedy or constitute an election to affirm this letter.  No election to affirm this letter will be effective unless it is in writing.  No single or partial exercise of any right or remedy will prevent any further or other exercise or the exercise of any other right or remedy under this undertaking.

7.3     The terms of this undertaking and the Purchaser's obligations under this undertaking may only be amended or modified by written agreement between the parties.

8.   INSIDE INFORMATION

The Purchaser acknowledges that some or all of the Confidential Information is or may be price-sensitive information and that the use of such information may be regulated or prohibited by applicable legislation including securities law relating to insider dealing and market abuse and the Purchaser undertakes not to use any Confidential Information for any unlawful purpose.

9.   NATURE OF UNDERTAKINGS

The undertakings given by the Purchaser in this undertaking are given to the Seller and are also given for the benefit of the relevant Company and each other member of the relevant Group.

10.  THIRD PARTY RIGHTS

10.1  Subject to this paragraph 10 and to paragraphs 6 and 9, a person who is not a party to this undertaking has no right under the Contracts (Rights of Third Parties) Act 1999 (the **"Third Parties Act"**) to enforce or to enjoy the benefit of any term of this undertaking.

10.2  The Relevant Persons may enjoy the benefit of the terms of paragraphs 6 and 9 subject to and in accordance with this paragraph 10 and the provisions of the Third Parties Act.

10.3  Notwithstanding any provisions of this undertaking, the parties to this undertaking do not require the consent of any Relevant Person to rescind or vary this undertaking at any time.

11.  GOVERNING LAW AND JURISDICTION

11.1  This undertaking and any non-contractual obligations arising out of or in connection with it (including any non-contractual obligations arising out of the negotiation of any Acquisition) are governed by English law.

11.2  The courts of England have non-exclusive jurisdiction to settle any dispute arising out of or in connection with this undertaking (including a dispute relating to any non-contractual obligation arising out of or in connection with either this undertaking or the negotiation of any Acquisition).

12.  DEFINITIONS

In this undertaking terms defined in the relevant Agreement (as defined below) shall, unless the context otherwise requires, have the same meaning and:

**"Agreement"** means any credit agreement in which the Seller has an interest and which requires the Seller to obtain from the Purchaser an undertaking in or substantially in the form of this undertaking as a condition to permitting disclosure by the Seller of certain information to the Purchaser.

**"Company"** means, in relation to each Acquisition, the principal company party to the relevant Agreement.

**"Confidential Information"** means, in relation to each Acquisition, all information relating to the relevant Company, any relevant Obligor, the relevant Group, the relevant Finance Documents, [the/a] relevant Facility and/or that Acquisition which is received by the Purchaser in relation to the relevant Finance Documents or [the/a] relevant Facility from the Seller or any

EMF_ACTIVE-564940718.11-CEHENDER 12/20/2016 4:04 AM

of its affiliates or advisers, in whatever form, and includes information given orally and any document, electronic file or any other way of representing or recording information which contains or is derived or copied from such information but excludes information that:

(a)     is or becomes public information other than as a direct or indirect result of any breach by the Purchaser of this undertaking; or

(b)     is identified in writing at the time of delivery as non-confidential by the Seller or its advisers; or

(c)     is known by the Purchaser before the date the information is disclosed to the Purchaser by the Seller or any of its affiliates or advisers or is lawfully obtained by the Purchaser after that date, from a source which is, as far as the Purchaser is aware, unconnected with the relevant Group and which, in either case, as far as the Purchaser is aware, has not been obtained in breach of, and is not otherwise subject to, any obligation of confidentiality.

"**Group**" means, in relation to each Acquisition, the relevant Company and its subsidiaries for the time being (as such term is defined in the Companies Act 2006).

"**Permitted Purpose**" means, in relation to each Acquisition, considering and evaluating whether to enter into that Acquisition.

**This undertaking has been entered into on the date stated at the beginning of this undertaking**

EME_ACTIVE-564940716.11-CEHENDER 12/20/2016 4:04 AM

**SIGNATURES**

[   ]

By:


[   ]

By:

EME_ACTIVE-564940718.11-CEHENDER 12/20/2016 4.04 AM

**SCHEDULE 8**
**TIMETABLES**

| | |
|---|---|
| Delivery of a duly completed Utilisation Request (Clause 5.1 (*Delivery of a Utilisation Request*) | Five (5) Business Days before the intended Utilisation Date |
| Agent notifies the Lenders of the Loan in accordance with Clause 5.4 (*Lenders' participation*) | Three (3) Business Days before the intended Utilisation Date |

EME_ACTIVE-584940718.11-CEHENDER 12/20/2016 4:04 AM

**SCHEDULE 9**
**DETAILS OF VESSEL**

**VESSEL A**

| | |
|---|---|
| Name of Ship: | MOMENTUM SCAN |
| Description: | 10,000 DWT multipurpose vessel |
| Legal Owner: | CFL Momentum Beheer B.V. |
| Flag State: | Netherlands |
| IMO Number: | 9534432 |
| Classification: | I HULL MACH General cargo ship -heavycargo(177) – equipped for carriage of containers.  Unrestricted navigation. AUT-UMS,     MON-SHAFT,     CLEANSHIP     (C), INWATERSURVEY |
| Classification Society: | Bureau Veritas |

- 133 -

**EXECUTION PAGE**

**BORROWERS**

Signed by *mr. A.J. Gunnink*,
for and on behalf of
**CFL MOMENTUM BEHEER B.V.**

In the presence of:- *mr. des. F.A. Keuning*

Signed by *mr. A.J. Gunnink*,
for and on behalf of
**C.V. CFL MOMENTUM,**
represented by its general partner
**CFL MOMENTUM BEHEER B.V.**

In the presence of:- *mr. des. F.A. Keuning*

**GUARANTORS**

Signed by *mr. A.J. Gunnink*,
for and on behalf of
**CANADA FEEDER LINES B.V.**

In the presence of:- *mr. des. F.A. Keuning*

Signed by *mr. A.J. Gunnink*,
for and on behalf of
**CFL OFFSHORE PARTICIPATIONS II
B.V.**

In the presence of:- *mr. des. F.A. Keuning*

**ORIGINAL LENDERS**

Signed by *Michael A. Reisner*,     )
for and on behalf of **ICON GP 14, LLC**  )
as General Partner of  )
**ICON EQUIPMENT AND CORPORATE**  )
**INFRASTRUCTURE FUND FOURTEEN,**  )
**L.P.**

In the presence of:-

                                                 **Michael A. Reisner**
                                                   Co-President
                                                   and
                                  Co-Chief Executive Officer

Signed by *Michael A. Reisner*,     )
for and on behalf of **ICON CP 15, LLC**  )
as General Partner of  )
**ICON ECI FUND FIFTEEN, L.P.**  )

In the presence of:-

                                                 **Michael A. Reisner**
                                                   Co-President
                                                   and
                                  Co-Chief Executive Officer

Signed by *Michael A. Reisner*,     )
for and on behalf of **ICON MT 16, LLC**  )
as Managing Owner of  )
**ICON ECI FUND SIXTEEN**  )

In the presence of:-

                                                 **Michael A. Reisner**
                                                   Co-President
                                                   and
                                  Co-Chief Executive Officer

**ARRANGER**

Signed by *Michael A. Reisner*,     )
for and on behalf of **IEMC, LLC**  )
as Manager of  )
**ICON AGENT, LLC**  )

In the presence of:-

                                                 **Michael A. Reisner**
                                                   Co-President
                                                   and
                                  Co-Chief Executive Officer

EME_ACTIVE-565375768.1-RSHO 12/19/2016 5:56 PM

**AGENT**

Signed by *Michael A. Reisner* ,
for and on behalf of **IEMC, LLC**
as Manager of
**ICON AGENT, LLC**

In the presence of:-

)
)
)
)

.....................................

**Michael A. Reisner**
Co-President
and
Co-Chief Executive Officer

**SECURITY AGENT**

Signed by *Michael A. Reisner* ,
for and on behalf of **IEMC, LLC**
as Manager of
**ICON AGENT, LLC**

In the presence of:-

)
)
)
)

.....................................

**Michael A. Reisner**
Co-President
and
Co-Chief Executive Officer

- 136 -